IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

Eugene Robison,                                             Civil Action No. 4:09-cv-2056

    Plaintiffs,                                                   Jury Demanded

vs.

SGE Management, LLC; Stream Gas & Electric, Ltd.; Stream SPE GP, et al,

    Defendants.
_____/

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO
<u>PLAINTIFF'S MOTION FOR CLASS CERTIFICATION</u>**

## **TABLE OF CONTENTS**

INDEX OF AUTHORITIES ................................................................................................ II

INTRODUCTION .............................................................................................................. 1

I.  REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS ........................................................................................ 1

    1)  REPLY TO SECTION II (A)(2) AND (3) ............................................. 3

    2)  REPLY TO DEFENDANTS' RESPONSE TO STATEMENT OF FACTS SUBSECTION B – INCOME DISCLOSURES ........................................................................................... 5

II. REPLY TO ARGUMENT AND AUTHORITIES ............................................. 6

    1)  REPLY TO ARGUMENT RELATING TO ARBITRATION CLAUSE ...................................................................................... 6

    2)  REPLY TO F.R.C.P. 23(A) ELEMENTS ARGUMENT ..................... 7

    3)  REPLY TO F.R.C.P. 23(B) ELEMENTS ARGUMENT ..................... 8

    4)  REPLY TO F.R.C.P. 23(B)(2) ELEMENTS ARGUMENT ............... 14

CONCLUSION ................................................................................................................ 15

# INDEX OF AUTHORITIES

**Cases**

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) .............................................................. 9, 11

*Bridge v. Phoenix Bond & Indemnity Co.,* 553 U.S. 639, 128 S. Ct. 2131 (2008) ................ passim

*Bridgewater v. Double Diamond Delaware, Inc.,* 2011 U.S. Dist. LEXIS 47248 (N.D. Tex. 4/29/2011) ................................................................................................................................ 13

*David v. Signal Int'l,* 2012 Dist. LEXIS 114247 (E.D. La. 1/3/2012) ......................................... 11

*Haley v. Merial, Ltd.,* 2013 U.S. Dist. LEXIS 46825 (N.D. Miss, 4/1/2013) ......................... 11, 14

*Hemi Group, LLC v. City of New York,* 130 S. Ct. 983, 992 (2010) .............................................. 8

*Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258 (1992) ..................................... 9, 11

*In re Amer. Express Merchs. Litig.,* 554 F.3d 300 (2d Cir. 2009) .................................................. 6

*In re: Koscot Interplanatory, Inc.*, 86 FTC 1106 (1975) ................................................................ 4

*Kristian v Comcast Corp.,* 446 F. 3d 25 (1st Cir. 2006) ................................................................. 6

*Minter v. Wells Fargo Bank, N.A.,* 274 F.R.D. 525, 546 (D.Md.2011) ........................................ 10

*Negrete v. Allianz Life Ins. Co. of N. Am.,* 287 F.R.D. 590 (C.D. Cal. 2012) .............................. 10

*Piambino v. Bailey,* 1306 (5th Cir. 1980) ....................................................................................... 4

*Sandwich Chef of Texas v. Reliance National Indemnity Ins. Co.,* 319 F.3d 205 (5th Cir. 2005). 13

*Schmuck v. United States,* 489 U. S. 705 (1989) ............................................................................ 9

*St. Germain v. Howard*, 556 F.3d 261 (5th Cir. 2009) ................................................................. 12

*Warnock v. State Farm Ins. Co.,* U.S. Dist. LEXIS 37004 (S.D. Miss. 3/24/2011) ..................... 13

*Webster v Omnitrition*, 79 F.3d 776 (9th Cir. 1996) .................................................................. 4, 5

**Rules**

F.R.C.P. 23(a) and (b) .................................................................................................................... 1

## INTRODUCTION

The court should certify the plaintiffs' class. The evidence and testimony the Plaintiffs cite in their class certification motion – and that they will elaborate upon at the upcoming evidentiary hearing – establish that the defendants, by running an illegal pyramid scheme and committing other RICO violations while holding themselves out as a legitimate enterprise, injured a clearly-defined class of current and former participants satisfying all of the F.R.C.P. 23(a) and (b) criteria. Defendants apparently concede that most of the prongs for class certification under both Rule 23 (a) and (b) are met, and focus on just a few legal points. The defendants' opposition memorandum [Dkt. No. 129] not only fails to rebut facts that establish a fraud-on-the market RICO scheme that has resulted in every court considering a similar case certifying a class, but mischaracterizes them. Worse, Defendants misstate the applicable law. Under properly stated law it is clear that there are no individualized proofs that need to be tried, and this case must be certified.

## I. REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS

While Plaintiffs rigorously annotated and quoted from Defendants' own documents in its motion, Defendants make no such effort in their response.[1] The case, though, is simple. The defendants' own data show their business meets the established, legal definition of an illegal pyramid scheme, which is, in turn, a *per se* RICO violation. The Defendants also fail to address, let alone rebut, the fact that their own records show SGE, through its advertising and marketing, induced class members to pay the company significant amounts of money for what it represented

---

[1] It should not go unnoticed that the Defendants primary "evidence" in opposition (as well as the same evidence purporting to support their response to Plaintiffs' Motion For Partial Summary Judgment and their own Motion For Summary Judgment) consists of conclusory affidavits that seek to explain away what their contemporaneous documents so plainly show.

1

was an equal "opportunity" to make "millions" (even to be paid on downline levels "to infinity") in its Ignite multi-level marketing ("MLM") business, just as certain early founders allegedly achieved, when the Defendants in fact knew the opportunity was not equal, but heavily stacked against new participants. Defendants fail to rebut data also showing that participants who joined after the first few months of the company's operation had very little chance of achieving the success of the early-founder salespeople the company continues to hold up as examples of "the Ignite Opportunity." To induce class members to pay into this illegal and knowingly fraudulent scheme, Defendants obscured and misrepresented this and other material facts in their advertising, marketing, and physical and online public appearances, including:

(1) that almost all of the founding executives of Stream Energy (and certain of their mothers and wives) secretly established themselves, at the company's founding, in non-disclosed positions at the very top of the company's Ignite MLM pyramid, as the source uplines for all later MLM participants;

(2) that the MLM earnings for these Stream Energy executives with undisclosed MLM positions were included in "Income Disclosure" figures the company publicized, which they admitted were the primary documents used to inform new recruits of the potention for money making, purporting to show the average earnings of MLM participants each year, thereby artificially skewing the figures to make the "Ignite Opportunity" seem easier and more lucrative to potential participants than is actually the case;

(3) that most of the early-founding Ignite salespeople SGE uses to promote the Ignite Opportunity – who imply, if not actually claim, in their promotional messages, that they held average jobs (as coaches, insurance agents, airline employees, etc.) before making enough money with Ignite to allow them to retire to pursue Ignite full-time, were in reality executives and high-level, professional salespeople with another MLM, Excel Communications (that eventually imploded as the plaintiffs allege Ignite ultimately will do), immediately before taking their act to Ignite;

(4) that almost all of the early-founding Ignite salespeople advertised as Ignite success stories were given lucrative leadership positions in the MLM structure before the company even was in business, without having to meet the qualifications all other participants were required to satisfy for such positions; and

2

    (5) that almost all of the early-founding Ignite salespeople used to promote the Ignite Opportunity also were allowed to set up downlines up to 20-levels deep (mostly by bringing over their existing downlines from the collapsing Excel Communications MLM who now were desperate for something new to sell) before Stream Energy even had a license to sell a product.

### 1) REPLY TO SECTION II (A)(2) AND (3)

Instead of addressing the actual facts, in a transparent effort to manufacture some kind of class-related distinction to try and split the defined class, Defendants claim that there is some substantive difference between the so-called "Commercial" and "Residential" compensation plans offered to the IAs.[2] Thus, while 10% of the people who signed up for the program may have checked the box that they were interested in the commercial program, the fact is that virtually none of them pursued it, or pursued it with any success. The purported difference between the "Commercial" and "Residential" programs is a pure red herring.

For essentially the remainder of their factual recitation, Defendants hang their hat on this unremarkable proposition: that the compensation plan as devised provided that, in order for a bonus to be paid to an IA after a successful recruitment of another IA, in addition to the recruited IA's payment of his/her $329 fee to SGE, there has to be an actual sale of an energy contract to either the IA or someone else (most often the IAs family). In other words, unless the newly-recruited IA not only paid the company his/her enrollment fee (and most often purchased a

---

[2] Defendants spent several pages suggesting that because Plaintiff Robison had in mind the idea that part of his energy business would be in commercial energy compensation, that this makes him different than other putative class members. It is a distinction without a difference. Exhibit 4A of Defendants' Response, in the very first sentence states: "*Commercial compensation is identical to residential compensation in structure* except commercial MEI does not have the same commission payout. Quick Start and Business Builder bonuses are the same as residential accounts." (Emphasis added). Worse, there is *no evidence whatsoever* from the data provided by DPI that *any* IA ever signed up a commercial account in the eight year history of Stream. Certainly, Defendants have pointed to no such sales in any of their expert reports or responses. That is not a surprise, since the notion that an untrained person who knows nothing about commercial electricity usage, needs, requirements, or pricing, can cause a commercial establishment - - a school system, a residential development or a manufacturing concern - - to actually supply their electricity through an unknown supplier based out of Texas is fatuous. The commercial compensation plan, such as it is, existed solely as a placeholder for Stream to point to as another way for gullable people to sign up for its IA program.

recurring charge website), unless that IA also entered into a contract to buy his/her energy through SGE (or caused his friends or family to do so), the recruiting IA would not be paid a defined, *per capita* bonus.

The reason for that is simple. Even though pyramid schemes are illegal in every state, and regulated by the FTC, and have long prohibited payments to a "distributor" for recruiting other "distributors" into the system, in the Ninth Circuit, in a RICO case involving a pyramid scheme much like the one at issue here, the court defined a pyramid scheme as including payment by participants of money to the promoter in return for the right, "to receive a return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users." *Webster v Omnitrition*, 79 F.3d 776 (9th Cir. 1996) (citing *In re: Koscot Interplanatory, Inc.*, 86 FTC 1106 (1975)).[3] By ostensibly not paying naked commissions for recruitment, but instead coupling a requirement that the "recruited" distributor also make a purchase or cause a purchase to be made in addition to paying the company the enrollment fee, SGE was hoping to be able to say, as it does right now, that the commissions are "unrelated" to recruitment and thus avoid the obvious conclusion by a court that it operates a pyramid scheme. But the requirement that the new recruit make an additional purchase from SGE cannot cure the illegality of the pyramid scheme: the company gets more money, not less, from the newly-recruited which it passes along to the recruiter. The more people the distributor recruits (and more sales rung up when the newly-recruited buys energy), the more payments go to the recruiter. Why SGE thought that the coupling would solve the blatant illegality of the program is a mystery. Were it to have paid a distributor *more* for making a sale and *less* for finding a new distributor (like a legitimate commissions-based sales program) the operation would not be

---

[3] As noted in Plaintiff Torres's motion for partial summary judgment, the Fifth Circuit, in a case after In re Koscot, ignored that definition. *Piambino v. Bailey,* 1306 (5th Cir. 1980).

illegal. But here, it is unrebutted that SGE pays literally hundreds of times more for recruiting than it does for making a sale, skewing the risk-reward such that only the people who recruit many others into the program can make back their money, much less earn an income, all the while being subsidized by the 86% who lose money in the scheme.[4]

### 2) REPLY TO DEFENDANTS' RESPONSE TO STATEMENT OF FACTS SUBSECTION B – INCOME DISCLOSURES

The Court can note that while the Defendants point to boilerplate statements in the Compensation and Policies and Procedures documents, Defendants did not begin to even deny or contradict the detailed facts set out in Plaintiffs' Motion For Class Certification relating to the *actual* misrepresentations made by the various Defendants in recruiting IAs into the system. Specifically, for purposes of class certification the Defendants did not even deny that the Income Disclosures contained false statements, detailed in Plaintiff's motion.

Defendants quarrel with, but point to no evidence other than the conclusory affidavit of Darryl Smith, the fact that commissions paid by Stream go to a variety of uplevel executive positions within the pyramid structure. Stream admits, for example, the Doug Witt does receive payments both on sales generated within the five levels below him and to an unlimited level in what Stream euphemistically calls "his leadership organization." (p. 19). Of course, this ignores the uncomfortable fact that the "leadership organization" is another phrase for the pyramid structure of 50 or 60 levels of recruited IAs with whom Witt had no contact whatsoever. In short, Defendants' response to the detailed facts in Plaintiff's moving papers adds nothing to the

---

[4] What Defendants do not acknowledge is, even if this Court (and the Fifth Circuit) were to ignore its own prior views of what constitutes a pyramid scheme, in *Webster* and other courts, not to mention the FTC, the term "unrelated to the sale of product" refers to sales to ultimate consumers, that is persons completely outside the participatory scheme and *not* to sales by or to the distributor. This is so for obvious reasons, exemplified by the case before this Court. Here, as in all illegal pyramids shut down by the FTC and in private actions, the bulk of the sales are made to the IAs themselves. This was admitted by Stream's founder, Rob Snyder. (P. Ex. 114).

5

class analysis, refutes no relevant facts, and does nothing to suggest that a class ought not be certified.

## II. REPLY TO ARGUMENT AND AUTHORITIES

### 1) REPLY TO ARGUMENT RELATING TO ARBITRATION CLAUSE

There are two simple answers to the somewhat preposterous arbitration-related issues raised by Defendants. First, of course, Defendants already lost the issue before the Fifth Circuit, which found the requirement to arbitrate as whole illusory and unenforceable. The Fifth Circuit reviewed the clause as a whole, and found that because the Policies and Procedures that Plaintiffs signed allowed it to change its terms without notice, in light of Texas law, the *entire* agreement to arbitrate is illusory. Courts have treated unilateral bars to litigation either under an arbitration clause or class action waiver interchangeably. *See, e.g., Kristian v Comcast Corp.,* 446 F. 3d 25 (1st Cir. 2006); *In re Amer. Express Merchs. Litig.,* 554 F.3d 300 (2d Cir. 2009) (courts decline to enforce arbitration clauses that would have precluded the plaintiffs from pursuing their antitrust claims in a class context).[5] Second, and even more obvious, to the extent the Defendants (or more particularly the SGE defendant, the only signatory to the alleged Terms and Conditions)[6] had an enforceable contractual bar to a class action, that bar was conspicuously waived in SGE's failure to assert it as an affirmative defense to the Second Amended Petition (or at any time). That failure makes the raised point moot.[7]

---

[5] The only case apparently to differ is the Colorado district court opinion, under Colorado state law, cited by Defendants. Every other federal case would treat the issue differently.

[6] There is no indication in the Response when the alleged term was inserted into the Terms and Conditions, or whether either or any IAs have signed that version.

[7] As a final obvious matter, the vast majority of the defendants in this action, including each of the Corporate Insider Defendants, and the Presidential Director Defendants had no contractual relationship with the Plaintiffs or any IA, so no clause purporting to seek a class action against any of them has no legal effect.

6

Defendants' arguments that the Eleventh Circuit's decision in *Betts* that conflicted with the Fifth Circuit's controlling decision are without merit. The operative complaints in this case do not, and have not limited themselves to "Georgia" plaintiffs, they identified a class of IAs nationally. Defendants have not identified which alleged putative IAs claims are allegedly barred (under some unidentified doctrine, *res judicata*? collateral estoppel?) by the *Betts* decision.

Finally, the Response makes an unsubstantiated claim that after the Fifth Circuit rendered the arbitration clause null and void, it allegedly amended the clause to make it "legal." No evidence of this is presented, and, even though it has precise records as to who allegedly became an IA after March, 2011, SGE presents no evidence as to these putative class members' identity. In any event, this too was a waivable bar. The answer and affirmative defenses in this case to the operative complaint do not raise the issue of arbitrability, and these issues, in whatever form, are waived.

### 2)   REPLY TO F.R.C.P. 23(A) ELEMENTS ARGUMENT

Defendants argue first that Robison's claims "are not representative" of the common IAs claims because Robson intended to pursue the Commercial opportunities, while the majority of the IAs, according to Stream, intended to pursue the Residential opportunities (Response at 29). That argument is of no consequence. The Commercial Plan was by its own terms "identical" to the Residential save for the amount of money that Stream announced it would pay per customer. Whether a particular IA lost money by investing into the touted "business opportunity" depended not on whether he/she "intended" to recruit others into one or the other program (and Plaintiff re-emphasizes, there is no proof at all that anyone ever actually did sell a Commercial account) but on wehether the program and the attendant false statements was a RICO scheme. The existence of the pyramid scheme or the fraudulent statements contained within the Income Disclosures are

the common facts and common claims; payments under a paper-only plan have no bearing in this case.[8]

### 3) REPLY TO F.R.C.P. 23(B) ELEMENTS ARGUMENT

Defendants argue that causation issues prevent the certification of this action because "individual issues" predominate over common ones (Response at 30). Defendants then boilerplate argue that "individualized proof" is needed to determine their RICO liability (*id.* at 31).[9] Their argument centers on a wrongheaded analysis of the Supreme Court's decision in *Bridge v. Phoenix Bond & Indemnity Co.,* 553 U.S. 639, 128 S. Ct. 2131 (2008).[10] While pretending to pay heed to the decision, Defendants actually ignore it and want this Court to commit reversible error by ignoring its plain holding. In *Bridge,* the Supreme Court in a unanimous decision (Justice Thomas) unequivocally rejected the notion that a RICO plaintiff alleging mail and wire fraud predicate acts must prove that he directly relied on the defendant's

---

[8] The Defendants misapprehend, or pretend to misapprehend, the liability issues in the case. They do not stem from the "economic incentives" (Response at 29) behind the program; they stem from the fact that, insofar as the scheme is illegal because it is a pyramid, it is based on rewarding for recruiting and not from procuring customers. The plain fact is that by signing up to be an IA, every defrauded IA was part of the same system of uplines and downlines, was eligible for every one of the myriad bonuses, and could sell electricity to friends or factories in return for some represented reward. The existence of the pyramid revolves around the legality of the system in toto, not whether a percentage of the 274,000 people who signed up "intended" to sell to their friends, their neighbors, the local business owner, or elsewhere.

[9] They present no specific issues that would require individualized proof and do not even address the list of issues presented by Plaintiffs in their motion which Plaintiffs identify as common. Nor do they present any counter-affidavit to the detailed trial plan proposed by Plaintiff (Affidavit of Andrew Kochanowski) which shows exactly how the common issues of liability and damages would be tried by common proof. Defendants had a burden to at least *attempt* to identify an individualized issue that requires trial and failed to do so, which should send a strong signal to the Court that there are no such issues.

[10] *Bridge* presented the issue of the scope of "scheme to defraud" and "by reason of" language in RICO cases based on mail and wire fraud. Defendants in the scheme at issue directed agents to misrepresent to an Illinois county that they were qualified bidders in a county-run property action. Plaintiffs lost some property in the auction to the phantom bidders; the financial harm to the plaintiffs was foreseeable and intended by the defendants and was the kind of harm that the auction rules was designed to prevent. The defendants in *Bridge* claimed that (unlike here) the fraudulent statements were filed with the government and were not directed at the plaintiffs, hence plaintiffs could prove no reliance since, by definition, they did not receive and see the fraudulent statements. Or, as later described by the Supreme Court in *Hemi Group, LLC v. City of New York,* 130 S. Ct. 983, 992 (2010), the "plaintiff's theory of causation in Bridge was 'straightforward.'"

alleged misrepresentations.[11] *Bridge* thus did away with the *very argument* proposed by the Defendants here, that first-party reliance is necessary to sustain a RICO action.[12]

In spite of this holding, Defendants make a wholly circuitous argument that mistakes the different concepts of proximate cause and reliance.[13] Proximate cause here is very simple and requires no individualized proof: it is akin to a fraud-on-the market scheme in which common

---

[11] The mail fraud in *Bridge* —as here—involved "'hundreds of mailings'… when they sent property owners various notices required by Illinois law," but *not* to the plaintiffs. *Bridge*, 128 S. Ct. at 2136. The Supreme Court, reading the plain text of both the "scheme to defraud" language of the mail and wire fraud statutes and the plain text of RICO[11] said:

> The upshot is that RICO provides a private right of action for treble damages to any person injured in his business or property by reason of the conduct of a qualifying enterprise's affairs through a pattern of acts indictable as mail fraud. Mail fraud, in turn, occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice or attempting so to do." §1341. The gravamen of the offense is the scheme to defraud, and any "mailing that is incident to an essential part of the scheme satisfies the mailing element," *Schmuck v. United States,* 489 U. S. 705, 712 (1989) (citation and internal quotation marks omitted), even if the mailing itself "contain[s] no false information," id., at 715.

[12] As Justice Thomas put it, "If [defendants'] proposed requirement of first-party reliance seems to come out of nowhere, there is a reason: Nothing on the face of the relevant statutory provisions imposes such a requirement." *Id.* at 2145. Defendants persist in telling the Court that Plaintiff Robison "cannot identify a single misrepresentation by any Defendant that caused him any injury… Robison has made no effort whatsoever to tie any such alleged misrepresentation to his actual experience or any injury suffered by him." (Response at 24). But clearly under *Bridge*, Robison need not have read, much less relied on any of the false statements made in furtherance of the scheme. And as noted by *Bridge* (and many other authorities) nothing in the mail or wire predicate acts (any email offering the "Business Opportunity", and communication made with intent to entice a new IA into joining, any piece of mailed advertising imputing success, and so on) need by itelf to have been false nor actually considered by any class member IA. That being so, no proof at all needs to be offered by any IA on these subjects.

[13] Proximate cause is an element of a RICO claim; reliance is not. As *Bridge* explained:

> Proximate cause… is a flexible concept that does not lend itself to "'a black-letter rule that will dictate the result in every case.'" [citation omitted] Instead, we "use[d] 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts," *Holmes* [*v. Securities Investor Co.,* 503 U. S. 258], at 268, with a particular emphasis on the "demand for some direct relation between the injury asserted and the injurious conduct alleged," ibid.; see also *Anza* [*v. Ideal Steel Supply Co.,* 547 U.S. 451] at 461 ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries").

To be sure, the notion of "reliance" in RICO jurisprudence still exists as distinct from proximate cause. The Supreme Court cautioned that "someone" must have relied on the misrepresentations for the to prove the "by reason of" RICO language. But that "someone" need not be Robison (although he is well-qualified to do so, having testified that he believed the scheme to be a good opportunity), and need not be *any* IA who testifies before a jury "I invested in this scheme because I believed these particular lies." Third-person reliance of any kind is sufficient to meet the *Bridge* standard.

9

sense provides the natural and straightforward inference that the enticement to invest was acted on by the purchasers of the worthless product.[14] Here, 274,000 people acted on the representations made by the Defendants on the SGE website and in countless "business presentations" that the "business opportunity" presented a lucrative financial opportunity. Proof of reliance is contained in the proximate cause. The IAs signed the Policies and Procedures, in which they acknowledge that the IA has been given and read the materials offered by the Defendants.  Indeed, it is admitted by the Defendants that they "require" their IAs to adhere to only the marketing materials offered by SGE for attracting new IAs. There cannot be any question, then, that the existence of the 274,000 IAs is circumstantial evidence of both reliance and the proximate cause of Defendants' actions—and neither Plaintiff Robison nor anyone else needs to testify that they relied on any one particular statement over another in joining the scheme. Thus, as in *Bridge*, the causation here is a "direct," "foreseeable," and "natural" result of

---

[14] *See, e.g., Negrete v. Allianz Life Ins. Co. of N. Am.,* 287 F.R.D. 590, 611-13 (C.D. Cal. 2012), where plaintiffs in a RICO case sought to prove causation on a class-wide basis because reliance on defendant's alleged misrepresentations is the "common sense" or "logical explanation" for class members' purchasing decisions. The court said:

> [R]esort to the "common sense" inference for proving class-wide reliance remains appropriate in this case. That [defendant's] annuities are allegedly inferior in value and performance to comparable investment products…gives rise to an inference that consumers decided to purchase the "inferior" annuities because of the standardized marketing materials at issue in this litigation, for they otherwise had no reason to do so. "Consumers are nearly certain to rely on prominent (and prominently marketed) features of a product which they purchase," [citation omitted] particularly where there are not otherwise compelling reasons for purchasing a product that is allegedly worth less than the purchase price…. a jury could infer on a class-wide basis that defendant's allegedly fraudulent marketing scheme is the cause of plaintiffs' injuries. *See, e.g., Minter v. Wells Fargo Bank, N.A.,* 274 F.R.D. 525, 546 (D.Md.2011) (affirming class-wide demonstration of reliance based upon a common sense inference …) … Because proof that at least some class members relied on the alleged misrepresentations can be shown on a class-wide basis, plaintiffs could demonstrate that all class members were injured by defendant's alleged misrepresentations through a price increase or overcharge. In this way, issues common to the class as a whole regarding [defendant's] liability would clearly predominate over individual issues, because a price increase due to [defendant's] misrepresentations would cause injury to all class members… .

the fraudulent scheme.[15] Thus, the claim that "each of the 236,544 potential class members over the course of many years were defrauded by the Defendants…each potential class member will have to submit individualized evidence as to what he or she received and read and heard, what he or she thought it meant, what he or she already knew about Ignite…" (Response at 32-33) is simply legally wrong. *All* of the so-called evidence listed by the Defendants is first-party reliance, specifically done away with by *Bridge*. To rule otherwise would be reversible error.[16]

None of the district court cases cited by the Defendants post-*Bridge* changes the analysis one iota. *David v. Signal Int'l,* 2012 Dist. LEXIS 114247 (E.D. La. 1/3/2012) involved a wildly-complex proximate cause, three-part illegal immigration scheme under three federal laws, involving utterly disparate claims about foreign visa requirements, promises about living accomodations, discrimination in a post-Hurricaine Katrina foreign worker camp, refunds of moneys paid for working visas, and so forth. Those plaintiffs sought multiple forms of recovery under three different enterprises. The district court correctly found in these particular facts that a class could not be certified.

*Haley v. Merial, Ltd.,* 2013 U.S. Dist. LEXIS 46825 (N.D. Miss, 4/1/2013) is a case involving distinct injuries arising from the sale of allegedly fraudulently-marketed heartworm

---

[15] Thus, to the extent the Defendants seek to cite pre-2008 law from both the Supreme Court (*Anza v. Ideal Steel Supply Corp*., 547 U.S. 451 (2006), *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258 (1992)) (Response at 32) for heightened proximate cause requirements in RICO cases, these cases have little to no relevance. But even under *Holmes* or *Anza* the proximate cause requirement would have been met here. In *Holmes* the proximate cause was defined as "some direct relation between the injury asserted and the injurious conduct alleged." 504 U.S. at 268. In *Anza* the clear victim of the scheme was the State of New York, as the action was brought by plaintiff, a competitor to a company that it claimed had defrauded the State by failing to pay taxes, causing its competitive injury by being able to undercut plaintiff's prices. The Supreme Court found the causation too "attenuated." *Hemi*, 130 S. Ct. 983, a post-*Bridge* case, was a causation case also predicated on a tax-avoidance scheme, in which the Court found that the City of New York did not suffer damages because Hemi failed to register and file reports identifying out-of-state cigarette purchasers; a classic 'disconnect" between the alleged fraud and the alleged injury (since a fourth party, the taxpayer, was alleged to be the actor who failed to remit the taxes).

[16] The string citation on page 34 to Fifth Circuit cases holding that RICO class cases require individualized proof consists entirely of pre-*Bridge* cases that are now irrelevant. Why these are cited is a mystery.

medicine. It is correctly decided—but not for the reasons Defendants think. First, the district court correctly found (as the Court should here) that common questions of RICO liability—the same questions as exist here-- abound and satisfy the commonality and typicality requirements.[17] The court denied class certification because—unlike here—there existed individualized questions of injury. More importantly, it clearly set forth the post-*Bridge* law in the Fifth Circuit:

> There have been no Fifth Circuit decisions regarding class certifications in RICO context since *Bridge*. However, case law does provide direction for navigating the waters post-*Bridge*. In *St. Germain v. Howard*, 556 F.3d 261 (5th Cir. 2009) (per curiam), the Fifth Circuit held that the district court erred in requiring plaintiffs "to demonstrate detrimental reliance when alleging injuries that resulted from fraud under RICO," and in so doing, "the district court relied on Fifth Circuit precedent that is no longer good law." 556 F.3d at 263. The Fifth Circuit further stated: "The Supreme Court recently held that no reliance requirement exists for civil causes of action under RICO for victims of mail fraud. . . . Thus, to the extent that our prior cases are in conflict with *Bridge*, they are overruled." *Id.* (Id. at 59-60).

Thus, contrary to Defendants' suggestion, courts in this Circuit recognize the dramatic effect of *Bridge* on issues of causation and class certification. The court did not refuse to certify on the grounds advocated by Defendants, that individual issues of causation exist, but because of damage proof issues, that do not exist here.[18]

---

[17] "The Court finds that some of the questions focused on Merial's alleged participation in a RICO enterprise clearly satisfy the commonality requirement. These questions include whether Merial engaged in a pattern of racketeering activity, engaged in "predicate acts" by using the mail and wire to disseminate false and misleading advertisements, and marketed the drugs as 100% effective while knowing these claims were false. The answer to any of these questions is common among the class members, and answers would decide an issue that is central to the RICO claim of every putative class member at the same time. For example, the answer of "yes" or "no" to whether Merial engaged in "predicate acts" by using the mail and wire to disseminate false and misleading advertisements of 100% efficacy would resolve that integral question in the RICO claim for all putative class members in one stroke. These common questions would "generate common <u>answers</u> apt to drive the resolution of the litigation," *see Dukes*, 131 S. Ct. at 2551, and thus, the Court finds that Plaintiffs have satisfied the commonality requirement." Id. at 20-21.

[18] While Defendants pay lip service to boilerplate claims that damages in this case would need individualized mini-trials, that is plainly not so. The damages claimed for the putative class members are their out-of-pocket losses. These are contained in a Schedule based on records available for each and every class member. The numbers aren't even contested by the Defendants.

*Warnock v. State Farm Ins. Co.,* U.S. Dist. LEXIS 37004 (S.D. Miss. 3/24/2011) is another case helpful to the Plaintiff, in which the court correctly analyzed the issues. There the court correctly found that *Bridge* did away with the "presumption" in the Fifth Circuit against certifying RICO cases based on mail and wire fraud:

> This Court's reading of *Bridge* and the relevant Fifth Circuit precedent is that class certification may now be appropriate where, as in *Bridge*, causation is alleged through third-party reliance by a single entity (there, Cook County) and reliance would not need to be individually determined for each class member. (Id. at 15).[19]

But because the case revolved around claims that a law firm, acting in concert with State Farm, denied different insurance claims, the case "depends heavily on the circumstances of each underlying automobile accident." (*Id.* at 16). None of the other cases cited by Defendants is helpful to any issues raised by the Defendants.[20]

In sum, since *Bridge*, the alleged "presumption" against certifying RICO class actions in this Circuit because of first-party reliance issues is gone. The proximate cause of *this* RICO injury is participation, and injury of loss of money for almost 9 out of 10 people. None of the Plaintiffs would need to testify about their reliance (first-party reliance). Pyramid schemes are inherently illegal—and whether Defendants doubled or tripled a bonus for a particular month (Response at 38) is of no moment. The scheme was or was not a pyramid. If it was, it cost 86% of the 274,000 participants money.

---

[19] The notion that there is a "presumption" in this Circuit against certifying RICO claims is far-fetched in any event. The only case that suggests that this Circuit is more stringent in applying mail and wire fraud claims than other circuits appears to be *Sandwich Chef of Texas v. Reliance National Indemnity Ins. Co.,* 319 F.3d 205 (5th Cir. 2005).

[20] *Bridgewater v. Double Diamond Delaware, Inc.,* 2011 U.S. Dist. LEXIS 47248 (N.D. Tex. 4/29/2011) is plainly wrong in its application of and reliance on *Sandwich Chef of Texas, supra. See supra*, discussion of post-*Bridge* cases overruling *Sandwich Chef.* The court made the obvious mistake of assuming that mini-trials about what each plaintiff understood about allegedly fraudulent assessments would need to be conducted—an issue done away with by *Bridge.* The court did not seem to understand that reliance is not an element of RICO, but rather proximate cause is.

Finally, Defendants argue that the alleged "reality" that there is no way of knowing which Plaintiffs suffered an injury because some may "get" money in the future (presumably pushing them from a net loss to a net gain) is nonsensical. Data is available as of May, 2013 for each and every Plaintiff. That data can be supplemented at time of trial. At that time the precise amount of loss of each Plaintiff in the certified class will be easily ascertainable to the last penny. Their RICO injury will be fixed, as the end result of a verdict will be cessation of SGE's illegal activities. The fact that SGE can voluntarily refund some of the payments made to it if it chooses to does not obviate the fact that it has already caused an ascertainable RICO injury.

### 4) REPLY TO F.R.C.P. 23(B)(2) ELEMENTS ARGUMENT

In the case before the court, the additional relief sought is an injunction under Section 1964(a) and (c). As *Haley v. Merial, supra,* has noted:

> The Fifth Circuit has defined "incidental" to mean "damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief' and has explained that "[s]uch incidental damages should only be those to which class members would be automatically entitled once liability to the class is established." *Id.* (citing*Allison*, 151 F.3d at 415). The Fifth Circuit has also explained that "damages may be incidental when they are 'capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances." *Bolin*, 231 F.3d at 976. (*Id.* at 35).

Here, Defendants' lengthy discourse notwithstanding, this is precisely the type of damage that is being claimed—one that is capable of objective computation. Under Fifth Circuit authority they are incidental and no bar to the injunctive claim. The class should be certified under this theory as well.

## **CONCLUSION**

Defendants' response challenged the class certification under only a few grounds, apparently conceding adequacy, numerosity, and superiority of class remedy. Defendants' commonality and typicality arguments are without merit. Defendants failed to present any argument, and no attempt at any specificity, showing the court what issues would require individualized proofs, and the one issue they focus on, reliance, is plainly inapplicable. Their attempt at distinguishing the pyramid scheme compensation plan into two alleged segments is transparently false and of no consequence in any event, as both plans are structurally identical and there is no proof that the "commercial" plan was ever used by anyone. Defendants made no attempt to explain to the court why *every* pyramid scheme case, whether under RICO or securities law, including the *Piambino* case in the Fifth Circuit, has been certified as a class action. In short, they present no persuasive evidence or argument that the class did not suffer a common injury, in the same way and by the same means, resulting in common damages that are capable of calculation on a class-wide basis. The class should be certified.

Respectfully submitted this 11th of October 2013,

                                    SOMMERS SCHWARTZ, P.C.

                                    /s/ Andrew Kochanowski
                                    Andrew Kochanowski
                                    Lance Young
                                    Tiffany R. Ellis
                                    One Towne Square, Suite 1700
                                    Southfield, MI 48076
                                    (248) 355-0300
                                    akochanowski@sommerspc.com
                                    lyoung@sommerspc.com
                                    tellis@sommerspc.com


                                    - and -

          CLEARMAN | PREBEG LLP
          Scott M. Clearman
          Texas State Bar No. 04350090
          Matthew J.M. Prebeg
          Texas State Bar No. 00791465
          Brent T. Caldwell
          Texas State Bar No. 24056971
          815 Walker, Suite 1040
          Houston, Texas 77002
          (713) 223-7070
          sclearman@clearmanprebeg.com
          mprebeg@clearmanprebeg.com
          bcaldwell@clearmanprebeg.com

- and –

          JEFFREY W. BURNETT, PLLC
          Jeffrey W. Burnett
          Texas State Bar No. 24025274
          12226 Walraven
          Huffman, Texas  77336
          (281)324-1400
          jburnett@burnetthoustonlaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2013 the foregoing document was served upon all counsel of record through the Court's CM/ECF system, including to the following:

| | |
|---|---|
| Michael K. Hurst | Vanessa Jean Rush |
| John Guild | Stream Gas and Electric, Ltd. |
| Gruber Hurst Johansen & Hail LLP | 1950 N. Stemmons Fwy, Ste. 3000 |
| 2500 Fountain Place | Dallas, TX 75207 |
| 1445 Ross Avenue | vanessa.rush@streamenergy.net |
| Dallas, TX 75205 | |
| mhurst@ghjhlaw.com | |
| jguild@ghjhlaw.com | |

          /s/ Andrew Kochanowski
          Sommers Schwartz, P.C.
          One Towne Square, Suite 1700
          Southfield, MI 48076
          (248) 355-0300
          akochanowski@sommerspc.com