**APPENDIX**

**CITED ELECTRONIC CASES**

*Bridgewater v. Double Diamond Delaware, Inc.,* 2011 U.S. Dist. LEXIS 47248 (N.D. Tex. 4/29/2011)

*David v. Signal Int'l,* 2012 Dist. LEXIS 114247 (E.D. La. 1/3/2012)

*Haley v. Merial, Ltd.,* 2013 U.S. Dist. LEXIS 46825 (N.D. Miss, 4/1/2013)

*Warnock v. State Farm Ins. Co.,* U.S. Dist. LEXIS 37004 (S.D. Miss. 3/24/2011)



Neutral
As of: October 11, 2013 10:38 AM EDT

# Bridgewater v. Double Diamond-Delaware, Inc.

United States District Court for the Northern District of Texas, Dallas Division
April 29, 2011, Decided; April 29, 2011, Filed
CIVIL ACTION NO. 3:09-CV-1758-B ECF

**Reporter:** 2011 U.S. Dist. LEXIS 47248; 2011 WL 1671021

BETTY BRIDGEWATER and JERRY P. WILLIAMS, Individually and on behalf of a Class of All Others Similarly Situated, Plaintiffs, v. DOUBLE DIAMOND-DELAWARE, INC., et al., Defendants.

**Prior History:** *Bridgewater v. Double Diamond-Delaware, Inc., 2010 U.S. Dist. LEXIS 45790 (N.D. Tex., May 10, 2010)*

---

### Core Terms

double, diamond, predominate, food and beverage, bluff, class certification, homeowners, property owner, certificate, class member, mail fraud, reasonable compensation, common issue, misrepresent, bridge, golf, derivative suit, predicate act, class action, set forth, invoice, entity, nonprofit corporation, fraudulent, resort, breach of fiduciary duty, state law, racketeering, fiduciary, amenity

---

### Case Summary

#### Overview

The property owners sought class certification in an action alleging that the developer assessed fees in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U.S.C.S. § 1962(c)*, *(d)*. The court found that individual class members would have to establish their reliance in order to prove their RICO mail fraud claims. Given that the court would be required to conduct mini-trials as to the issue of individual reliance as to each class member, the owners could not establish that common issues would predominate and could not establish superiority under *Fed. R. Civ. P. 23(b)(3)*.

#### Outcome

The motion for class certification was denied.

---

### LexisNexis® Headnotes

Civil Procedure > Special Proceedings > Class Actions > Certification of Classes
Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

**HN1** A district court must conduct a rigorous analysis of the *Fed. R. Civ. P. 23* prerequisites before certifying a class. The burden of proof rests with the party seeking certification. The district court's inquiry is a procedural one, focusing on whether *Rule 23* is satisfied; class certification hearings should not be mini-trials on the merits of the class or individual claims. The court may look beyond the pleadings if necessary, however, to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.

Civil Procedure > Special Proceedings > Class Actions > Certification of Classes
Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

**HN2** Under *Fed. R. Civ. P. 23(a)*, plaintiffs seeking certification bear the burden of meeting the rule's requirements of (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Fed. R. Civ. P. 23(a)*. Courts deciding whether to grant class action certification must conduct a rigorous analysis to insure that each of *Rule 23(a)*'s requirements have been met. Further, plaintiffs also bear the burden of showing that the proposed class action meets at least one of the *Rule 23(b)* requirements.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Commonality
Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Predominance
Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Superiority

**HN3** Before a class may be certified under *Fed. R. Civ. P. 23(b)(3)*, a court must also determine that questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The predominance and superiority requirements are far more demanding than is *Rule 23(a)(2)*'s commonality requirement.

Civil Procedure > ... > Class Actions > Prerequisites for Class Ac-

2011 U.S. Dist. LEXIS 47248, *47248

tion > Commonality
Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Predominance

*HN4* A determination of whether legal issues common to a class predominate over individual issues requires a court to inquire how the case will be tried. This inquiry entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class. Although this inquiry does not resolve the case on its merits, it requires that the court look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law. Such an understanding prevents the class from degenerating into a series of individual trials. Further, to predominate, common issues must form a significant part of the individual cases.

Civil Procedure > ... > Justiciability > Standing > Injury in Fact
Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview
Constitutional Law > ... > Case or Controversy > Standing > Elements

*HN5* Prior to determining whether the *Fed. R. Civ. P. 23* requirements are met, a court must determine whether the plaintiffs have standing to bring their claims. Before the certification inquiry, the court must decide standing first, because it determines the court's fundamental power even to hear the suit. In order to establish standing, the plaintiff must have suffered an injury in fact, there must be a causal connection between the injury and the conduct complained of, and it must be likely that the injury will be redressed by a favorable decision.

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > General Overview
Civil Procedure > ... > Justiciability > Standing > General Overview
Constitutional Law > ... > Case or Controversy > Standing > General Overview
Securities Law > Criminal Offenses & RICO Actions > RICO Actions > Standing

*HN6* Where Racketeer Influenced and Corrupt Organizations Act (RICO) plaintiffs bring claims analogous to shareholder derivative claims, a court applies a three-part test to determine whether the plaintiffs satisfy general standing requirements. The court asks (1) whether the racketeering activity was directed against the corporation; (2) whether the alleged injury to the shareholders merely derived from, and thus was not distinct from, the injury to the corporation; and (3) whether state law provides that the sole cause of action accrues in the corporation. If each of the questions can be answered, "yes," then the plaintiffs do not have the requisite standing.

Civil Procedure > Special Proceedings > Class Actions > Certification of Classes
Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Commonality

*HN7* Class certification may be inappropriate due to the predominance of individualized damages determinations over common issues. Where plaintiffs' damages claims focus almost entirely on facts and issues specific to individuals rather than the class as a whole, the potential exists that the class action may degenerate in practice into multiple lawsuits separately tried.

Civil Procedure > Special Proceedings > Class Actions > Certification of Classes
Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Commonality

*HN8* For the purposes of class certification, plaintiffs have the burden of showing that class certification is appropriate and that individual damages issues do not predominate over common issues.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > Predominance

*HN9* Courts are not to manufacture predominance through the nimble use of *Fed. R. Civ. P. 23(c)(4)*.

**Counsel:** **[*1]** For Betty Bridgewater, Individually and on behalf of a Class of All Others Similarly Situated, Jerry P Williams, Individually and on behalf of a Class of All Others Similarly Situated, Plaintiffs: Martin E Rose, LEAD ATTORNEY, Elizabeth Hosea Lemoine Lynda L Weaver, Michael D Richardson, Rose Walker LLP, Dallas, TX; Barbara T Hale, Jeffrey D Smith, Nellie G Hooper, Blanscet Sutherland Hooper & Hale LLP, Addison, TX.

For Double Diamond-Delaware Inc, Double Diamond Inc, Defendants: Jay J Madrid, LEAD ATTORNEY, Winstead Sechrest & Minick, Dallas, TX; Kent Bryan Pearson, Winstead PC, Dallas, TX; Wayne W Bost, Winstead PC, Austin, TX.

For R Mike Ward, Defendant: Richard A Sayles, LEAD ATTORNEY, Kimberly C Priest-Johnson, Shawn Long, Sayles Werbner, Dallas, TX.

For Fred Curran, Defendant: Richard A Sayles, LEAD ATTORNEY, Kimberly C Priest-Johnson, Shawn Long, Sayles Werbner, Dallas, TX.

For White Bluff Club Corp, Defendant: Jay J Madrid, LEAD ATTORNEY, Winstead Sechrest & Minick, Dallas, TX; Wayne W Bost, Winstead PC, Austin, TX.

For White Bluff Golf Inc, The Inn At White Bluff Inc, The Lighthouse Dining Co, The White Bluff 19th Hole Inc, Defendants: Jay J Madrid, LEAD ATTORNEY, Winstead Sechrest **[*2]** & Minick, Dallas, TX; Kent Bryan Pearson, Winstead PC, Dallas, TX; Wayne W Bost, Winstead PC, Austin, TX.

For United Equitable Mortgage Co, National Resort Man-

2011 U.S. Dist. LEXIS 47248, *2

agement Corp, Defendants: Jay J Madrid, LEAD ATTORNEY, Winstead Sechrest & Minick, Dallas, TX; Kent Bryan Pearson, Winstead PC, Dallas, TX.

For Huselton, Morgan & Maultsby, Movant: Rebecca E Bell, LEAD ATTORNEY, Fee Smith Sharp & Vitullo LLP, Dallas, TX.

For White Bluff Property Owners' Association, Inc, Interested Party: Kent Bryan Pearson, Winstead PC, Dallas, TX; Wayne W Bost, Winstead PC, Austin, TX; Jay J Madrid, LEAD ATTORNEY, Winstead Sechrest & Minick, Dallas, TX.

For ADR Provider, Mediator: Harlan A Martin, LEAD ATTORNEY, JAMS, Dallas, TX.

**Judges:** JANE J. BOYLE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JANE J. BOYLE

---

| Opinion |

---

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiffs' Motion for Class Certification filed December 17, 2011 (doc. 95). For the reasons set forth below, the Court finds that the Motion should be and hereby is **DENIED**.

**I.**

**FACTUAL BACKGROUND**[1]

Plaintiffs Betty Bridgewater and Jerry P. Williams (collectively "Bridgewater" or "the **[*3]** Plaintiffs") filed this class action suit on behalf of all property owners in the White Bluff Resort at Lake Whitney ("White Bluff") alleging that the Defendants, who developed, managed, or marketed the White Bluff properties, fraudulently assessed fees on property owners in violation of the federal RICO statute, *18 U.S.C. § 1962(c)* and *(d)*, and Texas law. The White Bluff Resort includes over 6,000 lots near Lake Whitney, Texas and the plaintiff class includes all White Bluff current and former property owners who from January 2004 to the present paid the challenged assessments.

Defendant Double Diamond-Delaware, Inc. is a privately-held, for-profit company in the business of resort development that operates in Texas through its affiliated Texas corporation, Double Diamond, Inc. (collectively "Double Diamond").[2] Double Diamond purchases large tracts of undeveloped property, which it subdivides into lots that are marketed and sold to individuals as investment or retirement property, including the White Bluff planned community.[3] Purchasers of Double Diamond property are not obligated to build on or improve their lots,[4] but they are required, as a condition of ownership, to become members **[*4]** of the White Bluff Property Owners' Association ("the WBPOA"). As owners and members of the WBPOA, the Plaintiffs in this action were required to pay annual dues to the property owners' association and were subject to the recurring mandatory assessments at the foundation of this dispute. Plaintiffs describe what they contend to be a scheme for improperly assessing the WBPOA for expenses incurred by other Double Diamond entities and misrepresenting the need for and use of those funds.

Double Diamond established subsidiaries (also defendants) to own and operate resort amenities at White Bluff. The amenities include "two 18-hole golf courses, the Lighthouse restaurant, a spa, The Inn, and a marina, all of which are owned by Double Diamond **[*5]** through one of its subsidiaries." FAC ¶ 22. Many of Bridgewater's claims are rooted in the alleged transfer of funds from the WBPOA to various Double Diamond entities and other allegedly improper assessments levied by the WBPOA for the benefit of those entities.

The WBPOA was formed as a nonprofit association in 1990 pursuant to a filing made by Defendant R. Mike Ward, who was also an officer of Double Diamond. Plaintiffs allege that the "WBPOA is currently, and always has been, controlled by Double Diamond" and that "Defendants Ward and [Fred] Curran have been directors of the WBPOA since its inception, while simultaneously holding positions as officers of Double Diamond." *Id.* at ¶ 25. The WBPOA, not a defendant in this action, is governed by a board of six directors, three of which were Double Diamond officers from the Board's inception until May 2010, and the remaining directors "are hand picked by Ward." *Id.* Plaintiffs allege that Double Diamond has maintained control of the WBPOA through a 1997 agreement that gave Defendant Ward the right to cast the deciding vote in the event of a deadlock and through Mr. Ward's decisive influence in choosing the property owners who fill the remaining

---

[1]   The Court takes its factual account from Plaintiffs' First Amended Complaint ("FAC") filed October 10, 2010.

[2]   The Court uses the term "Double Diamond" to refer both to the Double Diamond entities as well as all Defendants collectively.

[3]   Double Diamond has also acquired and marketed property, following a similar business model, in three other locations in Texas and one in Pennsylvania. Only the property and assessments related to White Bluff are at issue in this suit.

[4]   Of the approximately 6,000 lots in the White Bluff Resort, 600-700 homes have been constructed.

**[*6]** three seats on the WBPOA board. Plaintiffs also allege that Double Diamond has taken a number of other steps to maintain its dominance over the WBPOA board, such as changing the date and time of the annual meeting, aggressively opposing and punishing any attempt to fill seats on the board with candidates other than those chosen by Ward, manipulating proxy contest rules, and amending the WBPOA bylaws to require a 2/3 majority to remove a director, "as opposed to a simple majority standard that had been in place for twenty years," without notice to or input from the WBPOA membership. *Id.* at ¶ 34. Further, "[o]n more than one occasion, Double Diamond has sued members of the WBPOA for defamation when members engaged in activities that publicly criticized the actions of the WBPOA board, Double Diamond and/or Defendant Ward." [5] *Id.* at ¶ 31. Plaintiffs allege that these actions were part of a broader scheme by Double Diamond to maintain control of and use the nonprofit WBPOA to generate revenue for its other business interests, which are the exclusive service providers or owners of amenities at the resort. Double Diamond carried out the "illegal assessment scheme," Plaintiffs allege, "in [*7] connection with the conduct" of a RICO enterprise consisting of the board of directors of the WBPOA, Defendants Ward and Curran, and Double Diamond. *Id.* at ¶ 88.

*A. The Challenged Assessments and Transfers*

Plaintiffs allege that the scheme to assert Double Diamond's control over the WBPOA board resulted in a series of assessments and fees that were used for purposes of enriching Double Diamond or Ward instead of the purposes authorized by the WBPOA's bylaws. Through these assessments, the WBPOA collected approximately $3,500,000 in 2009 alone. Many of the assessments and fees ostensibly supported the "hospitality program," including a mandatory "food and beverage" assessment program. [6] The hospitality program was announced by letter in January 2004 as a means to fund the amenities at White Bluff more through the assessment of the members of the WBPOA and less through the funds raised by selling the remaining parcels of undeveloped [*8] real estate. Plaintiffs allege that the representations set forth in the letter to the WBPOA membership were false, and that the assessment of fees on WBPOA members to pay the costs incurred by other Double Diamond entities was also improper under both Texas law and federal tax law. In 2006, the WBPOA entered into a "Capital Improvement Agreement" with Double Diamond that extended the hospitality program for ten years, agreed to pay the assessment proceeds to Double Dia-

mond, and ended a revenue sharing agreement under which Double Diamond had previously remitted funds to the WBPOA. Plaintiffs allege that the WBPOA's funds were paid to Double Diamond entities, in part, through annual "allocations" of approximately $500,000 each, for which no contract existed.

In addition to the hospitality and "food and beverage" assessments, Plaintiffs [*9] challenge and seek to recover assessments made for golf course maintenance costs. Because the golf courses are not property of the WBPOA (they are owned by White Bluff Golf, Inc., a subsidiary of Double Diamond), Plaintiffs allege that it is improper to impose the costs on the members of the WBPOA, especially considering that Double Diamond receives 100% of the revenue generated by the golf courses and the WBPOA pays 100% of the maintenance expenses. Plaintiffs also challenge various other payments to Double Diamond entities made by the WBPOA which they argue are not arm's length transactions but rather further examples of self-dealing by Double Diamond and the individual defendants.

*B. The State Court Lawsuit*

On June 15, 2009, the 68th Judicial District Court of Dallas County entered final judgment in Cause No. DC-07-12490, *Double Diamond, Inc. and White Bluff Property Owners' Association v. Daniel Saturn* (the "State Court Action"). In that suit, Double Diamond and the WBPOA alleged various defamation and business disparagement claims after Daniel Saturn ("Saturn"), a property owner, attempted to organize a group of dissatisfied property owners to complain about the actions of Double [*10] Diamond and the WBPOA. Double Diamond and the WBPOA also sought to recover unpaid food and beverage assessments from Saturn.

Saturn responded with counterclaims challenging the validity of the food and beverage assessments. Each side sought declaratory judgment "on the propriety of the food and beverage assessments." FAC ¶ 69. Following a jury trial, the Court entered judgment for Saturn, finding that the food and beverage assessments were "not in accordance with the bylaws of the White Bluff Property Owners' Association" and that "assessing mandatory food and beverage assessments from [WBPOA] members and paying such assessments to Double Diamond, Inc. and/or its related companies without such payments being reasonable compensation for services provided to the White Bluff Property Owners' Association, Inc. violates *Article 1396-2.24 of the Texas Non-Profit Corpora-*

---

[5]   One such suit, against WBPOA member Daniel Saturn, is discussed in Section I(B), *infra*. In response to a defamation lawsuit, Saturn raised counterclaims for, among other relief, a declaration that certain of the assessments levied by the WBPOA were invalid.

[6]   The assessment is related to and sometimes referred to as a "food and beverage credit" or "hospitality credit." Under the program, a member is required to pay semi-annual assessments and would in return be granted a "credit" to be redeemed upon purchase of certain amenities at the White Bluff Resort, such as the golf course, restaurants, hotel, or spa.

*tion Act*." *Id.* at ¶ 70 (citing FAC Ex. A). The court declared the food and beverage assessments to be "void *ab initio* only as to the parties to" the state court lawsuit. *Id.* The state court action did not resolve questions related to the other challenged assessments. As a result of information obtained through discovery and **[*11]** trial of the state court action, Bridgewater filed this action on September 22, 2009, asserting claims on behalf of all property owners in the White Bluff Resort alleging claims under RICO and state law.

On Double Diamond's and the WBPOA's appeal, the appellate court affirmed the trial court's judgment that Double Diamond and the WBPOA take nothing on their claims against Saturn. *Double Diamond, Inc. v. Saturn, 339 S.W.3d 337, 2011 Tex. App. LEXIS 2494, 2011 WL 1240096 (Tex. App-Dallas 2011)*. However, the appellate court reversed the trial court's declaratory judgment for Saturn and its award of attorney's fees to Saturn, rendered judgment that Saturn take nothing on his claims for declaratory judgment, and denied Saturn's application for a permanent injunction. The appellate court explained that the jury answered "No" to the jury question regarding reasonable compensation, which asked in relevant part, "Are the food and beverage assessments collected by the White Bluff Property Owners' Association and paid to Double Diamond, Inc. and/or its related companies reasonable compensation for services rendered to or for the White Bluff Property Owners' Association related or pertaining to one or more of the **[*12]** Association's purposes?" *2011 Tex. App. LEXIS 2494, [WL] at *4*. The court explained that Double Diamond "failed to conclusively establish that the food and beverage charges paid" to White Bluff Club Corp., the owner of the hospitality operations and a subsidiary of Double Diamond, "were reasonable compensation for services rendered to the Owners' Association by Club Corp.," and the jury's "No" answer was "not so contrary to the evidence as to be clearly wrong and unjust." *2011 Tex. App. LEXIS 2494, [WL] at *5*. The court further explained:

> The jury's answer is an affirmative finding that appellants did not carry their burden of proof to show the food and beverage program complied with the bylaws because the charges constitute reasonable compensation, but it is *not* an affirmative jury finding that [Saturn] carried his burden of proof to show that the food and beverage program violated the bylaws because the charges did not constitute reasonable compensation.

*2011 Tex. App. LEXIS 2494, [WL] at *7* (emphasis in original).

## II.

## PROCEDURAL HISTORY

This Court ruled on Double Diamond's Motion to Dismiss, filed October 16, 2009, on May 10, 2010, granting Double Diamond's Motion to the extent that it sought dismissal of Bridgewater's claim for "conspiracy/aiding and abetting" against **[*13]** all Defendants. The Court denied the Motion to the extent that it sought dismissal, or alternatively a stay, of Bridgewater's claims based on a parallel state court action, and denied the Motion to the extent that it sought dismissal of the RICO, reimbursement, breach of fiduciary duty, and misapplication of fiduciary property claims. [7] Plaintiffs filed their amended complaint on October 12, 2010. The First Amended Complaint sought "to augment the factual allegations to include matters that took place after the suit was filed . . . and to add two parties," National Resort Management Corp. and United Equitable Mortgage. Mot. for Leave to File Oct. 8, 2010 at 2. The First Amended Complaint also added a new Count, "Injunctive Relief," and omitted the "misapplication of fiduciary property" and conspiracy claims. Plaintiffs filed their Motion for Class Certification on December 17, 2010, and the Court held a hearing on the Motion on February 15, 2011. [8]

## III.

## LEGAL STANDARD

*HN1* "A district court must conduct a rigorous analysis of the [*Federal Rule of Civil Procedure 23 ("Rule 23")*] prerequisites before certifying a class." *Castano v. Am. Tobacco Co., 84 F.3d 734, 740 (5th Cir. 1996)*. The burden of proof rests with the party seeking certification. *See Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 301 (5th Cir. 2003)*. The trial court's inquiry is a procedural one, focusing on whether *Rule 23* is satisfied; "[c]lass certification hearings should not be mini-trials on the merits of the class or individual claims." *Unger v. Amedisys Inc., 401 F.3d 316, 321 (5th Cir. 2005)*. The court may look beyond the pleadings if necessary, however, to "understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Castano, 84 F.3d at 744*.

---

[7]   Although Double Diamond sought dismissal or a stay of all claims under the *Colorado River* doctrine, it did not specifically seek dismissal of Count Six, "Constructive Trust", and Count Seven, "Unjust Enrichment" of the original Complaint **[*14]** filed September 22, 2009, and the Court did not reach the issue of whether these were appropriate claims.

[8]   The Court requested additional briefing on Plaintiffs' standing and this Court's jurisdiction after the class certification hearing, and this briefing was received on April 1, 2011.

2011 U.S. Dist. LEXIS 47248, *13

**HN2** Under *Rule 23(a)*, plaintiffs seeking certification **[\*15]** bear the burden of meeting the Rule's requirements of (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. FED. R. CIV. P. 23(a); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997). Courts deciding whether to grant class action certification must conduct a rigorous analysis to insure that each of *Rule 23(a)*'s requirements have been met. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982). Further, plaintiffs also bear the burden of showing that the proposed class action meets at least one of the *Rule 23(b)* requirements. FED. R. CIV. P. 23(b); *Amchem*, 521 U.S. at 614. **HN3** Before a class may be certified under *Rule 23(b)(3)*, "a court must also determine that 'questions of law or fact common to the members of the class predominate over any questions affecting only individual members' and that 'a class action is superior to other available methods for the fair and efficient adjudication of the controversy.'" [9] *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003) (quoting FED. R. CIV. P. 23(b)(3)). "The predominance and superiority requirements are 'far more demanding' than is *rule 23(a)(2)*'s commonality requirement." *Id.* (quoting **[\*16]** *Amchem*, 521 U.S. at 624). **HN4** A determination of whether legal issues common to the class predominate over individual issues requires the court to inquire how the case will be tried. *Id.* (citing *Castano*, 84 F.3d at 744). As explained by the Fifth Circuit,

> This [inquiry] entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class. Although this inquiry does not resolve the case on its merits, it requires that the court look beyond the pleadings to "understand the claims, defenses, relevant facts, and applicable substantive law." Such an understanding prevents the class from degenerating into a series of individual trials.

*Id.* (citing *Castano*, 84 F.3d at 744). Further, to predominate, common issues must form a significant part of the individual cases. *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 626 (5th Cir.1999) (citing *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986)).

**IV.**

**ANALYSIS**

*A. Standing*

**HN5** Prior to determining whether the *Rule 23* requirements are met, a court must determine whether the plaintiffs have standing to bring their claims. *O'Sullivan*, 319 F.3d at 742-43 ("As an inherent prerequisite to the class certification inquiry, [the court] must determine whether plaintiffs have a valid cause of action under Texas law and whether they have stated an injury-in-fact.") (citing *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002)); *see also Rivera*, 283 F.3d at 319 (before the certification inquiry, the court "must decide standing first, because it determines the court's fundamental power even to hear the suit") (citation omitted). In order to establish standing, "the plaintiff must have suffered an injury in fact, there must be a causal connection between the injury and the conduct complained of, and it must be likely that the injury will be redressed by a favorable decision." *Rivera*, 283 F.3d at 318 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351). Although the Court previously determined that Plaintiffs did have the required standing in its Memorandum of May 10, 2010 ruling on Double Diamond's Motion **[\*18]** to Dismiss, the Court revisits its previous findings in light of new case law and also to fulfill its duty to conduct a "rigorous analysis" in ruling on a class certification motion.

**i. Standing: RICO Claims**

This Court previous found that Bridgewater had standing to assert RICO claims against Double Diamond. After citing the standing test set forth in *Ocean Energy II, Inc. v. Alexander & Alexander, Inc.*, 868 F.2d 740, 746 (5th Cir. 1989), the Court explained:

> Defendants challenge the ability of the Complaint to satisfy the statutory standing requirements, arguing that Plaintiffs have not alleged injury "by reason of" the commission of RICO predicate acts. Defendants contend that Plaintiffs[] have not alleged that their injuries were the factual and proximate result of the alleged predicate acts. Defendants also argue that Plaintiffs "lack standing to assert their RICO claims because they lack standing to assert the underlying statutory violations [of the Texas Non-Profit Corporation Act] which are necessary to show that the assessments are 'illegal.'"
>
> Upon review, the Court concludes that Plaintiffs have . . . sufficiently pleaded that they were injured "by reason of" the predicate acts **[\*19]** of mail and wire fraud. Plaintiffs have standing "if, and can only recover to the extent that, he has been injured in his business or property by the conduct causing the

---

[9]   Because Plaintiffs seek certification under Rule 23(b)(3), the Court does not examine whether Plaintiffs' proposed class could or would qualify for certification under Rule 23(b)(1) **[\*17]** or Rule 23(b)(2).

violation." The statute confers standing on "any person injured in his business or property by reason of a violation of *section 1962* of this chapter." Plaintiffs are not required to plead that they relied on the allegedly fraudulent material; rather they are only required to allege that they were injured "by reason of" commission of the predicate acts. Here, Plaintiffs assert their own injuries; apart from any injury to the WBPOA, they allege that they were individually and directly injured by the fraudulent assessments that resulted from the alleged racketeering activity. They assert that the alleged predicate acts of mail and wire fraud caused them to pay specific assessments and fees. Taken as true, Plaintiffs allegations satisfy RICO's statutory standing requirements.

Mem. Op. May 10, 2010 at 22-23 (citing, *inter alia, Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658-59, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008)). The Court therefore denied Double Diamond's motion to dismiss on the asserted ground that the Complaint failed to properly allege  [*20] standing.

The day after the Court issued its opinion on Defendants' Motion to Dismiss, the Fifth Circuit issued its opinion in *Joffroin v. Tufaro*, 606 F.3d 235 (5th Cir. 2010), dealing with RICO claims asserted by property owners in connection with allegations that a developer and the developer's corporate officers controlled the property owners' association and were illegally profiting from association funds. Double Diamond now argues, in addition to reasserting prior arguments, that application of *Joffroin* defeats Plaintiffs' motion for class certification as to the RICO claims due to Plaintiffs' lack of standing. In *Joffroin*, the appellants, members of a homeowners' association, sued the developers of their subdivision and the developer's corporate officers, arguing that they controlled the homeowners' association, neglected common areas, and diverted the homeowners' assessments for their own benefit. *Id.* at 236-37. Specifically, the homeowners alleged that the construction company overcharged the association and the developer's "procurement procedure was deficient, preventing the [association] from taking advantage of competitive bidding for various services, and that the [association]  [*21] paid more for a trash contract granted to a company employing [a corporate officer's] relatives than it otherwise would have." *Id.* at 237. The homeowners alleged that the defendants engaged in racketeering activities in violation of RICO,

and they sought treble damages for assessments paid that were diverted for the developer's use and not utilized for the maintenance of the common areas or diverted for work performed for the developer's other entities. *Id.* The homeowners also sought treble damages for contracts procured that were not in the interest of the homeowners' association as well as any kickbacks for such contracts. *Id.* The trial court dismissed the RICO claims after finding that the homeowners alleged injuries that derived from injuries to the homeowners' association, and therefore they lacked standing to bring a direct suit. *Id.* [10] The Fifth Circuit then set forth the test to determine whether the homeowners had standing under RICO to assert their claims, explaining:

> HN6 Where, as here, RICO plaintiffs bring claims analogous to shareholder derivative claims, we apply a three-party test to determine whether the plaintiffs satisfy general standing requirements. We ask (1) whether  [*22] the racketeering activity was directed against the corporation; (2) whether the alleged injury to the shareholders merely derived from, and thus was not distinct from, the injury to the corporation; and (3) whether state law provides that the sole cause of action accrues in the corporation. If each of these questions can be answered, "yes," then the [plaintiffs] do not have the requisite standing.

*Id.* at 238 (citing *Ocean Energy II*, 868 F.2d at 745; *Whalen v. Carter*, 954 F.2d 1087, 1091 (5th Cir. 1992)). The Court then affirmed the trial court's finding that the homeowners had no standing under RICO, explaining that the defendants directed their alleged racketeering activity against the association, the injury to the homeowners merely derived from, and was not distinct from the injury to the association, and the sole cause of action accrued in the homeowners' association, based on its examination of cases applying Louisiana state law. *Id.*

Applying the factors as set forth in *Joffroin*, the Court finds that Plaintiffs  [*23] have adequately pleaded standing under RICO. Bridgewater and Double Diamond both make both make colorable arguments regarding whether the racketeering activity was directed against the homeowners' association and whether the alleged injury merely derived from the injury to the homeowners' association, and the Court declines to determine which side is correct at this time. [11] However, the Court's examination of cases shows that Texas state law does

---

[10]   The Court notes the factual similarity between the facts alleged and claims asserted in *Joffroin* and in the instant case but recognizes that *Joffroin* applied Louisiana state law.

[11]   Double Diamond has raised and continues to raise arguments that Plaintiffs do not have standing under RICO as it argues that the harms alleged were suffered by the homeowners' association. The Court declines at this time to disturb its previous find-

2011 U.S. Dist. LEXIS 47248, *23

*not* provide that the sole cause of action accrues in the homeowners' association, such that plaintiffs alleging injury to the homeowners' association must assert claims through derivative suits. Indeed, it is not clear whether a derivative suit mechanism for nonprofit corporations even exists under Texas state law.

In support of their assertion that **[*24]** the sole cause of action accrues in the property owners' association, Double Diamond cites to numerous cases applying Texas state law to for-profit corporations governed by the Texas Business Corporations Act. However, these cases appear only partially applicable to the instant case. Under Texas law, claims asserting injury to a for-profit corporation must be brought through derivative suits as set forth by the Texas Business Corporations Act. [12] However, as explained by one state appeals court, there is no such parallel section in the Texas Non-Profit Corporations Act. [13] *Flores v. Star Cab Coop. Ass'n*, 2008 Tex. App. LEXIS 6582, 2008 WL 3980762, at *7 (Tex. App-Amarillo Aug. 28, 2008) (recons. overruled Oct. 22, 2008). The *Flores* court examined previous cases where courts assumed the existence of a derivative suit mechanism for nonprofit corporations, *Mitchell v. LaFlamme*, 60 S.W.3d 123 (Tex. App.-Houston 2000, no pet.) and *Governing Board v. Pannill*, 561 S.W.2d 517 (Tex. Civ. App. -Texarkana 1977, writ ref'd n.r.e.) and explained that these courts did not decide whether members of a Texas nonprofit corporation may bring a derivative action on be-

half of that corporation. *Id.* The Court further explained that **[*25]** the Texas Non-Profit Corporation Act, unlike the Texas Business Corporation Act, does not specifically provide for derivative suits brought on behalf of the nonprofit corporation. [14]*Id.* (citing former *Tex. Bus. Corp. Act Art. 5.14(1)*. Given that no statute provided for a derivative suit mechanism on behalf of nonprofit corporations, and no such mechanism had been definitively established by the courts, the *Flores* court declined to recognize any right to a derivative suit mechanism by the nonprofit corporation's members. *But see Mitchell*, 60 S.W.3d at 128 (citing *Wingate*, 795 S.W.2d at 719 (Tex. 1990) for proposition that "an owner cannot personally recover damages for a wrong done solely to the corporation, even though the owner may be injured by that wrong"). [15] The Court notes that at times courts apply general corporate law to Texas nonprofit corporations. However, given the *Flores* court's definitive (and fairly recent) statements regarding the inapplicability of corporate law governing for-profit corporations to nonprofit corporations, specifically the derivative suit mechanism, this Court declines to find that members of nonprofit corporations are limited to derivative suits **[*26]** in order to assert claims based on harms done to the corpo-

---

ing, as set forth in its May 10, 2010 opinion, that Plaintiffs had sufficiently pled RICO violations based on injuries suffered by them personally.

[12]   Indeed, the case law is replete with statements by Texas courts that the sole remedy for wrongs done to a corporation governed by the Texas Business Corporations Act must be asserted by shareholders is a derivative suit brought on behalf of the corporation. Similarly, cases analyzing claims by shareholders for breach of fiduciary duty by directors governed by the Business Corporation Act also state that such claims must be brought through derivative suits. *See, e.g., Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990) (corporate stockholder cannot recover damages personally for wrong done solely to the corporation, even though he may be injured by that wrong); *Grinnell v. Munson*, 137 S.W.3d 706, 718 (Tex. App.-San Antonio 2004) (right to proceed against officer of corporation for breaching fiduciary duty owed to the corporation belongs to the corporation itself).

[13]   On January 1, 2010, the Texas Business Organizations Code replaced, *inter alia*, the Texas Business **[*27]** Corporations Act and the Texas Non-Profit Corporations Act. *See, e.g.,* http://www.sos.state.tx.us/corp/boc.shtml (last visited April 20, 2011); *see also In re Aguilar*, 344 S.W.3d 41 2011 Tex. App. LEXIS 2733, WL 1402848, at *2 n.3 (Tex. App.-El Paso Apr. 13, 2011). Business Organizations Code § 1.008(d) provides that "[t]he provisions of Chapters 20 and 22 and the provisions of Title 1 to the extent applicable to nonprofit corporations may be cited as the 'Texas Nonprofit Corporation Law.'" The Texas Business Organizations Code also does not provide a derivative suit mechanism for nonprofit corporations but provides for derivative proceedings as to for-profit corporations. *Compare* Tex. Bus. Org. Code §§ 22.001 *et seq* (nonprofit corporations) *with* §§ 21.551-21.563 (derivative proceedings for for-profit corporations). The Court refers the Texas Non-Profit Corporation Act and the Texas Nonprofit Corporation Law interchangeably.

[14]   The *Flores* case concerned claims brought by members of a tax cooperative against the cooperative, which was created under the Texas Cooperative Association Act ("TCAA") and was subject to the Texas Non-Profit Corporation Act ("TNCA") to the extent the TNCA's provisions did not conflict **[*28]** with the TCAA. The *Flores* court explained that "[b]ecause it is thus governed by the Texas Non-Profit Corporation Act, the Business Corporation Act does not apply to [the cooperative]." 2008 Tex. App. LEXIS 6582, 2008 WL 3980762, at *6.

[15]   *Mitchell* later explained that "recovery for damages done the common areas belong solely to [homeowners'] association, and to sue for those damages, the Owners were required to bring a representative suit on behalf of the corporation." (citing *Wingate*, 795 S.W.2d at 719); *see also Myer v. Cuevas*, 119 S.W.3d 830, 835 (Tex. App.-San Antonio 2003) (Texas Condominium Act grants right to council of owners to institute litigation on behalf of two or more apartment owners concerning a matter related to the common elements, but does not confer standing on owner to sue individually to recover proportionate share of damages for injury done to the common elements).

Denise Ward

2011 U.S. Dist. LEXIS 47248, *26

ration. [16] As such, the Court finds that dismissal of Plaintiffs' RICO claims based on the standing analysis set forth in *Joffroin* is not warranted at this time.

### ii. Standing: Breach of Fiduciary Duty Claim

Double Diamond has argued that Plaintiffs have no standing to assert breach of fiduciary duty claims against Ward and Curran because 1) directors of corporations only have fiduciary duties to the corporations for which they serve, and 2) claims for breach of fiduciary duty must be raised by the corporation. Thus, in their view, only the property owners' association may raise this claim against them. [17] This Court previously found that Plaintiffs sufficiently alleged standing to assert breach of fiduciary duty claims against Defendants Ward and Curran, explaining:

> Because Plaintiffs have asserted injury to themselves and do not bring derivative claims on behalf of the WBPOA, the Court cannot conclude that they lack standing. Defendants have not met their burden of showing that such claims are foreclosed under Texas law.

Mem. Op. May 10, 2010 at 24. The Court therefore denied Defendants' Motion to Dismiss to the extent that it sought dismissal of the fiduciary duty claims based on standing. [18] The Court declines to disturb this **[*31]** finding at this time. [19] Further, even if Plaintiffs' claims were more prop-

erly construed as asserting claims based on harm to the property owners' association, the Texas Non-Profit Corporations Act does not provide a derivative suit mechanism that would allow White Bluff property owners to assert claims against Ward and Curran on behalf of the property owners' association. Without such a mechanism, and if the individual property owners are not found to have a individual cause of action against these directors, it would be impossible for anyone to assert breach of fiduciary duty claims against directors violating this duty, if the directors do in fact, as alleged here, control the property owners' association board. [20]

### B. Class Certification

Although the parties dispute whether the proposed class meets the requirements of *Rule 23(a)* and the superiority requirement of *Rule 23(b)(3)*, the bulk of their dispute concerns whether the proposed class meets the predominance requirement of *Rule 23(b)(3)*, *i.e.*, the requirement that common issues predominate over individual **[*33]** issues. Because the Court finds the *Rule 23(b)(3)* inquiry dispositive, the Court assumes, without deciding, that the *Rule 23(a)* requirements have been met.

Plaintiffs claim that the following issues are common to the class and would predominate at trial: "(1) whether the fees and assessments levied by the WBPOA are ille-

---

[16]   In support of their argument that Texas law does not provide that the sole cause of action resides in the homeowners' association, Plaintiffs state that under Texas law, a property owners' association may not assert claims unless a member of the association has standing individually. The cases cited by Plaintiffs do not in fact **[*29]** set forth such a rule but merely establish that an association, if suing *on behalf of its individual members*, only has standing if individual members have standing. In other words, if an association is going to stand in the shoes of its members, it cannot assert claims that the individual member could not assert. *See, e.g.*, *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 447 (Tex. 1993) (adopting test set forth in *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977), which explains that "an association has standing to sue on behalf of its members when," *inter alia*, "its members would otherwise have standing to sue in their own right"); *see also* *Wilchester W. Concerned Homeowners LDEF, Inc., v. Wilchester W. Fund, Inc.*, 177 S.W.3d 552, 561 (Tex. App.-Houston 2005) (where homeowners' organization brought action against homeowners' association and adjacent recreation club seeking declaratory judgment voiding amendments to deed restrictions, organization could bring suit and was not required to join all homeowners, as organization "has alleged that its members have suffered an injury as a result of the actions taken by the [homeowners' association], and thus its **[*30]** members would be able to bring suit in their own right") (citing, *inter alia*, *Tex. Ass'n of Bus.*, 852 S.W.2d at 447-48).

[17]   Ward and Curran also assert that they breached no fiduciary duty, even if the individual property owners did have standing to assert a breach of fiduciary claim.

[18]   The Court dismissed the fiduciary duty claims to the extent they sought recovery under Section 32.45 of the Texas Penal Code.

[19]   The Court notes that Double Diamond generally cites cases applying Texas corporate law applicable to for-profit corporations in support of its argument that Bridgewater may not assert **[*32]** fiduciary claims against it. Given the *Flores* court's statement that no derivative mechanism exists for nonprofit corporations, the Court declines to dismiss the fiduciary claims based on standing at this time. *But see* *Myer v. Cuevas*, 119 S.W.3d 830, 836 (Tex. App-San Antonio 2003) (property owner could not assert fiduciary duty claim against property owners' association board unless he alleged that a fiduciary duty was owed to him personally by the officers, as right to proceed against officer of corporation for breaching fiduciary duty owed to corporation belongs to the corporation) (citations omitted).

[20]   The Court expresses no opinion at this time as to whether Curran and Ward did in fact violate any duty to the property owners' association or Plaintiffs, nor as to whether Curran and Ward do and did control the property owners' association board.

2011 U.S. Dist. LEXIS 47248, *33

gal; (2) whether Double Diamond owners/executives Ward and Curran, as directors of the WBPOA, have breached their fiduciary duties; (3) whether Defendants have been unjustly enriched; and (4) whether injunctive relief is warranted." Mot. 3-4. As explained by Plaintiffs:

> The central issue in this litigation is the fees and assessments levied by the WBPOA Board of Directors against the property owners at White Bluff. . . . The claims alleged by the class ? RICO, breach of fiduciary duty, collateral estoppel, unjust enrichment, constructive trust, and a request for injunctive relief — all focus on the same questions of fact and law. Showing that Defendants, through the use of mail and wire, engaged in an ongoing pattern of making false statements about the need for the assessments, and then soliciting, collecting and using the funds improperly for their benefit, are all common [*34] issues, regardless of who the class member is. The fiduciary duties owed by WBPOA directors Ward and Curran are owed to the entire class, as they have been directors of the WBPOA for the entire class period, and all proposed class members are members of the WBPOA. If the fees are improperly assessed, then Defendants' failure to make restitution is a uniform issue. Finally, the injury here is common to all class members, who would each be entitled to a monetary recovery or receivable reduction calculated by a straightforward, uniform formula.

> Not only do common issues predominate Plaintiffs' affirmative claims, but Defendants cannot successfully defeat class certification by arguing that individual issues predominate either the affirmative defense of limitations or the elements of a RICO claim.

> First, the issue of whether the applicable statutes of limitation are tolled by the doctrine of fraudulent concealment is common, because that inquiry focuses on Defendants' conduct, which is common to the whole class and can be proved by evidence common to all class members. Further, the fact that different limitations may apply to different causes of actions does not defeat certifica-

tion, as courts [*35] routinely find that common issues predominate even when multiple statutes of limitations apply. In this case, the Court will not have difficulty applying the two applicable statutes of limitations, and the time of their accrual will be established by evidence common to the entire class.

> Next, because reliance is not an element of RICO, and the class has not asserted a fraud claim, there is no reliance argument that requires individualized proof, which may otherwise defeat predominance. Here, the class challenges the legality of the WBPOA Board of Directors forcing property owners to participate in the Food and Beverage program as well as assessing any maintenance fee that is not related to association property or not competitively bid or otherwise part of a fair, arm's length transaction. The dispute is with the fee itself, not whether the class members relied on any misrepresentations in paying it. [21]

*Id.* at 7-8 (citations omitted).

In response, Double Diamond argues that individual issues predominate over issues common to the class:

> Plaintiffs have not shown that common issues predominate over issues requiring individualized proof as to each class member as required by *Rule 23(b)(3)*. In short, this is a RICO fraud case. It is based on alleged misrepresentations by Defendants concerning White Bluff's hospitality program and golf course maintenance fees. Yet Plaintiffs have not shown — or even attempted to show — how they could prove, on a class-wide basis, with class-wide proof, that each of the thousands of White Bluff property owners, who bought and sold property in White Bluff from Defendants [*37] and various others over the course of many years, were defrauded by Defendants.

> Without class-wide proof, each putative class member would need to submit individualized proof — thereby creating the need for thousands of mini-trials — about, for example: what he or she received and read or heard, what he or she thought it meant,

---

[21] Plaintiffs also discuss, in connection with their arguments regarding predominance, that due to the relatively small amount of money assessed to each property owner, individual litigation is "economically unfeasible" and "a class action is a more efficient [*36] mechanism for adjudication." Mot. 7. It is not clear how the amount of money at stake is relevant to the issue of predominance, even if it is true that individual litigation is in fact "economically unfeasible." Further, although this contention is repeatedly emphasized throughout Plaintiffs' briefing and their arguments at the class certification hearing, such argument, even if accepted by the Court, is not sufficient to meet Plaintiffs' burden under Rule 23, if the requirements of Rule 23 such as predominance are not met.

2011 U.S. Dist. LEXIS 47248, *37

what he or she already knew about White Bluff's programs and fees, and how, if at all, a Defendant's statement affected his or her action or conduct. Thousands of individual mini-trials on liability would, if successful, then be followed by potentially thousands more on damages.

And that is only one side of the equation. In their defense, Defendants would present evidence about the different dates on which limitations began to run on a given owner's various claims and the extent to which an individual owner's claim for harm or injury should be offset or reduced due to the various benefits (e.g. usage of free golf rounds; sale or redemption of hospitality credits; added value to one's property caused by the amenities and realized upon sale) realized by the owner. This ocean of individualized evidence would swamp this litigation and make the case unmanageable.

Defs.' [*38] Opp'n 4-5 (citations omitted). In analyzing the parties' arguments on predominance, the Court focuses on the RICO claims and damages.

### i. RICO Claims

Double Diamond argues that class certification is not appropriate for Plaintiffs' RICO claims due to the reliance that must be shown as to each class member, specifically each class member's reliance on Double Diamond's alleged misrepresentations. Plaintiffs argue in contrast that they need not show reliance given that the predicate act is RICO mail fraud, relying on the Supreme Court's statements in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008). The Court now revisits its prior findings regarding RICO mail fraud and reliance based on *Bridge*. The Court previously found, in the context of Defendants' Motion to Dismiss that:

[RICO] confers standing on any person injured in his business or property by reason of a violation of *section 1962* of this chapter. Plaintiffs are not required to plead that they relied on the allegedly fraudulent material; rather they are only required to allege that they were injured "by reason of" commission of the predicate acts.

Mem. Op. May 10, 2010 at 22 (citing *Bridge* and *18 U.S.C. § 1964(c)*). This [*39] Court therefore found that Plaintiffs had standing to assert their RICO claims given that they asserted their own injuries apart from any injury to the WBPOA. *Id.* at 23. Upon further examination of *Bridge* and relevant Fifth Circuit case law, the Court concludes that Plaintiffs, and all members of the potential class, must establish their individual reliance on the allegedly fraudulent representations in order to recover for RICO mail fraud. [22] The Supreme Court's discussion in *Bridge* is instructive. In *Bridge*, disappointed bidders in a municipal auction alleged RICO mail fraud violations by defendants, bidders who made fraudulent representations to the municipality, enabling the defendants to purchase property that the plaintiffs sought. The court rejected the defendants' contention that proximate cause for fraud claims can only be shown where the plaintiff can demonstrate that he relied on the misrepresentation. The court explained reliance was not an element of RICO mail fraud nor essential to showing causation:

Petitioner's argument is twice flawed. First . . . the predicate act here is not common-law fraud, but mail fraud. Having rejected petitioners' argument that reliance is an [*40] element of a civil RICO claim based on mail fraud, we see no reason to let that argument in through the back door by holding that the proximate-cause analysis under RICO must precisely track the proximate-cause analysis of a common-law fraud claim. Reliance is not a general limitation on civil recovery in tort; it is a specialized condition that happens to have grown up with common law fraud. That "specialized condition," whether characterized as an element of the claim or as a prerequisite to establishing proximate causation, simply has no place in a remedial scheme keyed to the commission of mail fraud, a statutory offense that is distinct from common-law fraud and that does not require proof of reliance.

Second, while it may be that first-party reliance is an element of a common-law fraud claim, there is no general common-law principle holding that a fraudulent misrepresentation can cause legal injury only to those who rely on it.

---

[22]   Aside from *Bridge*, Double Diamond cites to the Fifth Circuit's pattern jury instruction on RICO mail fraud, which implies that plaintiffs must be deceived by the defendants' scheme to defraud, thus imposing a reliance requirement on Plaintiffs' RICO mail fraud claim. Hr'g Tr. Feb. 15, 2011 at 35-36 (discussing Fifth Circuit Pattern Jury Instructions — Civil 2006 at § 8.1, found at http://www.lb5.uscourts.gov/juryinstructions/fifth/2006civil.pdf (last visited April 12, 2011)). Given that the Fifth Circuit's jury instructions on RICO have not been updated since 2006, before the *Bridge* case was decided, the Court does not base its findings regarding the requirement of reliance in RICO mail fraud claims on the pattern jury instruction.

2011 U.S. Dist. LEXIS 47248, *40

*Bridge*, 553 U.S. at 655-56 (citations omitted). Plaintiffs rely on this portion of the *Bridge* opinion in support of their contention that they need not establish reliance for each class member. However, the Supreme Court continued to explain that generally [*41] plaintiffs will have to establish their own reliance in order to establish RICO mail fraud:

> Of course, none of this is to say that a RICO plaintiff who alleges injury "by reason of" a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations." In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation. . . . Accordingly, it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation. . . . Proof that the plaintiff relied on the defendant's misrepresentations may in some cases be sufficient to establish proximate cause, but there is no sound reason to conclude that such proof is always necessary. By the same token, the absence of first-party reliance may in some cases tend to show that an injury was not sufficiently direct to satisfy § 1964(c)'s proximate cause requirement, but it is not in and of itself dispositive. A contrary holding would ignore *Holmes'* instruction that proximate cause is generally not amenable to bright-line rules.

*Bridge*, 553 U.S. at 658-59 (citing, *inter* [*42] *alia*, *Holmes v. Secs. Investor Protection Corp.*, 503 U.S. 258, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992) (emphasis in original); *see also id. at 657 n.6* (a "misrepresentation can cause harm only if a recipient of the misrepresentation relies on it").

As read by this Court, *Bridge* does not establish the bright-line rule that plaintiffs asserting RICO claims based on mail fraud need not assert or establish their reliance on the fraud. *Bridge* focused primarily on whether the plaintiffs, who did [*43] not in fact rely on any misrepresentations by the defendants, may still assert RICO mail fraud claims based on alleged misrepresentations that were relied upon by a nonparty to the suit, leading to the plaintiffs' injury. In essence, the Supreme Court found that in most cases, plaintiffs will either have to show third-party reliance or first-party reliance. [23] Plaintiffs cite cases in support of their contention that no showing of reliance is necessary to show causation in this case, but the Court disagrees with these cases to the extent that they may assert that no showing of reliance by any party is necessary for RICO mail fraud claims. [24]

Here, Plaintiffs do not claim third-party reliance and it is not clear how they may show causation without first-party reliance. Plaintiffs argue that the homeowners' payment of their assessments shows that they relied on the truthfulness of the invoices setting forth the assessments. *See, e.g.*, Pls.' Reply 4 ("[I]t is logical to assume that, given the millions of dollars received each year from property owners in assessments as well as Defendants' practice of initiating foreclosure proceedings against those who do not pay, property owners are induced to believe that they must pay for these assessments."). However, such theory does not obviate the need to show the individual class members' reliance. [25] A similar "invoice theory" was found inappropriate to show causation [*45] for the purposes of class certification in *Sandwich Chef of Texas, Inc. v. Reliance National Indemnity Insurance Co.*, 319 F.3d 205 (5th Cir. 2003). As set forth in *Sandwich Chef*, the plaintiffs alleged that "each class member was overcharged by means of an inflated invoice that affirmatively misrepresented that the premium charged was the amount lawfully due," and "[i]ndividual proof of reliance was not an obstacle to class certification because the act of payment of invoices could establish circumstantial evidence of reliance." *Id. at 220*. The defendants argued that the plaintiffs were aware that they were being charged unlawful rates, and such

---

[23]  *See, e.g.*, *Braswell Wood Co. v. Waste Away Group, Inc.*, 2010 U.S. Dist. LEXIS 80836, 2010 WL 3168125, at *3 n.1 (M.D. Ala. Aug. 10, 2010)) ("*Bridge* abrogated the Eleventh Circuit's precedent . . . only narrowly in deciding that a RICO claim may proceed on the basis of 'third-party' reliance; that is, when a plaintiff alleges that it was harmed because a third party relied on the defendant's misrepresentations. *Bridge* did not hold that no reliance on anyone's part is required to sustain a RICO claim with a fraud predicate.") (citations omitted).

[24]  Plaintiffs cite to, *inter alia*, [*44] *Kennedy v. Jackson National Life Insurance Co.*, 2010 U.S. Dist. LEXIS 63604, 2010 WL 2524360 (N.D. Cal. June 23, 2010); *Charrons v. Pinnacle Group N.Y. LLC*, 269 F.R.D. 221 (S.D.N.Y. 2010); and *Spencer v. Hartford Financial Services Group, Inc.*, 256 F.R.D. 284 (D. Conn. 2009). Even if these cases were binding upon the Court, it is not clear that they establish that plaintiffs need not establish first- or third-person reliance in order to prove causation.

[25]  Notably, this assertion and Plaintiffs' assertions that "individual issues of reliance do not thwart class actions" and "a court can presume reliance," Pls.' Reply 4, conflicts with Betty Bridgewater's statement that she believed the food and beverage credit was illegal from the beginning. At least one other class member, Daniel Saturn, appears to have had similar beliefs at an early stage as well. While perhaps the majority of the class members did not have similar beliefs, the fact that one of the lead plaintiffs claims that she knew one of the programs at issue was illegal certainly [*47] calls into doubt any presumption of reliance by all class members.

2011 U.S. Dist. LEXIS 47248, *45

knowledge, if found, "would eliminate reliance and break the chain of causation." *Id.* (citations omitted). The trial court had found that plaintiffs could present circumstantial evidence "consist[ing] of proof that the invoices contained material misrepresentations — inflated premiums — and that the class members had paid overcharges in reliance on the invoices," as well as "expert witness testimony that businesses customarily and reasonably rely on the accuracy of invoices . . . and that commercial transactions between businesses occur based **[*46]** on an ethic of honesty and fair dealing." *Id.* (citations omitted). The Fifth Circuit rejected this finding, explaining that the plaintiffs "must establish at trial that they detrimentally relied on the misrepresentations in the invoices" and explaining that the defendants were entitled to submit proof demonstrating a lack of reliance by individual plaintiffs. *Id.* at 220-21. Accordingly, the court found that the invoice theory set forth by the plaintiffs did not "eliminate individual issues of reliance and causation that preclude a finding of predominance of common issues of law or fact." [26] *Id.* at 221.

Under similar reasoning the Court finds that individual class members must establish their reliance in order prove their RICO mail fraud claim. **[*48]** Given that the Court would be required to conduct mini-trials as to the issue of individual reliance as to each class member, [27] Plaintiffs cannot establish that common issues would predominate at trial and cannot establish superiority under *Rule 23(b)(3)* as to Plaintiffs' RICO mail fraud claims. As

such, the Court **DENIES** class certification with respect to Counts One (*18 U.S.C. § 1962(c)*) and Two (*18 U.S.C. §1962(d)*), given that they are based on the predicate acts of RICO mail and wire fraud. *See* FAC ¶¶ 91-92, 95.

### ii. Claims for Relief/Remedies

*HN7* Class certification may be inappropriate due to the predominance of individualized damages determinations over common issues. *O'Sullivan*, 319 F.3d at 744-45 ("Where the plaintiffs' damages claims focus almost entirely on facts and issues specific to individuals rather than the class as a whole, the potential exists that the class action may degenerate in practice into multiple lawsuits separately tried.") (citing *Allison*, 151 F.3d at 419; *Castano*, 84 F.3d at 745 n.19). Double Diamond argues that common issues do not predominate in this case due to the individual damages determinations that will be required, preventing class certification. Specifically, Double Diamond argues that any possible damages award class members receive must be reduced by the value of benefits they received, specifically the value of the free rounds of golf and food and beverage credits they used or sold to other property **[*50]** owners. Double Diamond argues that due to the lack of record keeping by the homeowners' association or the corporations providing the various amenities at White Bluff, this information is solely within the control of the class members and

---

[26] Plaintiffs argue that *Sandwich Chef* is no longer good law, relying on *Bridge* and *St. Germain v. Howard*, 556 F.3d 261 (5th Cir. 2009). *St. Germain* explained:

> In holding that Appellants were required to demonstrate detrimental reliance when alleging injuries that resulted from fraud under RICO, however, the district court relied on Fifth Circuit precedent that is no longer good law [citing *Summit Props. Ins. v. Hoechst Celanese Corp.*, 214 F.3d 556, 562 (5th Cir. 2000)]. The Supreme Court recently held [in *Bridge*] that no reliance element exists for civil causes of action under RICO for victims of mail fraud. Thus, *to the extent that our prior cases are in conflict with Bridge*, they are overruled.

556 F.3d at 263 (emphasis added). The Court agrees that *Sandwich Chef* is overruled to the extent that it precluded assertion of RICO claims based on third-party reliance. However, *Bridge* makes no findings which would overrule *Sandwich Chef's* findings rejecting the invoice theory of reliance.

[27] As explained by Double Diamond, the Court would need to examine :

1) What allegedly false statement was received by the individual property owner?

2) What did the individual property owner understand the statement to mean?

3) What did the individual property owner already know about the substance of the statement?

4) What did the property owner do, if anything, in response to the statement?

5) How was the individual property owner proximately injured, if at all, by the allegedly false statement?

Defs.' Br. Opp'n 12. Without expressing an opinion regarding to what extent each class member would need to answer these questions, the Court finds that each class member would need to show **[*49]** his or her reliance on whatever misrepresentations were made by Double Diamond. The Court also notes that Double Diamond disputes that uniform representations were made to each class member, which also tends to negate a finding of predominance of common issues. *Id.*

2011 U.S. Dist. LEXIS 47248, *50

therefore damages will have to be determined on an individual basis. In contrast, Plaintiffs argue that no "offset" is necessary because 1) these assessments are illegal and 2) under accounting principles they are not "benefits" as the property owners "didn't have a choice of whether to receive it or not." Hr'g Tr. 25-26; Pls.' Reply 5.

The Court is aided in its determination of whether "offsets" are necessary by a recent decision of the Dallas Court of Civil Appeals in the related state case *Double Diamond, Inc. and White Bluff Property Owners' Association v. Daniel Saturn*, 339 S.W.3d 337, 2011 Tex. App. LEXIS 2494, 2011 WL 1240096 (Tex. App-Dallas Apr. 5, 2011). Double Diamond and the WBPOA ("the Appellants") sought, *inter alia*, unpaid food and beverage assessments from Daniel Saturn, a property owner at White Bluff, as well as a declaratory judgment that the food and beverage program was proper and in accordance with the WBPOA bylaws, and that Saturn, as a member of the WBPOA, **[*51]** was subject to the program. *2011 Tex. App. LEXIS 2494, [WL] at *2*. Saturn asserted counterclaims seeking a declaratory judgment that the food and beverage program was illegal and seeking an injunction barring the Appellants from assessing future food and beverage assessments, foreclosing on his lot, or making negative credit reports against him for refusing to pay the charges. *2011 Tex. App. LEXIS 2494, [WL] at *2*. The court found that the Appellants failed to conclusively establish that the food and beverage assessments were reasonable compensation for services rendered to the WBPOA by the receiving Double Diamond entity Club Corp. *2011 Tex. App. LEXIS 2494, [WL] at *5*. The court reasoned that the jury could find that the funds paid to Club Corp. were not reasonable compensation based on evidence that Double Diamond had agreed to make a million dollars' worth of capital improvements to the resort that would have otherwise been paid by the WBPOA, but would also be relieved of a $50,000 annual payment to the WBPOA and would receive over $11 million in food and beverage funds over 10 years in exchange for $1 million in capital improvements. *Id.* The court implied that the determination of whether the compensation was reasonable would necessarily involve weighing the **[*52]** benefits received by the property owners in the form of food and beverage credits used against the compensation received by Club Corp. in the form of food and beverage assessments:

Although *the members of the Owners' Association received benefits totaling the amount of the food and beverage credits they actually used*, there was no evidence as to that amount. And although the value of the lots of the Owners' Association's members might be increased by the presence of Club Corp.'s hospitality operations, there was no evidence as to the amount of such property-value increases. These facts constitute some evidence that the food and beverage funds paid by the Owners' Association to Club Corp. were not reasonable compensation for services rendered to the Owners' Association by Club Corp. [28]

Thus, Appellants failed to conclusively establish that the food and beverage charges paid to Club Corp. were reasonable compensation for services rendered to the Owners' Association by Club Corp.

*Id.* (emphasis added); *see also* *2011 Tex. App. LEXIS 2494, [WL] at *7* ("In this case, the jury made no findings in support of any element of appellee's declaratory judgment claim, and lack of reasonable compensation was not conclusively established **[*53]** because the food and beverage credits themselves constituted some evidence of reasonable compensation."). The appellate court found that a reasonable jury could find that the assessments were not reasonable compensation in part due to the fact that the Appellants had not produced evidence on the amount of credits actually used. [29] However, in the instant case, Plaintiffs have the burden of showing their damages in addition to Double Diamond's liability. Also, *HN8* for the purposes of class certification, Plaintiffs have the burden of showing that class certification is appropriate and that individual damages issues do not predominate over common issues. Given that the appellate court found that any determination of what constituted "reasonable compensation" to the Double Diamond entities would have to include the value of food and beverage credits actually used by the members, the Court similarly finds that any calculation of individual class members' damages must also take in account the value of ben-

---

28   Although this issue was not discussed by the trial court or the appellate court, neither court appeared concerned that payments by the property owners were used to support non-association property. Rather, the key issue was whether the food and beverage program assessments received by Club Corp. were reasonable compensation for the food and beverage credits given and/or used.

29   The court explained that the jury made "an affirmative finding that appellants did not carry their burden of proof to show the food and beverage program complied with the bylaws because the charges constitute reasonable compensation, but it is *not* an affirmative **[*55]** jury finding that [Saturn] carried his burden of proof to show that the food and beverage program violated the bylaws because the charges did not constitute reasonable compensation." 2011 Tex. App. LEXIS 2494, [WL] at *7 (emphasis in original). The court therefore reversed the trial court's declaratory judgment that the food and beverage program was not in accordance with the bylaws and that it violated article 1396-2.24 of the Non-Profit Corporations Act based on the jury's findings. *Id.*

2011 U.S. Dist. LEXIS 47248, *53

efits received, specifically the free rounds of golf and food and beverage credits received and exercised or transferred to others. The Court is mindful of the fact that at least some class [*54] members claim they were forced to pay the assessments and that they did not in fact receive benefits equal to the dollar amount of credits they received. However, the Court is also mindful of the fact that the homeowners did receive food and beverage credits and free rounds of golf which have a monetary value greater than zero, if not equal to the amount of the credit or the normal cost of a round of golf at White Bluff, [30] and these benefits should be deducted from the assessments paid by each class member in order to determine that member's damages. [31]

Plaintiffs argue that even if offsets are required to be deducted from each class member's individual damages, "Defendants maintain records showing usage of credits," and then a fair market value should be attributed to those credits, and "whatever amount [*56] was used by a property owner would be deducted from the award to that particular property owner." Pls.' Reply 5. In response to Double Diamond's contention that they did not track food and beverage credit usage until 2006, preventing a uniform damages calculation, Plaintiffs argue that "[i]t would not be Plaintiffs' burden, and therefore should not be Plaintiffs' problem, to have to consider how to recreate credit usage." Id. at 5 & n.5. While perhaps Double Diamond should have kept records of credit us-

age and use of the free rounds of golf, such omission does not relieve Plaintiffs of their burden to show that certification is warranted and that individualized issues do not predominate over common issues. [32] See, e.g., Castano, 84 F.3d at 740 (plaintiff has burden of proof to show that class should be certified). Due to the lack of this information, each class member's damages would have to be calculated on an individual basis using individualized proof, [33] thus defeating Plaintiffs' claims of predominance of class issues and superiority of the class action mechanism. Accordingly, the Court finds that class certification as to damages is inappropriate and is hereby **DENIED**.

Further, the Court declines to sever, *sua sponte*, the issues of liability of the remaining potential class claims from the issues of damages. [*58] The Court declines to sever these issues given the Court's requirement to consider the cause of action as a whole and the Fifth Circuit's instruction *HN9* not to "manufacture predominance through the nimble use" of *Federal Rule of Civil Procedure 23(c)(4)*. *Castano*, 84 F.3d at 745 n.21. Further, Plaintiffs have not sought, as an alternative to certification of both liability and damages, to certify the issue of liability only as to each claim in the face of Double Diamond's arguments that individual determinations must be made as to each class member's damages. Given that the Court declines to sever the issue of damages, Plaintiffs' request for certification of Counts Three (reimbursement), [34] Four (breach of fiduciary duty), and Six

---

[30]   These more readily quantifiable benefits are also in addition to whatever benefits the homeowners may have enjoyed due to maintenance of the amenities supported by the assessments such as increased property values, though Plaintiffs argue that Double Diamond was contractually obligated to provide and maintain these amenities.

[31]   To refund the full amount of assessments paid could result in windfalls to class members who did in fact take at least partial advantage of their credits.

[32]   The cases [*57] cited by Plaintiffs in support of their assertion that no offsets are required are neither binding on this Court nor on point. Further, Plaintiffs' claims that failure to track food and beverage credit usage "underscores what an illusory 'benefit' this program really is," Pls.' Reply 5-6, is more appropriate to the merits of the case and not whether their claims are appropriate for class certification.

[33]   As explained by Double Diamond,

[E]ach property owner would have to be questioned about their credit usage and documents potentially establishing such usage would be, if at all, in the possession of the individual property owner. Similarly, except as may have been kept by an individual owner, records tracking the amounts received by property owners for their sale of hospitality credits do not exist. Likewise, evidence of other benefits received an enjoyed by an individual, like usage of the free rounds of golf and purchase of discounted merchandise and services is in the possession, if at all, of each individual property owner.

Defs.' Br. Opp'n 17.

[34]   Based on the Court's reading of the appellate court's decision in *Double Diamond, Inc. v. Saturn*, 2011 Tex. App. LEXIS 2494, 2011 WL 1240096, it is not clear that there is any determination by the trial court or now the appellate court which Plaintiffs may use for collateral estoppel purposes, given that apparently the only relevant finding left after appeal is that Double Diamond did not establish its right to collect on the food and beverage credit in that particular case. Notably, the appellate court reversed the trial court's finding that assessments received by Double Diamond were not reasonable compensation for the goods and services provided by the Double Diamond entity, and that the food and beverage assessments were void *ab initio*. However, the parties dispute the effect of the appellate court's determination, and the Court declines at this time to deter-

2011 U.S. Dist. LEXIS 47248, *62

(unjust enrichment) [35] is **DENIED**. [36]

Plaintiffs also seek certification of their "counts" requesting injunctive relief and imposition of a constructive trust. [37] Given that the Court declines to certify any underlying legal or equitable claims upon which these remedies may be based, the Court **DENIES** certification as to Counts Five and Seven.

**V.**

**CONCLUSION**

For [*62] the reasons discussed in this order, Plaintiffs' proposed Class does not meet the predominance require-ments of *Rule 23(b)(3)*. Plaintiffs' Motion for Class Certification is therefore **DENIED**. [38]

**SO ORDERED.**

**SIGNED: April 29, 2011.**

/s/ Jane J. Boyle

**JANE J. BOYLE**

**UNITED STATES DISTRICT JUDGE**

---

mine what collateral estoppel effect the trial court's and appellate court's determinations may have, if any.

[35]   Even if there were uniform damages issues as to Plaintiffs' unjust enrichment claim, individualized determinations of liability as to this claim would predominate. "A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992); *see also First Union Nat'l Bank v. Richmont Cap. Partners I, L.P.*, 168 S.W.3d 917, 931 (Tex. App.-Dallas 2005, no pet.). Therefore each class member would be required to show that they paid their assessments because of Double Diamond's fraud, duress, or [*60] taking of an undue advantage. Further, Double Diamond would be able to assert the defense of waiver. "Under Texas law, waiver is a voluntary, intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *First Interstate Bank of Ariz. N.A. v. Interfund Corp.*, 924 F.2d 588, 595 (5th Cir.1991). Whether a waiver occurred ordinarily involves a fact question focusing on intent. *See F.D.I.C. v. Niblo*, 821 F. Supp. 441, 451 (N.D. Tex.1993). While the Court expresses no opinion on whether Double Diamond has a valid defense of waiver, it notes that determining whether class members waived any rights will require individualized determinations in which Double Diamond would be able to submit evidence as to particular class members and which Plaintiffs could rebut. As with Plaintiffs' RICO claims, assertion of an invoice theory will not suffice to show that Plaintiffs relied on any misrepresentations nor whether Plaintiffs waived or did not waive their claims.

[36]   It is not clear that unjust enrichment and reimbursement are independent *claims*, rather than equitable *remedies*. *See, e.g., Hancock v. Chicago Title Ins. Co.*, 635 F. Supp. 2d 539, 560 (N.D. Tex. 2009) [*61] (While some courts applying Texas law "still occasionally refer to an 'unjust enrichment claim' . . . . [t]hese opinions do not, however, characterize unjust enrichment as a separate cause of action from money had and received; they consider it to be a general theory of recovery for an equitable action seeking restitution."); *see also id.* ("Texas courts of appeals have consistently held that unjust enrichment is not an independent cause of action, but is instead a theory upon which an action for restitution may rest.") (citations omitted). The Court did not reach the issue of whether unjust enrichment and reimbursement are proper claims rather than remedies in its Order of May 10, 2010 granting Defendants' Motion to Dismiss in part and denying it in part.

[37]   Plaintiffs also seek exemplary damages and attorneys' fees, though those two forms of relief are not styled as "counts."

[38]   Because the Court finds that Plaintiffs do not meet their burden of showing predominance due to individualized issues regarding reliance and damages, the Court does not reach Double Diamond's argument that individualized issues regarding limitations predominate over common issues.



Neutral
As of: October 11, 2013 10:40 AM EDT

# David v. Signal Int'l, LLC

United States District Court for the Eastern District of Louisiana
January 3, 2012, Decided; January 4, 2012, Filed
CIVIL ACTION NO: 08-1220 SECTION: "A" (3)

**Reporter:** 2012 U.S. Dist. LEXIS 114247

KURIAN DAVID, ET AL. versus SIGNAL INTERNATIONAL, LLC, ET AL.

**Subsequent History:** Motion granted by *David v. Signal Int'l, L.L.C., 2012 U.S. Dist. LEXIS 135254 (E.D. La., Sept. 21, 2012)*

**Prior History:** *David v. Signal Int'l, L.L.C., 2010 U.S. Dist. LEXIS 128614 (E.D. La., Nov. 23, 2010)*

| Core Terms |
| --- |

signal, green card, certificate, visa, forced labor, traffic, coercion, arrive, involuntary servitude, predominate, permanent, recruitment, temporary, fraudulent, predicate act, first-party, bridge, immigrate, compensatory damages, class-wide, skill, conspiracy, slavery, indian, travel, mail, psychological, terminate, misrepresent, advertize

**Counsel:** **[*1]** For Kurian David, Plaintiff: Alan Bruce Howard, LEAD ATTORNEY, PRO HAC VICE, Crowell & Moring, LLP (New York), New York, NY; Ashleigh Ferris, Daniel Werner, PRO HAC VICE, Kristi L. Graunke, PRO HAC VICE, Mary C. Bauer, PRO HAC VICE, Morris S. Dees, PRO HAC VICE, Naomi Tsu, PRO HAC VICE, Southern Poverty Law Center, Immigrant Justice Project, Atlanta, GA; Chandra S. Bhatnagar, PRO HAC VICE, American Civil Liberties Union Foundation (New York/Broad), New York, NY; Hugh Daniel Sandler, PRO HAC VICE, Joseph Bjarnson, Dewey & LeBoeuf LLP (New York), New York, NY; Ivy O. Suriyopas, PRO HAC VICE, Shirley Lin, PRO HAC VICE, Asian American Legal Defense and Educational Fund, New York, NY; Jennifer Stewart, Winston & Strawn, LLP (New York), New York, NY; Tracie L. Washington, The Louisiana Justice Institute, New Orleans, LA.

For Sony Vasudevan Sulekha, Palanyandi Thangamani, Hemant Khuttan, Andrews Issac Padaveettiyl, Dhananjaya Kechuru, on behalf of other similarly situated individuals, Sabulal Vijayan, Krishan Kumar, Kuldeep Singh, Plaintiffs: Alan Bruce Howard, LEAD ATTORNEY, PRO HAC VICE, Crowell & Moring, LLP (New York), New York, NY; Ashleigh Ferris, Daniel Werner,

Kristi L. Graunke, Mary **[*2]** C. Bauer, Morris S. Dees, Naomi Tsu, Southern Poverty Law Center, Immigrant Justice Project, Atlanta, GA; Chandra S. Bhatnagar, PRO HAC VICE, American Civil Liberties Union Foundation (New York/Broad), New York, NY; Hugh Daniel Sandler, Joseph Bjarnson, Dewey & LeBoeuf LLP (New York), New York, NY; Ivy O. Suriyopas, Shirley Lin, Asian American Legal Defense and Educational Fund, New York, NY; Jennifer Stewart, Winston & Strawn, LLP (New York), New York, NY; Tracie L. Washington, The Louisiana Justice Institute, New Orleans, LA.

For Maruganantham Kandhasamy, Plaintiff: Alan Bruce Howard, LEAD ATTORNEY, PRO HAC VICE, Crowell & Moring, LLP (New York), New York, NY; Ashleigh Ferris, Daniel Werner, Kristi L. Graunke, Mary C. Bauer, Morris S. Dees, Naomi Tsu, Southern Poverty Law Center, Immigrant Justice Project, Atlanta, GA; Chandra S. Bhatnagar, PRO HAC VICE, American Civil Liberties Union Foundation (New York/Broad), New York, NY; Hugh Daniel Sandler, Joseph Bjarnson, Dewey & LeBoeuf LLP (New York), New York, NY; Ivy O. Suriyopas, Shirley Lin, Asian American Legal Defense and Educational Fund, New York, NY; Jennifer Stewart, Winston & Strawn, LLP (New York), New York, NY; **[*3]** Tracie L. Washington, The Louisiana Justice Institute, New Orleans, LA.

For Jacob Joseph Kaddakkarappally, Plaintiff: Alan Bruce Howard, LEAD ATTORNEY, PRO HAC VICE, Crowell & Moring, LLP (New York), New York, NY; Shirley Lin, LEAD ATTORNEY, PRO HAC VICE, Ivy O. Suriyopas, Asian American Legal Defense and Educational Fund, New York, NY; Ashleigh Ferris, Daniel Werner, Kristi L. Graunke, Mary C. Bauer, Morris S. Dees, Naomi Tsu, Southern Poverty Law Center, Immigrant Justice Project, Atlanta, GA; Chandra S. Bhatnagar, PRO HAC VICE, American Civil Liberties Union Foundation (New York/Broad), New York, NY; Hugh Daniel Sandler, Joseph Bjarnson, Dewey & LeBoeuf LLP (New York), New York, NY; Jennifer Stewart, Winston & Strawn, LLP (New York), New York, NY; Tracie L. Washington, The Louisiana Justice Institute, New Orleans, LA.

For Thanasekar Chellappan, individually, Plaintiff: Alan Bruce Howard, LEAD ATTORNEY, PRO HAC VICE,

Crowell & Moring, LLP (New York), New York, NY; Ashleigh Ferris, Daniel Werner, PRO HAC VICE, Kristi L. Graunke, PRO HAC VICE, Mary C. Bauer, PRO HAC VICE, Morris S. Dees, PRO HAC VICE, Naomi Tsu, PRO HAC VICE, Southern Poverty Law Center, Immigrant Justice Project, Atlanta, [*4] GA; Chandra S. Bhatnagar, PRO HAC VICE, American Civil Liberties Union Foundation (New York/Broad), New York, NY; Hugh Daniel Sandler, Joseph Bjarnson, Dewey & LeBoeuf LLP (New York), New York, NY; Ivy O. Suriyopas, PRO HAC VICE, Shirley Lin, Asian American Legal Defense and Educational Fund, New York, NY; Jennifer Stewart, Winston & Strawn, LLP (New York), New York, NY; Tracie L. Washington, The Louisiana Justice Institute, New Orleans, LA.

For Signal International LLC, Defendant, Third Party Plaintiff, Cross Claimant: Erin Casey Hangartner, LEAD ATTORNEY, Alan Dean Weinberger, Dominic Joseph Gianna, Elham Rabbani, Hal D. Ungar, Paul John Mirabile, Middleberg, Riddle & Gianna (New Orleans), New Orleans, LA; Elliot Ross Buckley, Jr., Jefferson Parish Attorney's Office (Elmwood), Harahan, LA; Patricia Anne F. Bollman, Patricia A. Bollman, APLC, Metairie, LA.

Malvern C. Burnett, Defendant, Pro se, New Orleans, LA.

For Malvern C. Burnett, Gulf Coast Immigration Law Center, L.L.C., Law Offices of Malvern C. Burnett, A.P.C., Defendants, Cross Defendants: Ralph R. Alexis, III, LEAD ATTORNEY, Denia Sylve Aiyegbusi, Glenn B. Adams, Porteous, Hainkel & Johnson (New Orleans), New Orleans, LA; Michael [*5] J. Madere, The Law Offices of Robert D. Ford, Kenner, LA.

Gulf Coast Immigration Law Center, L.L.C., Defendant, Pro se, New Orleans, LA.

Law Offices of Malvern C. Burnett, A.P.C., Defendant, Pro se, New Orleans, LA.

Indo-Ameri Soft L.L.C., Defendant, Pro se, New Orleans, LA.

Kurella Rao, Defendant, Pro se, Metairie, LA.

For J & M Associates, Inc. of Mississippi, Billy R Wilks, J&M Marine & Industrial, LLC, Defendants: James G. Curenton, Jr., LEAD ATTORNEY, PRO HAC VICE, James G. Curenton, Jr., Attorney at Law, Fairhope, AL; Ralph R. Alexis, III, Porteous, Hainkel & Johnson (New Orleans), New Orleans, LA.

Global Resources, Inc., Defendant, Pro se, c/o Michael Pol, Beaumont, MS.

Michael Pol, Defendant, Pro se, Beaumont, MS.

For Sachin Dewan, Defendant: Ralph R. Alexis, III, Porteous, Hainkel & Johnson (New Orleans), New Orleans, LA.

For Dewan Consultants Pvt. Ltd., also known as Medtech Consultants, Defendant: Stephen H. Shapiro, LEAD ATTORNEY, Stephen H. Shapiro, Attorney at Law, New Orleans, LA.

For J&M Associates, Inc. of Mississippi, Cross Claimant, Cross Defendant: James G. Curenton, Jr., LEAD ATTORNEY, PRO HAC VICE, James G. Curenton, Jr., Attorney at Law, Fairhope, AL.

Malvern C. Burnett, [*6] Cross Defendant, Pro se, New Orleans, LA.

Gulf Coast Immigration Law Center, L.L.C., Cross Defendant, Pro se, New Orleans, LA.

Law Offices of Malvern C. Burnett, A.P.C., Cross Defendant, Pro se, New Orleans, LA.

Kurella Rao, Cross Defendant, Pro se, Metairie, LA.

Global Resources, Inc., Cross Defendant, Pro se, c/o Michael Pol, Beaumont, MS.

Michael Pol, Cross Defendant, Pro se, Beaumont, MS.

For Sachin Dewan, Dewan Consultants Pvt. Ltd., Cross Defendants: Stephen H. Shapiro, LEAD ATTORNEY, Stephen H. Shapiro, Attorney at Law, New Orleans, LA.

Global Resources, Inc., Cross Claimant, Pro se, c/o Michael Pol, Beaumont, MS.

Michael Pol, Cross Claimant, Pro se, Beaumont, MS.

**Judges:** JAY C. ZAINEY, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JAY C. ZAINEY

---
| Opinion |
---

## ORDER AND REASONS

The following motions are before the Court: **Motion to Certify Class (Rec. Doc. 165)** and **Supplemental Motion to Certify Class (Rec. Doc. 994)** filed by plaintiffs Kurian David, et al.; **Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1012)** filed by defendant Signal International, LLC;

2012 U.S. Dist. LEXIS 114247, *6

[1] **Motion for Leave to File a Third Amended Complaint (Rec. Doc. 1031)** filed by plaintiffs Kurian David, et al.; **Motion to Strike Evidence [*7] Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1082)** filed by defendant Signal International, LLC.

All motions are opposed. [2]

The Motion to Strike-1012 was taken under submission on March 16, 2011, and the Motion for Leave was taken under submission on March 23, 2011, but the Court elected to take up those motions in conjunction with the issue of class certification. The motion(s) for class certification were taken under submission on April 29, 2011 (Rec. Doc. 1076), upon receipt of the parties' rebuttal submissions. [3] The Motion to Strike-1082 was taken under submission on June 22, 2011.

For the reasons that follow, the Motions to Certify are DENIED, the Motion to Strike-1012 is DENIED, the Motion for Leave to File a Third Amended Complaint is DENIED AS MOOT, and the Motion to Strike-1082 is DENIED.

## I. INTRODUCTION

Plaintiffs are seven (7) citizens of India who secured H-2B guest-worker visas to work in the United States for defendant Signal International, LLC. These seven plaintiffs, Kurian David, Sony Vasudevan Sulekha, Palanyandi Thangamani, Muruganantham Kandhasamy, Hemant Khuttan, Padaveettiyil [*9] Issac Andrews, and Kechuru Dhananjaya, seek to represent a putative class of approximately 500 ship and rig workers to pursue federal class claims against the defendants under the Trafficking Victims Protection Reauthorization Act of 2003, *18 U.S.C. § 1589* (forced labor) & *§ 1590* (trafficking); the Racketeer Influenced and Corrupt Organizations Act,

*18 U.S.C. §§ 1962(c)-(d)*; the Civil Rights Act of 1866, *42 U.S.C. § 1981*; and the Ku Klux Klan Act of 1871, *42 U.S.C. § 1985*. [4]

Defendants are immigration attorney Malvern C. Burnett and his business Gulf Coast Immigration Law Center, LLC and Law Offices of Malvern C. Burnett, A.P.C. (collectively "Burnett"); labor recruiter/broker Michael Pol and his company Global Resources, Inc. (collectively "Pol"); labor broker Billy Wilks and the two companies through which he operated, J & M Associates Inc. of Mississippi and J & M Marine & Industrial, LLC; Kurella Rao and his company Indo-Ameri Soft, LLC ("IAS"); Indian labor [*10] recruiter Sachin Dewan and his company Dewan Consultants Pvt., Ltd. (collectively "Dewan"); and American employer Signal International, LLC. [5]

Plaintiffs' claims are numerous and at times complex but the gist of their claims is that Defendants engaged in a fraudulent scheme built around the fictitious promise of employment-based green cards to obtain permanent residence in the United States. [6] Plaintiffs assert that they relied on this core false promise, as well as other misrepresentations by Defendants, when deciding to pay exorbitant labor recruiting fees to travel to the United States to work at Signal's marine fabrication facilities in Mississippi and Texas. Once there, Plaintiffs allege that they were subjected to segregated housing, severe discrimination, and adverse working and living conditions —that given their debts—reasonable persons in their position would have felt compelled to endure. Plaintiffs contend that the scheme yielded Dewan, Pol, and Burnett millions of dollars in fees, and procured for Signal a compliant and expendable labor pool that saved the company millions [*11] of dollars in wages that it would otherwise have had to pay to contract laborers and American direct hires.

---

[1]   Defendants Malvern C. Burnett, Gulf Coast Immigration Law Center, LLC, and the Law Offices of Malvern C. Burnett, A.P.C., Sachin Dewan, and Dewan Consultants, Pvt. Ltd. have formally moved to join in the Motion to Strike-1012. (Rec. Docs. 1039 & 1053).

[2]   Defendants J & M Associates Inc. of Mississippi, J & M Marine & Industrial, LLC, and Billy Wilks adopt Signal's and the Burnett Defendants' arguments in opposition to class certification. (Rec. Doc. 992). Defendant Kurella Rao has indicated that he will be a "passive" defendant. (Rec. Doc. 897).

[3]   In this case, all parties consented to waive [*8] a live evidentiary hearing and to submit the issue of certification to the Court on the briefs. (Rec. Docs. 907 & 926). Rule 23 does not itself require an evidentiary hearing on the question of class certification. Merrill v. So. Methodist Univ., 806 F.2d 600, 608 (5th Cir. 1986). However, any factual uncertainties trigger the necessity for a hearing. Id. at 609.

Signal has requested oral argument on its Motion to Strike-1012 and Plaintiffs have requested oral argument on their Motion for Leave to File a Third Amended Complaint. The Court finds that the parties' memoranda more than adequately expound upon the issues presented and that oral argument would not be helpful to the Court.

[4]   Plaintiffs also assert claims for fraud, negligent misrepresentation, and breach of contract. Plaintiffs are not seeking certification to pursue these claims as a class so those claims are not before the Court at this time.

[5]   Defendants Pol and Rao and their associated companies are not represented by counsel at this time.

[6]   The term "green card" is used colloquially for an alien registration receipt card, which denotes legal permanent resident status in the United States. See Ascencio-Guzman v. Chertoff, No. B-94-215, 2009 U.S. Dist. LEXIS 32203, 2009 WL 1064962, at *4 (S.D. Tex. Apr. 15, 2009).

2012 U.S. Dist. LEXIS 114247, *11

Plaintiffs seek to have a class certified pursuant to *Federal Rule of Civil Procedure 23(b)(3)* consisting of

> All Indian guest-workers who were recruited by one or more Defendants and who traveled and/or were transported to the United States at any time through September 30, 2007, pursuant to *8 U.S.C. § 1101(a)(15)(H)(ii)(b)* ("H-2B") visas assigned to Defendant Signal International.

Plaintiffs contend that the core facts of the case as well as Defendants' main defenses are equally applicable to the claims of all class members, and that the "pernicious scheme" underlying this case had no individualized dimensions. According to Plaintiffs, they satisfy *Rule 23*'s legal requirements for certification and equity militates in favor of Defendants having to answer for their conduct in the same fashion that they treated Plaintiffs in their prior  [*12] dealings with them: As a nameless and faceless class of fungible migrant workers who could be misled and exploited without regard to individual rights or interests.

## II. BACKGROUND

The factual background for this case separates well into two phases. The Phase 1 events began in 2004 and did not involve defendant Signal or the H-2B visa process. But the Phase 1 events, and the pre-existing relationships between the various other defendants, laid the ground work for much of the Phase 2 events. The Phase 2 events began in 2006 when Signal's domestic labor pool was adversely affected by Hurricanes Katrina and Rita. It was in the aftermath of the hurricanes that Signal sought to supplement its labor pool with foreign workers via the H-2B visa process. Thus, many of the plaintiffs in this case were originally recruited for employers other than Signal, although all of the plaintiffs eventually came to the United States to work for Signal under the auspices of the H-2B guest-worker program. [7]

### A. Factual Background—Phase 1

At all material times, defendant Global was a Mississippi corporation engaged in the business of recruiting foreign workers for employment in the United States. Defendant Michael Pol was Global's president. Pol had an existing business relationship with defendant Billy R. Wilks, defendant J & M's corporate principal. (Pla. Exhs. 520(Pol); 521(Pol)). J & M is in the business of recruiting laborers to then subcontract them out to other com-

panies for a profit. Together Pol and Wilks were supplying labor to a shipyard client in California.

Pol also had a prior business relationship with defendant Sachin Dewan. Dewan is a businessman and he resides in India. As far back as 1996, Pol and Dewan had worked together, along with defendant Malvern Burnett, to bring Indian H-2B welders and pipe fitters into the United States for Avondale Shipyards. (Signal Exh. C).

According to Pol, Dewan contacted him in early 2004 to see if Pol was interested in placing foreign workers with his customers. [8] Pol then presented  [*14] Billy Wilks with a plan to recruit foreign workers through the green card program that he and Dewan had discussed. Global and J & M executed a contract whereby Global would find qualified foreign workers to be acquired for employment with J & M under the I-140 "permanent resident" process. (Pla. Exh. 522(Pol)). Under the agreement Global was to provide the services of an immigration attorney to facilitate bringing workers into the country legally—that attorney was Malvern Burnett. Wilks sent Pol a demand letter for 300 workers. (Pla. Exh. 520(Pol)).

To facilitate the J & M/Global deal, in March 2004, Global, Sachin Dewan (for Dewan Consultants), and Malvern C. Burnett (for Gulf Coast Immigration Law Center, Inc.) executed a contract, the Multi-Lateral Business Agreement, pursuant to which Dewan would recruit suitable foreign workers, Burnett would handle the immigration legal work, and Global would provide suitable employment in the United States. (Pla. Exh. 455). Each applicant-employee was to be charged a fee of roughly $10,000-$12,000 USD. The Multilateral Agreement states that the workers would be coming to the United States under  [*15] the "'permanent residence' process for migration." Id.

In early 2004 defendant Kurella Rao (for IAS) also entered the picture. Rao and his company IAS had been in the business of recruiting foreign information technology personnel since 1997 and Rao wanted to branch out into shipyard workers. Rao and Dewan executed a contract, the Bilateral Business Agreement, to memorialize their business arrangement. [9] (Pla. Exh. 756). Dewan was to recruit the foreign workers and Rao (via his company IAS) was to sponsor them for employment in the United States.

Burnett acted as immigration counsel for the J & M and IAS recruits. But the workers recruited by IAS had no

---

[7]  At least 38 putative class members were denied employment at Signal even though they paid the recruiting fees and came to the United States. (Rec. Doc. 994-1, at 4). Plaintiffs' claim under *42 U.S.C. § 1981*  [*13] for discriminatory conditions at Signal does not apply to these 38 plaintiffs. Plaintiffs suggest that a sub-class as to these plaintiffs might be appropriate.

[8]  Dewan asserts that it was Pol who contacted him.

[9]  Plaintiffs' Exhibit 746 is an unsigned copy of the agreement.

direct contact with Burnett. Rather, Rao retained Burnett for legal services in connection with IAS's recruitment of workers and IAS made payments to Burnett for legal services provided.

Thus, as of 2004 Dewan was recruiting foreign workers on behalf of Global, for the ultimate benefit of J & M and its clients, and for IAS. Dewan recruited 232 workers for the benefit of J & M. Dewan recruited around 130 workers for the benefit of IAS. According to Dewan, he used the same recruitment **[*16]** process for the Global/J & M and IAS contracts. (Dewan depo at 216). Dewan was the lead recruiter but Pol, Burnett, and Rao each participated in some recruiting seminars overseas in order to assist Dewan with the process. It is undisputed that all of the recruitment and placement was done with permanent residence in the United States as part of the program and the workers were told that this would take about two years. At this stage, H-2B visas were not part of the arrangement. [10]

As of February 2006 none of the green card promises to the J & M and IAS recruits had come to fruition. [11] The workers had paid significant fees up front and were naturally becoming frustrated with the process and

irate with the lack of progress toward their legal, permanent immigration to the United States. By **[*18]** this point some of the workers had been waiting for over two years to come to the United States with green cards. Some workers even demanded refunds, which none of the recruiter/broker defendants were interested in providing. [12]

Those Plaintiffs who were originally recruited during the Phase 1 events are referred to as "Group I Plaintiffs." Second Amended Complaint ("SAC") (Rec. Doc. 944). Named plaintiffs Issac Andrews Padaveettiyil **[*20]** and Kechuru Dhananjaya are in this group. (Id. at 5).

**1. Issac Andrews Padaveettiyil**

Padaveettiyil was working in Dubai in 2004 when he was recruited for employment with J & M. According to Padaveettiyil, Dewan advertised in the paper in Dubai for jobs in America and permanent residence in this country. Padaveettiyil recalls attending an information seminar in Dubai with Dewan, Burnett, and Pol present. Padaveettiyil sold his land to finance his way in the program and he asserts that he was promised a permanent job and permanent residency in the United States. Pa-

---

[10]  At this point it bears noting that an H-2B guest-worker visa is fundamentally different than an employment-based green card. H-2B visas are *temporary, non-immigrant* visas. Under the H-2B program, a worker may come to the United States *temporarily* to work for an employer who has petitioned for the right to employ H-2B guest-workers and whose petition has been approved by the Department of Labor. Castellanos-Contreras v. Decatur Hotels, LLC, 622 F.3d 393, 405 n.2 (5th Cir. 2010) (en banc) (Dennis, J., dissenting) (quoting 8 C.F.R. § 214.2(h)(1)(i)). Once admitted, the guest-worker's legal status is tied to performing labor for the specific employer who petitioned for the visa. Id. (citing § 214.2). If at any **[*17]** point the H-2B visa expires or the worker is dismissed from his job, then he is required to immediately leave the country. Id. (citing § 214.2(h)(6)(vi)(E), (h)(17)(iii)(C)). Under no circumstances can the worker remain in the country longer than three years. Id. (citing § 214.2(h)(15)(ii)(C)).

An employment-based green card, on the other hand, is given to someone who has obtained an immigrant visa to enter the United States on a permanent basis and to reside here indefinitely. Green card holders are permanent resident aliens and they have nearly all of the rights of a citizen. Generally speaking, a permanent resident alien can live and work in the United States without restriction.

Thus, as a practical matter, H-2B employees cannot simultaneously be sponsored for an H-2B visa and a green card, given the fundamental difference in the temporal aspects of the two types of visas.

[11]  According to Burnett, in 2003-2004 the process of obtaining labor certifications was extremely long—in some cases in excess of three years. (Burnett memo at 6). It was anticipated that the Department of Labor was going to institute a streamlined process for granting labor certifications or PERMs. Burnett contends that he delayed the filing of any PERMs to take advantage of the new system, which itself was delayed for nearly a year.

The employment based green card process is a three step process. The first step requires that an ETA 9089 ("PERM") be filed with the Department of Labor and certified. The second step requires the filing of an I-140 with the United States Citizenship and Immigration Services.

The third step depends on a "window of opportunity" opening and this can take a matter of months or even years depending on the allocation of immigrant visas by the State Department. The third step differs depending on whether the beneficiary of the PERM and **[*19]** the I-140 is in the United States or a foreign country when a green card becomes available for him in the quota. If the beneficiary is in a foreign country then he processes through the consulate and receives his green card. If the beneficiary is already lawfully in the United States then he files an I-485 for adjustment of status. Once the I-485 is approved then the applicant receives permanent resident status in the United States. (Signal memo at 3 n.8; Burnett memo at 9).

[12]  As of the end of 2006 IAS was no longer a functional company and Burnett had filed no I-140 petitions on behalf of the IAS recruits. The filing of an I-140 petition with the United States Citizenship and Immigration Services is the second step of three for obtaining a green card. Rao knew by January 2006 that IAS was no longer financially viable and that no green cards would be processed for his recruits. (Signal Exhs. K, L). He nonetheless continued to accept installment payments from the recruits. (Id.).

daveettiyil claims that in 2006, still with no green card, Dewan told him that he would be going to the United States on an H-2B visa to work for Signal, to forget about the current green card processing, and that Signal would file for a green card on his behalf. According to Padaveettiyil, he had no choice but to go because he had already paid his money. After arriving in the United States in 2007 Padaveettiyil worked at Signal's Pascagoula, Mississippi facility.

## 2. Kechuru Dhananjaya

Dhananjaya was recruited as part of the IAS employment program. In December 2003, Dhananjaya was working in Dubai when he saw one of Dewan's advertisements [*21] in the newspaper. Dhananjaya went to the office listed in the advertisement and spoke to Dewan about the recruiting program. Dewan told Dhananjaya about an upcoming meeting where Dhananjaya could learn more about the program and pay his first installment for green card processing if he was interested. Defendants Rao, Burnett, and Dewan were present at the meeting. Dhananjaya borrowed money from his brother and some of his friends to finance his way in the program. Dhananjaya and IAS executed an Agreement for U.S. Permanent Residency/Green Card on January 18, 2004. (Pla. Exh. 578). In the following two years Rao sent Dhananjaya encouraging correspondence about the status of his green card. (Signal Exhs. I, J). Dhananjaya had worked at Avondale Shipyards in 1997 under the H-2B guest-worker program. (Signal Exh. D). When Dhananjaya entered the IAS program he had never heard of a company called Signal. After arriving in the United States in 2007 Dhananjaya worked at Signal's Orange, Texas facility.

Plaintiffs do not suggest that Signal was involved in recruiting the foreign workers during the 2004 time frame. But by 2006 when the Indian recruits were becoming disgruntled with the green [*22] card program that Pol, Dewan, Burnett, and Rao had concocted, Signal was experiencing its own labor problems in the aftermath of Hurricanes Katrina and Rita. Signal had a legitimate and immediate need for laborers like those that Pol, Dewan, Burnett, and Rao had recruited beginning in 2004 and who were now clamoring for results on the promised green cards. Thus, Signal's labor shortage in 2006 and its willingness to employ foreign workers, which it viewed as a cheap source of labor, created a seemingly perfect opportunity for Pol, Dewan, Burnett, and Rao to temporarily mollify the original J & M/IAS green card recruits by offloading them to Signal. According to Dewan, some of the workers jumped at the opportunity to go to the United States sooner rather than later, even if that meant traveling on an H-2B visa to the detriment of the green card process. (Signal Exh. AA). But

Plaintiffs contend that Dewan persuaded them to go to the United States on the H-2B visas and that they were told that Signal would take care of getting them their green cards once they arrived in the United States.

## B. Factual Background—Phase 2—Enter Signal

Signal is a marine and fabrication company with its home [*23] office in Pascagoula, Mississippi and an additional shipyard in Orange, Texas. Signal is in the business of providing offshore drilling rig overhaul, repair, upgrade, and conversion. Signal also offers services to the general marine and heavy fabrication markets. In 2006-2007 Signal had a substantial amount of work after hurricanes Katrina and Rita because of damages to rigs in the Gulf of Mexico. Hurricane-related housing shortages around Signal's shipyards had depleted its work force.

Sometime in the first quarter of 2006, Pol called Ron Schnoor (Sr. VP & General Mgr.) with Signal to talk to him about the possibility of Global providing Signal with foreign workers under the "permanent resident process." Schnoor called contacts with Avondale Shipyards to inquire about how the H-2B program had worked at that company. (Signal Exh. W). Bill Bingle (VP of Production) with Signal called Pol to set up a meeting. Bingle and Pol discussed bringing workers to the United States under the H-2B program for employment with Signal and Bingle eventually accompanied Pol to India on a recruiting trip. According to Pol, the plan was to get permanent residence visas for welders and fabricators to work [*24] at Signal's Pascagoula, Mississippi and Orange, Texas facilities. Using H-2B visas was an "afterthought" because Signal wanted the workers to arrive quickly, certainly more quickly than what green card processing could provide. Signal would not be required to pay any of the workers' fees and travel expenses—everything was to be paid by the workers themselves so Signal considered this to be a good deal. [13] Pol told Signal that the workers would be paying about $2,000 each to participate in the program, which was of course not accurate. Signal was adamant that it incur none of the costs of the program.

On April 18, 2006, Global and Signal executed a Skilled Worker Recruitment Agreement (Pla. Exh. 423) to establish the framework for their arrangement to bring foreign workers into the United States under the H-2B temporary program and/or the I-140 "permanent residence" process. (Id. at 1). The agreement clearly delineates the temporary nature of an H-2B visa versus [*25] the long-term nature of an I-140 permanent residence visa. The agreement also expressly notes that H-2B visas are not always issued in a timely manner but that "[i]n any case, the permanent resident (I-140) process will continue as

---

[13]   Indian workers in particular were considered to be a cheap source of labor. (Pla. Exh. 517). Signal intended to use the Indian workers to displace subcontracted labor that was costing the company $100,000 to $200,000 per day.

agreed upon." (Id. at 3). With the Multi-Lateral Business Agreement between Pol, Burnett, and Dewan already in place, Pol contacted Dewan and Burnett about the Signal deal.

Signal executed a document appointing Dewan as its representative in India to facilitate the recruitment of skilled workers to the United States for employment under "the temporary and permanent resident program." (Pla. Exhs. 463 & 665). In that same document Signal granted Dewan a limited power of attorney to sign any legal document or letter which may be required to obtain permission from the government/immigration agencies in India for advertising, conducting seminars, and trade tests to further "our efforts." Id. On June 19, 2006, Signal sent Dewan a demand letter for 600 skilled workers for a 10-24 month period. (Pla. Exh. 461). Accommodations, transportation, and food were all to be paid via salary deduction and travel expenses to Pascagoula, Mississippi were to be paid by the individual [*26] worker. Id. The workers were to be skills tested in India prior to any employment offer and the salary range would be $14 to $18 USD per hour depending on experience and skill level. Id.

On August 3, 2006, Signal executed yet another power of attorney in favor of Dewan making him the company's agent and giving him full authority to act on behalf of Signal, whether filing documents with the U.S. immigration authorities or executing contracts, in the process of bringing migrant workers to the United States for employment at Signal. (Pla. Exh. 512). Signal retained Burnett and his law firm to represent the company in legally bringing the workers into the United States. (Pla. Exhs. 563 & 574). The terms of the agreement between Signal and Burnett dictated that all of the legal fees were to be paid by the workers, with Signal owing Burnett nothing for legal fees.

Dewan went to work recruiting workers for Signal. Dewan placed advertisements in newspapers throughout India and the United Arab Emirates in 2006 offering opportunities for welders and pipe fitters to immigrate to the United States under the auspices of Signal's guest-worker program. (Pla. Exh. 460). Dewan and Pol held six recruitment [*27] seminars using a PowerPoint presentation that Pol had prepared. (Pla. Exh. 684). Green cards were expressly touted as part of the program but a second set of advertisements only mentioned H-2B visas. Nonetheless, Dewan asserts that he believed that Signal was going to request green cards for these workers too. The average fee that each worker paid was about $10,000 [14] (split between Dewan, Pol, and Burnett) which in some cases might exceed the worker's annual salary in his home country. [15] Plaintiffs contend that Dewan, Pol, and Burnett used the Signal contract as a way to extract more money from the existing and eager J & M and IAS recruits and to generate fees from a whole new group of Signal recruits. To be sure, maximizing profits from importing foreign workers into the United States was of the utmost importance to Dewan, Pol, and Burnett. (Signal Exhs. Z, CC, FF).

In late May and early June 2006, Signal filed paperwork with the United States Department of Homeland Security -Citizenship and Immigration Services and the Department of Labor seeking permission to import and hire 590 foreign guest-workers pursuant to the government's H-2B guest-worker program. Bingle, [*29] on behalf of Signal's Mississippi operation, and Thomas Rigolo (Sr. VP & General Mgr., Texas Operations), on behalf of Signal's Texas operation, executed the paperwork. In the filings Bingle explained that Hurricanes Katrina and Rita had caused a tremendous but temporary shortage of labor in the Gulf region and that Signal sought to hire temporary H-2B workers until the labor force would return to normal. (Pla. Exh. 516). Bingle explained that the need for current workers reflected a peak load and would be a one-time occurrence. Bingle also stated that the peak load temporary workers would not become part of Signal's permanent workforce—they would work for the length of time prescribed and then return to their home countries at the end of the employment period. (Pla. Exh. 516). In Signal's Application(s) for Alien Employment Certification to the Department of Labor, Bingle and Rigolo declared under penalty of perjury that the exact dates that the workers would be employed were 10/01/06 to 07/31/07. (Pla. Exhs. 515, 595, 863, 864).

According to Bingle, Signal had always intended to file for green cards for the foreign workers, or at least those workers who proved to meet Signal's expectations. [*30] When questioned at his deposition about the

---

[14]  Plaintiffs contend that Rao, J & M, Pol, Dewan, and Burnett eventually charged the recruits anywhere from $17,600 to $20,000 for an "expedited option" when the H-2B program with Signal came along. Plaintiffs were charged more for H-2B visa processing after the first set of H-2B visas were approved by the consulate.

[15]  The [*28] workers executed separate contracts with Global, Burnett, and Dewan, agreeing to pay each of them separately for their services in three installment payments. Global was to be paid $3750, (Pla. Exhs. 327, 345, 354, 500), Burnett was to be paid $3750, (Pla. Exhs. 342, 350)and Dewan was to be paid Rs.33,500 (Pla. Exhs. 344, 351, 502, 505). Plaintiffs' Exhibit 59 indicates that Global and Burnett were to be paid $5373 USD each. Burnett was particularly adamant about receiving his fee. (Pla. Exhs. 468 ("Mafiaso: Tell them to pay up . . .", 572, 834 ("Please see if you can't get Ramesh to 'persuade' him to pay me . . . . If he does not pay, I will see to it that his visa gets mysteriously revoked.")). Plaintiffs estimate that Dewan, Pol, and Burnett collected about $7 million dollars from all of the putative class members. (Pla. Exhs. 865, 866, 867, 868 (repeated recitation of "Cha Ching")).

certifications of temporary employment made to the government, Bingle explained that he did have concerns about signing those documents and making those representations but that Malvern Burnett had told him that this was just the way the H-2B visa process worked. Rigolo testified that Signal actually needed workers for about a two-year time frame but that he had no reservations about submitting forms to the government that cited the ten month time frame dictated by the H-2B program. Burnett's explanation was that the workers coming over on temporary visas were not going to be part of Signal's permanent workforce, at least in the beginning, and that it might be a year or two before they might return to Signal as permanent workers. (Burnett depo at 457-48).

Signal sent employees to India to personally test the workers' skills. Therefore, everyone who was given an offer of employment with Signal had passed a test to the satisfaction of Signal's employees and no one with Signal told the workers that there would be further testing when they arrived at Signal and that their hourly pay would be subject to reduction or their employment subject to [*31] termination if they failed to pass. Signal's form letter offer of employment simply offers congratulations for passing the skills test in India and the worker is told that "[a]s agreed, [his] salary will be $18.00 per hour." (Pla. Exh. 381). Nothing in the offer of employment from Signal alluded to a second round of testing once the worker arrived in the United States. The Signal employment agreement itself, however, specifically states that the worker would be subject to skills testing upon arrival at Signal and that his hourly rate might be reduced based on skill level. (Pla. Exhs. 64, 179, 201, 294, 300, 348, 808, 854). [16] But the Signal employment agreement was presented to the workers after they had already traveled to the United States from India and arrived at Signal. (Signal Exhs. SSS, SSS-A).

In addition to the workers that Dewan, Pol, and Burnett actively recruited anew for Signal, Pol agreed to use Rao's IAS recruits to fill some of the employment slots at Signal, (Pla. Exh. 808 [Dhananjaya/Signal agreement]), even [*32] though Pol would receive significantly less of a fee for each of these recruits who had already paid their fees over to Rao, Dewan, and Burnett. Global's agreement with Signal also provided a U.S. employer onto which Dewan, Pol, and Burnett could offload the J & M green card recruits. Nearly half of the Indian workers whom Burnett, Dewan, and Pol provided to Signal had been recruited for other companies.

Dewan, Pol, and Burnett were well aware that U.S. immigration officials would not approve an H-2B visa for any worker who communicated to the consulate officials that he was participating in the Signal program with the intent of receiving a green card. (Pla. Exhs. 519, 550). The recruits were therefore escorted to their consulate interviews by a Dewan Consultants employee to ensure that all went well. The recruits were warned about not disclosing anything about green cards to the consulate officials. Dewan also warned them not to mention the amount of money that they had paid to participate in the Signal program. Several plaintiffs also contend that after their visas were issued Dewan (and perhaps on one occasion Burnett) [17] withheld their passports pending the final installment payment [*33] for the program. Plaintiffs contend that with their passports being held they feared that they must either pay the rest of the money to Dewan to go to Signal or forfeit all of the money that they had already paid. Plaintiffs claim that they were assured by Dewan that participation in the H-2B program would allow them to stay in the United States while their green card applications were being processed.

Those Plaintiffs who were recruited specifically for Signal during the Phase 2 events are referred to as "Group II Plaintiffs." SAC at 6. Named plaintiffs Kurian David, Sony Vasudevan Sulekha, Palanyandi Thangamani, Murugantham Kandhasamy, and Hemant Khuttan are in this group. Id.

### 1. Kurian David

David was working in Abu Dhabi as a high-level senior foreman when he saw one of Dewan's advertisements in a newspaper. David attended an information seminar in Dubai where employment opportunities at Signal were discussed. He asserts that the attendees were told that they would receive green cards within 24 months but that the company needed workers immediately so they would [*34] be going on H-2B visas. David says that Burnett explained that David would first go on an H-2B temporary visa which would eventually be extended two times. During the 24 month waiting period and with the two extensions of the original H-2B visa, David would get the green card. David says that he was assured that Signal was a good company with good accommodations and that the workers would be treated well.

David asserts that he came to Signal only because he expected a green card and that he would not have left his otherwise lucrative position at home to come to the United States solely for temporary employment. David borrowed money from his brother-in-law to finance his participation in the program. David stayed with Signal through March 2008. (Signal Exh. FFF). After arriving in the United States in 2007 David worked at Signal's Or-

---

[16]   The Memorandum of Understanding that each worker executed with Dewan also references the second round of testing. (Pla. Exhs. 344, 351, 502, 505, at ¶¶ 5 & 9).

[17]   Sony Sulekha testified that Burnett took custody of his passport after his H-2B visa was approved. (Sulekha depo at 182).

ange, Texas facility.

**2. Sony Vasudevan Sulekha**

Sulekha decided to participate in the program because of an ad that he saw in a Malayalam newspaper. Sulekha attended a seminar at the Hilton Hotel in Cochin in May 2006. Dewan, Pol, and Salimon (another Dewan employee) were present. Sulekha was told that Signal needed workers, the company would give permanent **[*35]** residence, that Signal was a good company, and that this would be a very good opportunity for him. Dewan and Pol explained that at first the workers would be sent on an H-2B temporary visa, which would be extended, and a green card would follow within 24 months. Sulekha pawned his ornaments and wife's jewelry and borrowed money from a distant relative in order to finance his participation in the program. Sulekha contends that he was promised a green card and that he would be able to bring his family to the United States but those promises never materialized. After arriving in the United States in 2006 Sulekha worked at Signal's Orange, Texas facility.

**3. Palanyandi Thangamani**

Thangamani testified that he went to Signal expecting a green card. Thangamani pledged his sister's ornaments and jewelry in order to finance his participation in the program. After arriving in the United States in 2006 Thangamani worked at Signal's Orange, Texas facility.

**4. Muruganantham Kandhasamy**

Kandhasamy saw an advertisement in a paper called Dhinethandi that advised that workers were needed to work in the United States and would receive green cards. Kandhasamy attended an interview with Pol, Dewan, Burnett, **[*36]** and representatives from Signal—everyone present spoke. Kandhasamy was told that he would get a green card. Kandhasamy contends that just a few days before he was to leave for the United States he was told by Dewan that he would be going on an H-2B visa instead of a green card. Kandhasamy contends that Dewan told him, in the presence of Pol, Burnett, and a Signal representative, that once he arrived in the United States his H-2B visa would become a green card. After arriving in the United States in 2007 Kandhasamy worked at Signal's Orange, Texas facility.

**5. Hemant Khuttan**

Khuttan responded to an advertisement in the Hindustan Time newspaper in Delhi. The advertisement did not mention Signal by name. Khuttan attended an information meeting in Delhi where he first met Dewan. Khuttan traveled from Delhi to Mumbai to speak with Dewan Consultants about the program and this is when he first heard about Signal. Khuttan paid Dewan about $20,000 USD up front to participate in the employment program and he borrowed the money from a friend. Khuttan contends that he really didn't know which kind of visa he was supposed to get but that Dewan later informed him that he would be going **[*37]** to Signal on an H-2B visa and that once he arrived in the United States Signal would take care of him and get him a green card. After arriving in the United States in 2007 Khuttan worked at Signal's Pascagoula, Mississippi facility.

All of the named plaintiffs, whether recruited for J & M, IAS, or Signal contend that they were promised green cards and that this is what their contracts with Defendants guaranteed to them. Plaintiffs contend that it was in reasonable reliance on Defendants' assertions that they undertook such considerable personal, financial, and familial sacrifices in order to participate in the recruiting program, and they assert that they would not have made such sacrifices had they known that Defendants' assertions regarding permanent residence in the United States were false.

**C. Factual Background—Phase 2—Employment/Life at Signal**

From the beginning, it was understood that housing and meals would be provided by Signal with the cost of these "accommodations" to be paid by the workers out of their paychecks. [18] Originally, Global was going to provide the accommodations with Signal then reimbursing Global out of the workers' paychecks. (Pla. Exh. 517). But Signal opted **[*38]** to construct man camp housing facilities onsite in Texas and Mississippi to house the workers. The decision was prompted in large part by housing shortages after hurricanes Katrina and Rita. Meals would also be prepared and served onsite. These preparations did require capital and expense outlays by Signal but it was always Signal's intention to recoup these expenditures by deducting fees from the workers' pay. Signal invested millions of dollars building the camps and decided to charge the workers $35 dollars per day (7 days a week) for room and board so that the company could recoup its investment over a five year period. [19] At the $35/day rate Signal anticipated realizing a profit from the man camps. [20] (Pla. Exh. 871). For this reason it would eventually become important to Signal to en-

---

[18]  Plaintiff Thangamani testified that someone told him that room and board would be free. (Thangamani depo at 56).

[19]  Signal also envisioned charging the workers for enlarging its welder testing and training facilities. (Pla. Exh. 846).

[20]  One member of Signal's management proposed charging the workers $53.50 per day for accommodations, reasoning that the workers had only been making about $10 per day in India and that even after the deduction they would still be making about

2012 U.S. Dist. LEXIS 114247, *38

sure that the man camps were filled to maximum capacity. (Pla. Exhs. 528, 449, 850). Signal implemented a policy that required each foreign worker to pay the $35/day accommodations charge even if the worker elected to live offsite and even if the worker earned no pay for a given day. Only the Indian H-2B workers were allowed to live at the man camps. And only the Indian H-2B workers were charged  [*39] the $35 per day accommodations fee regardless of whether they chose to live in the man camp or elsewhere.

By August 2006 Signal was eager to have the workers arrive given its increased workload and manpower shortage in that year and given the soaring costs that the company was incurring for subcontracted labor. (Pla. Exh. 550). The first workers began arriving at Signal in November 2006. Each H-2B worker was given a second skills test—some workers had their wages reduced from the $18  [*40] per hour rate by as much as 30 percent to an amount commensurate with their skills and some were terminated. Each worker also executed a Man Camp Housing Rules Agreement (Pla. Exhs. 48, 76, 811, 858, 859), [21] an H2B Resident Housing Agreement (Pla. Exhs. 63, 181, 779, 860, [22] and an Authorization Agreement for Payroll Deduction (Pla. Exhs. 75, 812, 845, 861, 862). [23] Once arrived the workers were presented with new employment contracts terminable at will. (Signal Exhs. SSS, SSS-A).

Perhaps Signal understood even before the first workers arrived that they expected to receive green cards at some point. [24] (Pla. Exhs. 550, 817). But without question Signal knew of the workers' green card expectations once they arrived  [*41] on site because the workers questioned Bill Bingle about green cards on their first day at the camp. According to Bingle, it was only later in the process that Signal learned that the H-2B process would not support the filing of green cards for the workers. Signal maintains that it had believed early on that there was an avenue available to convert the temporary visas to green cards and that it intended to apply for green cards for those workers who proved to be good employees. (Pla. Exh. 817). But green cards would

only be considered once the allowable H-2B extensions were exhausted and only for valued workers. Prior to the expiration of the first H-2B visas in July 2007, Signal began using a "yes/no" evaluation protocol for identifying potential candidates for long term employment.

Signal concedes  [*42] that its intention was never to seek green cards for all H-2B workers without considering factors like skill level, work ethic, attitude, etc. Signal maintains that it never agreed to seek green cards on behalf of every worker without considering job performance and that it never felt obligated to do that. According to Signal, if such broad promises pertaining to green cards were made to the workers then they were not authorized by Signal and were not true. After all, green cards are issued by the government and with the government involved no employer could guarantee any worker a green card.

Plaintiffs contend that Defendants' green card scheme was grounded in part upon false representations about the living conditions at Signal. Upon arriving at Signal, Plaintiffs were sorely disappointed in the man camp accommodations, including the food. According to Plaintiffs, their $35 per day bought them life in overcrowded and cramped labor camps, [25] with insufficient bathroom and shower facilities for the number of men housed in each bunkhouse. Plaintiffs assert that the facilities lacked privacy and were not conducive to regular sleep. Signal believes that the facilities conformed to all  [*43] applicable city codes but not necessarily to OSHA requirements. (Pla. Exh. 940). Plaintiffs contend that the squalid conditions in the man camp were conducive to the spread of disease and illness. At one of the camps water would leak and stagnate due to shoddy plumbing. (Pla. Exh. 621). One kitchen facility was described by Signal's own staff as "disgusting." (Pla. Exh. 828 ("I pray that the TX Health Dept doesn't show up. They will shut this place down immediately.").

Plaintiffs also resented the man camp housing rules. In practice, Plaintiffs did not appreciate having to pass through security to enter the camps, and the atten-

---

11 times more per day than what they were making at home. (Pla. Exh. 671). Signal did not recoup its expenditures for the man camps and in the end Signal spent about $6.5 million dollars more than it recovered. (Cunningham depo at 136).

21   The Rules prohibited alcohol, smoking, visitors/guests, and horse-playing in the man camp. Also, all employees were required to enter the facility through security.

22   The Housing Agreement expounds upon some of the rules contained in the Man Camp Rules, imposes the $35/day charge for room and board, and imposes stiff fines for violations of camp rules.

23   Via this document each worker authorized Signal to deduct the $35/day "accommodations" or room/board charge from his paycheck.

24   Less clear, however, and perhaps ultimately more important, is whether Signal understood the significance of the references to green cards in the various emails and correspondence that were exchanged before the workers arrived at Signal. See Rigolo depo at 72 ("[V]ery early in the process [] there was probably some misunderstanding and [the terms] visa and green card were used synonymously.").

25   Plaintiffs submitted numerous photographs and a video of the man camp living areas while they were occupied. (Pla. Exhs. 838, 839). Plaintiffs' assertions about overcrowded conditions are not exaggerated.

dant searches of their parcels and requisite presentation of identification. Alcohol and visitors were strictly prohibited in the camps, and Plaintiffs contend that they often felt like prisoners while living in the camps, and isolated or marginalized from the rest of the workforce and the community. Of course, no worker could be forced to live at the man **[*44]** camp so long as he was willing to pay room and board elsewhere on top of the $35 per day (approximately $1050 per month) accommodations fee that Signal would continue to charge him in light of his H-2B status. Thus, some of the workers felt financially compelled to live in the man camps despite how miserable any particular worker might have felt about that prospect.

Plaintiffs characterize the man camp as a "racialized ghetto," (Pla. memo at 20), and they point to the man camp as strong evidence of the discriminatory treatment that they claim to have received at Signal. Plaintiffs point out that they were the only members of Signal's workforce who were allowed or required to live in the man camp, with its attendant security rules and hefty daily rates, and that they were required to pack their lunches from the food available at the man camp cafeteria, which often spoiled in the heat before they could eat it. Plaintiffs point out that only the migrant workers at Signal were subjected to these conditions. [26] Plaintiffs also complain that they were given the most undesirable and dangerous work that Signal's non-foreign workers did not want to perform. Plaintiffs contend that they were **[*45]** left with no choice but to endure the unpleasant and abysmal conditions at Signal or go back to India financially bankrupt and socially scarred. Plaintiffs contend that Signal exploited their precarious financial situation and their vulnerable immigration status.

John Sanders was Signal's point man for the Global/Signal contract and he took what appears to be a genuine interest in the day to day concerns and welfare of the H-2B workers. [27] In November 2006 Sanders learned from the workers about the onerous fees charged by Dewan, Pol, and Burnett. Several workers told Sanders personal stories about pawning private possessions in order to raise the fees required to participate in the H-2B program, and of the significant debts that they had incurred in the process. The workers also complained about the $35 per day accommodations fee, pointing out that after this fee was deducted from their pay, and in light of the debts already incurred, it was not economically advantageous to be at Signal. Sanders **[*46]** relayed this information to upper management and noted how these issues were affecting morale amongst the workers. (Pla. Exh. 618).

On November 20, 2006, a meeting took place to discuss the clear contradiction in the workers' assertions about the fees that they were claiming that they had paid to participate in the H-2B/green card program and Pol's statements to Signal that the workers had paid $2000 to participate. (Pla. Exh. 521(Bingle)). Pol, Ron Schnoor, and John Sanders were present. Signal maintains that it was during this meeting that it learned with certainty about the exorbitant fees that the workers had paid to Global, Burnett, and Dewan. Ron Schnoor followed up with a letter to Pol demanding an accounting of the workers' payments and demanding that Pol refund 50 percent of the fees paid by the workers and reimburse them for airfare. (Pla. Exh. 520(Bingle)). Schnoor copied Dewan and Burnett on the letter. Pol replied via letter defending the fees charged and explaining why he could not refund **[*47]** any of the money. (Pla. Exh. 559). Signal was convinced that Pol had misrepresented to Signal the amount of money that each worker would be paying to participate. Signal terminated its relationship with Pol and requested that Dewan and Burnett do the same. (Pla. Exh. 669).

Thus, as of November 2006, Signal knew about the significant fees that the workers had paid and about the workers' green card expectations. Around this time Signal also became concerned that perhaps Dewan was not being honest with the testing in India because the actual skill level of the workers who were arriving at Signal was not commensurate with the tests that they were passing in India. Signal noticed that the workers coming over were not the best and that perhaps the ability to pay hefty recruiting fees was being given more weight than actual skill. Plaintiffs assert that November 2006 presents a watershed moment in the case because from this point onward Signal clearly knew what was going on but nevertheless continued for months thereafter to accept hundreds more workers into the program—workers who were relying on false promises. And while Signal terminated its dealings with Pol, it nonetheless continued to **[*48]** work with Dewan and Burnett. (Pla. Exh. 522(Bingle)). Plaintiffs contend that Signal took no corrective action because it needed the workers to continue to save on labor costs and to continue to pay for the man camp. Plaintiffs contend that Signal's decision to continue to bring in workers via Dewan and Burnett, all the while knowing the truth, makes the company liable in the scheme.

On March 9, 2007, Signal decided to terminate eight of the workers—six who were allegedly unproductive and two, Jacob Joseph Kaddakkarappally and Sabulal Vijayan, who might be characterized as "rabblerousers." (Pla. Exh. 646). Jacob and Sabulal had a reputation in Mis-

---

[26]   Plaintiffs have also submitted various emails from Signal personnel which they contend exemplifies the company's discriminatory attitude toward the Indian H-2B workers. (Pla. memo at 23 n.25).

[27]   Sanders kept a personal diary in which he recorded his dealings with the Indian workers and Signal management and his personal impressions of many of the events at issue in this case.

sissippi for creating unrest among the foreign workers even though they were otherwise skilled workers. By this time Signal also knew that some of the workers had contacted a lawyer about their rights, and that two of the workers in particular had been wheedling other workers to also speak to the lawyer. (Pla. Exh. 443). Signal undertook to terminate Jacob and Sabulal on the morning of March 9, 2007, in the presence of the other foreign workers, which Plaintiffs contend was a calculated decision in order to make an example of Jacob and Sabulal **[*49]** so that everyone would understand what happens to troublemakers. Signal called in Swetman security guards in advance of the terminations in the event that things got out of hand—which they did as the situation deteriorated into mayhem. The security guards allegedly detained the terminated workers unlawfully in one of the bunkhouses, and Plaintiffs contend that this was done at Signal's direction. Sabulal attempted suicide and the Pascagoula Police Department arrived on the scene after someone called to report a kidnaping. (Pla. Exh. 444). The Mississippi Immigrant Relief Association was present outside the camp and so was the media. (Pla. Exh. 646). The Mississippi debacle of March 9, 2007, became known as ″Black Friday.″ Plaintiffs contend that word of the Black Friday events in Mississippi quickly spread to the workers in the Texas camp.

Dewan flew from India to Mississippi on March 9, 2007, to help settle some of the unrest amongst the foreign workers but he was not present for the Black Friday events. Dewan believed that he might be able to calm the workers in light of the troublemakers who were trying to create problems for everyone. (Pla. Exh. 446). Dewan suggested that the workers **[*50]** who had initiated the problems should be deported first. Burnett later traveled to the Texas facility to similarly calm the workers.

On March 12, 2007, Schnoor and Burnett addressed the workers in Mississippi to reassure them that they were part of Signal's long term solution for supplementing its labor force. Schnoor advised the workers to think very carefully about suing Signal because Signal would vigorously fight any such efforts and that a bunch of frivolous lawsuits would mean no visa extensions for the foreign workers so that they would all have to return to India when the first H-2B visas expired on July 31, 2007. Plaintiffs contend that the events and aftermath of Black Friday emphasized to the Indian workers the importance of being compliant while at Signal because even good workers would be terminated and deported if they complained. Plaintiffs assert that Signal made false assurances about the status of their green cards thereby continuing the deception. Plaintiffs characterize the working and living conditions at Signal as psychologically coercive.

By April 25, 2007, Dewan, Burnett, and Pol were at odds when Pol and Burnett came to suspect that Dewan had lied to them about **[*51]** giving a refund to a candidate while he in fact took the candidate's money. (Pla. Exh. 469). Signal's first H-2B authorization was scheduled to expire on July 31, 2007, but on the advice of Burnett Signal requested the first extension for all of the workers because it was just easier that way. By March 2008 when this lawsuit was filed more than three quarters of the putative class had left Signal. At present, none of the putative plaintiff class members remain at Signal.

### D. Procedural Background

Plaintiffs filed this proposed class action on March 7, 2008, and amended their complaint twice. Plaintiffs originally moved for class certification on October 1, 2008. (Rec. Doc. 165). Plaintiffs filed their Second Amended Complaint (Rec. Doc. 944) on November 23, 2010. The Court allowed discovery on class issues and that discovery proceeded for over two years.

Plaintiffs successfully defeated numerous dispositive motions but on November 10, 2010, the Court granted Signal's motion to dismiss Plaintiffs' claim for certification of a *Rule 23(b)(2)* class for injunctive relief. [28] (Rec. Doc. 926).

Plaintiffs filed their Supplemental Motion to Certify (Rec. Doc. 994) on February 1, 2011, and Defendants filed their submissions in opposition to certification (Rec. Docs. 997, 998, 992, & 1000). Signal then filed its Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1012) and Motion for Partial Stay of Class Certification Proceedings (Rec. Doc. 1013), in response to Plaintiffs' argument that certification of RICO claims predicated on *18 U.S.C. § 1546*, insofar as Plaintiffs were urging that Signal defrauded the United States government, were **[*53]** not pled with the required specificity. Plaintiffs then filed their Motion for Leave to File a Third Amended Complaint (Rec. Doc. 1031). The Court granted Signal's Motion for Partial Stay such that Defendants would not be required to address the merits of the *§ 1546* claims in their rebuttal memoranda. (Rec. Doc. 1043). The Court advised that it would issue an order inviting Defendants to

---

[28]   When dismissing the (b)(2) claims the Court specifically noted that the ruling did not constitute a **[*52]** final adjudication of the class certification issue so as to trigger any party's right to seek an interlocutory appeal pursuant to *Rule 23(f)*. (Rec. Doc. 926). In order to avoid the inefficiency of a piecemeal appeal process, all parties expressly agreed on the record to waive any subsequent argument that Plaintiffs' failure to seek immediate review in the Fifth Circuit would constitute a waiver of their rights under *Rule 23(f)*. Accordingly, the Court will incorporate its ruling on the (b)(2) claims as part of this Order and Reasons so that the parties can seek review of all certification claims at one time.

respond to the *§ 1546* claims on the merits if the Court were inclined to deny the Motion to Strike-1012 and/or to grant the Motion for Leave, and if the *§ 1546* claims were otherwise certifiable. (Rec. Doc. 1043).

The parties filed their rebuttal memoranda (Rec. Docs. 1073, 1070, 1074, $ 1071) on April 29, 2011, at which time the issue of class certification was taken under submission, along with the Motion to Strike-1012 and Motion for Leave to File, the latter two relating solely to the issue of RICO claims predicated on *§ 1546* insofar as Plaintiffs argue third-party reliance by the United States government.

After the rebuttal memoranda were filed, Signal filed its second motion to strike, Motion to Strike-1082, which was taken under submission on June 22, 2011. This motion to strike, as with the **[*54]** first motion to strike, pertains solely to the RICO claims.

## III. CLASS CERTIFICATION PURSUANT TO *RULE 23(b)(3)*

Plaintiffs move to have a class certified pursuant to *Federal Rules of Civil Procedure 23(b)(2)* [29] and *(b)(3)* consisting of

> All Indian guest-workers who were recruited by one or more Defendants and who traveled and/or were transported to the United States at any time through September 30, 2007, pursuant to *8 U.S.C. § 1101(a)(15)(H)(ii)(b)* ("H-2B") visas assigned to Defendant Signal International.

Plaintiffs seek certification with respect to their claims for violations of 1) the Trafficking Victims Protection Reauthorization Act of 2003, *18 U.S.C. § 1589* (forced labor) & *§ 1590* (trafficking); 2) the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C. §§ 1962(c)-(d)*; 3) the Civil Rights Act of 1866, *42 U.S.C. § 1981*; and 4) the Ku Klux Klan Act of 1871, *42 U.S.C. § 1985(3)*.

*Federal Rule of Civil Procedure 23* governs class actions. The rule provides in relevant part:

> **(a) Prerequisites. [*55]** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
>> **(1)** the class is so numerous that joinder of all members is impracticable;
>>
>> **(2)** there are questions of law or fact common to the class;

> **(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> **(4)** the representative parties will fairly and adequately protect the interests of the class.

**(b) Types of Class Actions.** A class action may be maintained if *Rule 23(a)* is satisfied and if:

> **(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> **(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
>> **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;
>>
>> **(B)** the extent **[*56]** and nature of any litigation concerning the controversy already begun by or against class members;
>>
>> **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>>
>> **(D)** the likely difficulties in managing a class action.

---

[29]   The Court has already rejected the (b)(2) injunctive relief class claims. <u>See</u> note 28, <u>supra</u>. The Court will therefore limit the substance of its analysis to the *Rule 23(b)(3)* class claims.

2012 U.S. Dist. LEXIS 114247, *56

*Fed. R. Civ. Pro. 23(a)*, *(b)(2)-(3)*. To obtain certification a party must satisfy *Rule 23(a)*'s four threshold requirements (numerosity, commonality, typicality, and adequacy of representation), as well as the requirements of *Rule 23(b)(1)*, *(2)*, or *(3)*. *Gene & Gene, LLC v. Biopay, LLC*, 541 F.3d 318, 325 (5th Cir. 2008) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)). District courts have discretion as to whether a class will be certified. *Stirman v. Exxon Corp.*, 280 F.3d 554, 561 (5th Cir. 2002) (citing *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)). However, that discretion must be exercised within the framework of *Rule 23*. Id. The district court must "conduct a rigorous analysis of the *Rule 23* prerequisites before certifying a class." *Gene & Gene*, 541 F.3d at 325 (quoting *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 737-38 (5th Cir. 2003)). The party seeking certification bears the [*57] burden of demonstrating that the *Rule 23* requirements have been met.[30] Id. (citing *Berger v. Compaq Comp. Corp.*, 257 F.3d 475, 479 (5th Cir. 2001)).

*Rule 23(b)(3)* is "[f]ramed for situations in which 'class-action treatment is not as clearly called for' as it is in *Rule 23(b)(1)* and *(b)(2)* situations. *Amchem Prods.*, 521 U.S. at 615 (quoting Adv. Comm. Notes, 28 U.S.C. App., p. 697). A party seeking certification of a *Rule 23(b)(3)* class must demonstrate *inter alia* that the questions of law or fact common to class members predominate over any questions affecting only individual members. *Gene & Gene*, 541 F.3d at 325 (quoting *Fed. R. Civ. Pro. 23(b)(3)*). Considering whether "questions of law or fact common to class members predominate" begins with the elements of the underlying cause of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184, 180 L. Ed. 2d 24 (2011).

The predominance inquiry requires a court to consider "how a trial on the merits would be conducted if a class were certified." *Gene & Gene*, 541 F.3d at 325 (quot-

ing *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003)). This in turn means that the court must identify the substantive issues that will control the outcome, assessing which issues will predominate, and then determine whether the issues are common to the class—a process that ultimately prevents [*59] the class from degenerating into a series of individual trials. Id. The court must go beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues. *Castano*, 84 F.3d at 744 (citing Manual for Complex Litigation § 30.11 (3d ed. 1995)). The predominance requirement tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. Id. (quoting *Amchem Prods.*, 521 U.S. at 623-24). The predominance of individual issues necessary to decide an affirmative defense may preclude class certification. *Gene & Gene*, 541 F.3d at 327 (quoting *In re Monumental Life Ins. Co.*, 365 F.3d 408, 420 (5th Cir. 2004)).

Generally, the strength of the plaintiff's claim on the merits should not affect the certification decision. See *Castano*, 84 F.3d at 744. Nonetheless, the determination of class action questions is often intimately involved with the merits of the underlying claims. *Id.* at 744 n. 17 (quoting *Cooper & Lybrand v. Livesay*, 437 U.S. 463, 469 n.12, 98 S. Ct. 2454, 57 L. Ed. 2d 351 (1978)). Frequently the "rigorous analysis" required for *Rule 23* certification will entail some overlap with [*60] the merits of the plaintiff's underlying claim. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52, 180 L. Ed. 2d 374 (2011). "The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." Id. (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)). This is particularly true with the more complex determinations required for certification under *Rule 23(b)(3)*. *Castano*, 84 F.3d at 744 n.17. "[I]n some cases there will be overlap between the demands of *23(a)* and *(b)* and the question of whether plaintiff can succeed on the merits." *Huff v. N.D. Cass Co.*, 485 F.2d 710, 714 (5th Cir. 1973) (en banc).

In this case all aspects of the *Rule 23* certification in-

---

[30]   Plaintiffs suggest that courts in the Fifth Circuit are urged to err on the side of certifying class actions because the order is always subject to modification in light of later developments. (Rec. Doc. 994-1, at 35). The Court has reviewed numerous class action decisions from this circuit and the Court does not glean such an urging. To the contrary, the Fifth Circuit has specifically noted how certification can dramatically affect the litigation stakes for defendants by magnifying and strengthening the number of unmeritorious claims, Castano, 84 F.3d at 746 (citing In re Agent Orange Prod. Liab. Litig., 818 F.2d 145, 165-66 (2d Cir. 1987)), and that certification cannot follow from mere instinct and a "figure-it-out-as-we-go-along approach," Madison v. Chalmette Refining, LLC, 637 F.3d 551, 557 (5th Cir. 2011). The "rigorous" Rule 23 analysis required by this circuit's precedent does not comport well with a policy of erring on the side of certifying class actions when there is any uncertainty as to whether Rule 23's standards are [*58] met.

2012 U.S. Dist. LEXIS 114247, *60

quiry are contested except the numerosity requirement [31] and the adequacy of Plaintiffs' counsel. (Rec. Doc. 994-1, at 40 n.42). All of the *Rule 23(a)* requirements are important and must be satisfied but the *(b)(3)* requirements usually present a far more challenging obstacle for certification than do the *Rule 23(a)* requirements. Therefore, for the various causes of action, the Court can appropriately begin its *Rule 23* analysis by assuming arguendo that the *Rule 23(a)* [*61] requirements are satisfied and turning its attention to the more "exacting demands" of *Rule 23(b)(3)*, in particular the predominance requirement. *Gene*, 541 F.3d at 325. If the predominance requirement is satisfied then the Court will necessarily address *Rule 23(b)(3)*'s superiority requirement, and if necessary, *Rule 23(a)*'s requirements. *Id.* at 326.

### 1. Trafficking Victims Protection Act

The first set of claims that Plaintiffs seek to certify for class-wide treatment are their forced labor and trafficking claims brought under the auspices of the Trafficking Victims Protection Reauthorization Act of 2003. These claims derive from alleged violations of two criminal statutes, *18 U.S.C. § 1589* (forced labor) and *18 U.S.C. § 1590* (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor). *18 U.S.C. § 1595* allows Plaintiffs to seek civil recovery for violations of the forced labor and trafficking criminal statutes, *§§ 1589* and *1590*. [32] Plaintiffs' forced labor and trafficking claims are brought against defendants Signal, Pol, and Dewan.

Defendants contend that Plaintiffs' *§ 1589* claims cannot be tried on a representative basis and are therefore not amenable to certification because the claims are fundamentally about individual consent. According to Defendants, the legislative history of *§ 1589*, and the Supreme Court's decision in United States v. Kozminski, which actually predates the enactment of *§ 1589*, demonstrate that Plaintiffs' forced labor claims cannot be certified as a matter of law under the facts of this case. In other words, the very nature of a forced labor claim precludes Plaintiffs from meeting their burden of demonstrating that the predominance requirement [*63] of *Rule 23(b)(3)* is satisfied.

Plaintiffs argue that the Trafficking Victims Protection Act ("TVPA") does not require a showing of individualized consent because the TVPA focuses on the actions of the defendant, not the plaintiff. Therefore, liability under the TVPA can be proven regardless of the number of plaintiffs bringing a claim. Plaintiffs point out that the TVPA introduced the concept of "serious harm" into the forced labor realm and that "serious harm" is assessed objectively on a reasonable person standard. Therefore, according to Plaintiffs, no one plaintiff's perspective, subjective position, or consent is legally relevant. The only question that need be answered is whether a reasonable person in Plaintiffs' shoes would feel compelled to provide his labor against his will—a question that can be answered on a class-wide basis.

The question of whether to certify a class for a TVPA claim is a question of first impression in the Fifth Circuit. To determine whether issues of fact common to the class predominate over individual issues the Court turns its attention to the elements of the forced labor cause of action and the substantive issues that will control the outcome of the [*64] claims.

### A. Forced Labor, *18 U.S.C. § 1589*

*Section 1589 of Title 18*, pertaining to **Forced Labor**, provides:

> Whoever knowingly provides or obtains the labor or services of a person—
>
> (1) by threats of serious harm to, or physical restraint against, that person or another person;
>
> (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or
>
> (3) by means of the abuse or threatened abuse of law or the legal process,
>
> shall be [subject to criminal penalties].

*18 U.S.C.A. § 1589* (West 2000 & Supp. 2001). [33] The coercive means described in *subsections (1)-(3)* supra are taken nearly verbatim from the definition of "coercion" found at *22 U.S.C. § 7102(2)*, which is part of the civil provisions of the Trafficking Victims Protection Act.

---

[31]   The proposed class numbers about 500 members.

[32]   "An individual who is a victim of a violation of section 1589, 1590, or 1591 of [*62] this chapter may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorney's fees." 18 U.S.C.A. § 1595(a) (West 2000 & Supp. 2004). The civil remedies provision was enacted as part of the Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2875 (2003). In 2008 Congress broadened the scope of the civil remedy statute but that amendment, which came subsequent to the events giving rise to this lawsuit, is not at issue in this case.

[33]   Congress amended § 1589 in 2008 to make it even broader. That amendment was signed into law on December 23, 2008, and is not applicable to Plaintiffs' claims.

2012 U.S. Dist. LEXIS 114247, *64

*Section 1589* became law on October 28, 2000, when President Clinton signed into law the Victims of Trafficking and Violence Protection Act of 2000. The [*65] purposes of the Act were "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *22 U.S.C.A. § 7101 (West 2004)*.

It is widely recognized that Congress crafted *§ 1589* pertaining to forced labor to fill a significant gap in the scheme of involuntary servitude criminal laws that the Supreme Court identified in *United States v. Kozminski*, 487 U.S. 931, 108 S. Ct. 2751, 101 L. Ed. 2d 788 (1988). In Kozminski, the government prosecuted the defendants for criminal violations of *18 U.S.C. § 1584*, which criminalized involuntary servitude. The victims were two mentally retarded men who had been found laboring on the defendants' farm in poor health, in squalid conditions, and in relative isolation from society. During the criminal prosecutions the government offered some evidence of physical abuse but also relied on various other methods of coercion—denial of pay, subjection to substandard living conditions, isolation—to establish that the victims believed that they had no alternative but to work on the farm. *Kozminski*, 487 U.S. at 936. The government had argued that the [*66] two men were "psychological hostages" whom the defendants had "brainwashed into serving them." Id. The district court's jury charge specifically allowed the jury to consider various types of non-physical, psychological coercion when determining whether the two men had been held to involuntary servitude. *Id.* at 939. The jury voted to convict. The appellate court en banc reversed the convictions.

The Supreme Court granted the government's writ to consider the scope of conduct pertinent to the meaning of "involuntary servitude" for purposes of a criminal prosecution under *§ 1584*. In light of the state of the law when Congress first enacted *§ 1584* in 1948, the Court concluded that "involuntary servitude" was limited to cases involving the compulsion of services by the use or threatened use of physical or legal coercion— psychological coercion would not suffice. *Kozminski*, 487 U.S. at 948. The government had urged the Court to adopt a broad construction of "involuntary servitude" so as to prohibit the compulsion of services by any means that, from the victim's point of view, either leaves the victim with no tolerable alternative but to serve the defendant or deprives the victim of the power [*67] of choice. *Id.* at 949. But the Court refused to give such an amorphous interpretation to a criminal statute. Such an interpretation would give no notice to ordinary people who are required to conform their conduct to the law and the question of whether any specific acts would constitute a crime would depend solely on the specific victim's state of mind. *Id.* at 949-50. Further, the rule of lenity, which serves to promote fair notice to those subject to the criminal laws, requires that any uncertainty concerning the

ambit of criminal statutes leads to a narrower interpretation, not a broader one. *Id.* at 951-52.

In summing up, the Supreme Court stated that *absent change by Congress*, for purposes of a criminal prosecution under *§ 1584*, the term "involuntary servitude" necessarily means a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process. *Kozminski*, 487 U.S. at 952. The Court clarified, however, that its holding did not imply that evidence of other means of coercion, or of the victim's special vulnerabilities would be irrelevant. [*68] To the contrary, the vulnerabilities of the victim would be relevant in determining inter alia whether the physical or legal coercion or threats thereof "could plausibly have compelled the victim to serve," as well as the "causal effect" of any physical or legal coercion. Id. The Supreme Court affirmed, thereby vacating the convictions and remanding for a new trial.

Congress enacted *§ 1589* in the wake of Kozminski to provide federal prosecutors with the tools to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in Kozminski. H.R. Rep. 106-939. *Section 1589* is intended to address the increasingly subtle methods of traffickers who often use means other than overt violence. Id. With *§ 1589*, prosecutors would no longer be required to demonstrate physical harm or threats of force against victims because the "serious harm" standard employed by the statute encompasses a broad array of harms, both physical and non-physical. Id.

The Kozminski Court did not directly confront the question of whether a forced labor charge requires proof that the victim's rendering of labor was involuntary or non-consensual, which of course is the point of [*69] law that the parties dispute in this case. But it is beyond dispute that the Court's discussion of the law throughout the opinion confirms that the concept of involuntary servitude or forced labor turns on whether the victim rendered labor because of the verboten physical force or legal coercion. In other words, the issue is whether the victim was coerced by physical force or legal coercion into providing labor *involuntarily*. Nothing about Kozminski even remotely suggests that a finding of involuntary servitude or forced labor could be premised solely on the defendant's conduct and the fact that the victim did in fact work for the defendant, while ignoring the issue of causation. Kozminski clearly suggests that a determination of involuntary servitude or forced labor requires a causal connection between what the defendant did, what the victim did, *and why the victim did it*. See *Kozminski*, 487 U.S. at 952 ("[T]he vulnerabilities of the victim are relevant in determining whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve."). In other words, the forced

2012 U.S. Dist. LEXIS 114247, *69

labor analysis cannot be confined solely to the defendant's conduct but necessarily **[\*70]** must take into account the particular victim's vulnerabilities. [34]

The question then is whether the TVPA so changed the forced labor inquiry so as to focus solely on the defendant's conduct to the exclusion of the victim's perspective. The TVPA included the new *§ 1589* statute on forced labor, that Plaintiffs rely upon herein, to counter Kozminski but the problem with Kozminski was not that the Supreme Court considered the individual victim's vulnerabilities to be relevant to the issue of compulsion but rather that the coercive means punishable for a forced labor violation were too narrow under Kozminski, particularly with respect to psychological coercion. *Section 1589* clearly recognizes that there are numerous **[\*71]** types of harm beyond physical abuse or legal coercion that can be used to force an individual to work involuntarily. So because of the TVPA the more subtle forms of coercion that escaped criminal punishment in Kozminski are now clearly unlawful.

But the Court does not read either the TVPA or *§ 1589* in particular as shifting the focus of the crime of forced labor solely to the defendant's conduct without concern for whether the defendant's conduct was sufficient to make *the specific alleged victim* render labor involuntarily. The TVPA did not render the issue of consent irrelevant to a forced labor determination. Congress could have expressly rendered victim consent irrelevant to the determination, as is the case with the United Nations Protocol applicable to human trafficking, but Congress declined to do so. *See* Jennifer M. Chacon, Misery & Myopia: Understanding the Failures of U.S. Efforts to Stop Human Trafficking, *74 Fordham L. Rev. 2977, 2982 (2006)*. [35] And the House Report on the TVPA contains a discussion that talks about "the individual circumstances of the victims that are relevant in determining whether a particular type or certain degree of harm or coercion is sufficient to **[\*72]** maintain or obtain a victim's labor or services, including the age and background of the victims." H.R. Rep. 106-939. Other courts continue to recognize implicitly that even in the aftermath of the TVPA the question of forced labor turns on whether the defendant's conduct or tactics reasonably coerced or forced the victim to provide labor. *See, e.g.,*

*United States v. Bradley*, 390 F.3d 145 (1st Cir. 2004), rev'd on other grounds, *Bradley v. United States*, 545 U.S. 1101, 125 S. Ct. 2543, 162 L. Ed. 2d 271 (2005); *United States v. Peterson*, 627 F. Supp. 2d 1359 (M.D. Ga. 2008). And one cannot determine whether the defendant's actions coerced or forced the victim to provide labor without looking to the specific victim involved.

Moreover, the need to consider the specific alleged victim becomes even more crucial when the subtler forms of psychological coercion are involved, which the new *§ 1589* allows and which Plaintiffs rely upon in this case. Most human beings would likely choose to provide labor in lieu of receiving severe beatings or being tortured so with **[\*73]** egregious forms of physical abuse the specific victim's vulnerabilities may become less important. But with more subtle types of coercion, particularly psychological coercion, the vulnerabilities and characteristics of the specific victim become extremely important because one individual could be impervious to some types of coercion that cause another to acquiesce in providing forced labor. This is exactly what *§ 1589* now recognizes. But because *§ 1589* is a criminal statute that potentially reaches a broad range of coercive conduct that standing alone might not be unlawful, two things are clear. First, the defendant's conduct must be the driving force behind the victim's "choice" to render the labor. [36] And second, the victim's response to the defendant's actions must pass the reasonable person test. The reasonable person test injects an objective standard into the forced labor determination which is important given the criminal nature of the statute. After all, as Justice Brennan noted in Kozminski, criminal sanctions cannot depend on a completely subjective standard that criminalizes otherwise innocent behavior simply because a particularly sensitive victim reacts to it. *487 U.S. at 960-61* **[\*74]** (Brennan, J., concurring). Therefore, even though the "serious harm" that *§ 1589* encompasses is extremely broad it must at least pass a threshold objective standard such that it would cause a reasonable person in the victim's shoes to render forced labor—the criminal law of which *§ 1589* is a part requires no less. Thus, it is not enough that the defendant's conduct was subjectively coercive so as to cause the victim to render involuntary labor. The defendant's conduct must also

---

[34]   Justice Brennan's concurring opinion in particular contains numerous points of discussion that confirm that the victim's perspective is crucial to a forced labor determination. *See, e.g.,* Kozminski, 487 U.S. at 956-57 (Brennan, J., concurring) ("Without considering these techniques (and their particular effect on a mentally disabled person), one would hardly have a complete picture of whether the coercion inflicted on the victims was sufficient to make their service involuntary.").

[35]   In fact, this author has opined that the TVPA, contrary to earlier law, actually gives "central importance" to the question of victim consent. Chacon, *supra,* at 2999.

[36]   Justice Brennan sagaciously explained in Kozminski how at some level the laborer always has a "choice" no matter what the threat because he can choose to work or take a beating. But with less **[\*75]** egregious forms of coercion it is particularly difficult to determine when a person's actions are "involuntary." Kozminski, 487 U.S. 931, 959, 108 S. Ct. 2751, 101 L. Ed. 2d 788 (Brennan, J., concurring).

2012 U.S. Dist. LEXIS 114247, *74

be objectively coercive enough to do so. [37] But contrary to Plaintiffs' assertion, the injection of the objective reasonable person standard into the forced labor equation does not serve to eliminate the subjective aspects of the crime—the jury must still determine whether the victim was coerced subjectively to provide labor based on the defendant's threats. This is the very essence of the crime of forced labor and Plaintiffs' interpretation of their burden of proof on the forced labor claims is contrary to the statute.

Of course, Plaintiffs are not prosecutors, they are civil litigants seeking to recover money damages under § 1595 for a violation of a criminal statute, § 1589. But § 1595 is a damages statute, not a statutory penalty provision that imposes a monetary sanction once the plaintiff establishes that the defendant has engaged in [*76] certain conduct. The plaintiff must prove the damages that he sustains as a result of the defendant's violation of § 1589, and proving that compulsion at the hands of the defendant caused the plaintiff to render his services involuntarily is simply part of the causation analysis for the civil claim. It would be inimical to the concept of damage recovery in civil litigation to simply ignore the question of whether the individual plaintiff was in fact injured by the defendant's conduct. And with a forced labor claim, the injury question is inextricably intertwined with the question of whether it was in fact the defendant's conduct that coerced labor from the plaintiff.

That said, Plaintiffs do not suggest that they are completely irrelevant to whether a violation of § 1589 has occurred, only that individual characteristics that might make one individual less susceptible to coercion than his co-worker are irrelevant. Plaintiffs' contention is that certain broader characteristics shared by the class as a whole, e.g., immigration status, payment of exorbitant fees to recruiters, poor living conditions at Signal, would have compelled any reasonable person to stay at Signal and provide labor [*77] and therefore the focus should be on Defendants' conduct. Clearly, the members of the class do share some common characteristics. And broadly speaking, it may very well be a logical conclusion that a welder of Indian origin, who incurred significant debt and now finds himself in the United States on a temporary visa, might choose to stay in an unpleasant employment situation. But while all of these considerations surely factor into the decision to stay with the employment, it does not mean that these characteristics that apply class-wide can substitute for the subjective aspects of why any given Plaintiff chose to stay at Signal. The question in a forced labor case is not whether any reasonable person who finds himself in the victim's situation would have felt trapped by his circumstances and therefore stayed on the job with Signal. The question is whether Defendants' coercive conduct was such that it could overcome the will of the victim so as to make him render his labor *involuntary*. The Court is persuaded that this question cannot be answered via generalized class-wide proof but rather must be answered individually based upon individualized proof.

The Court does not agree, however, [*78] with Signal's contention that a § 1589 claim can never be suitable for class certification. Certainly, based on the type of coercion used, there may be cases where consent becomes irrelevant. In other words, some "choices" might be so illegitimate that any decision to work is "involuntary." See *Kozminski*, 487 U.S. at 959 (Brennan, J., concurring). But this case does not present one of those situations. To the contrary, this case involves paid workers who in fact could leave their jobs at any time, albeit under penalty of returning to their home countries but that restriction was dictated by U.S. immigration law. The workers were for the most part paid well, free to come and go as they pleased, and some even took vacations and bought cars. The pressure to work for Signal arguably came at least in part from a set of circumstances that each plaintiff individually brought upon himself when he elected to pay what is now characterized as "exorbitant" fees to participate in the green card program. Part of the "serious harm" that Plaintiffs claim that they faced was financial and reputational harm which are uniquely individual in nature. And the "threats" that Plaintiffs allege were made to [*79] compel them to work were often made to individuals, not to the class as a whole.

Based on the foregoing this Court is persuaded that individual issues with respect to coercion and consent will predominate Plaintiffs' § 1589 forced labor claims. This is true whether the question is viewed as one of coercion as an element of Plaintiffs' claims, see *Channer v. Hall*, 112 F.3d 214 (5th Cir. 1997), or as consent as an element of Defendants' defense. Plaintiffs cannot avoid the burden of proof that each individual plaintiff faces, i.e., that it was conduct on the part of either Signal, Pol, or Dewan that was coercive so as to overcome his will and render his labor involuntary, by relying on the characteristics that apply broadly to the class as a whole. Plaintiffs cannot satisfy the predominance requirement of *Rule 23(b)(3)* even though common issues are present in their forced labor claims. The motion to certify is therefore DENIED as to the § 1589 forced labor claims.

---

[37]   The reasonable person standard for serious harm was codified in the 2008 amendments to the TVPA when Congress added a definition for "serious harm" to § 1589: "The term 'serious harm' means any harm, whether physical or nonphysical including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform and to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C.A. § 1589(c)(2) (West Supp. 2011). The court in Bradley had used a very similar definition of "serious harm" in its pre-2008 charges to the jury. 390 F.3d at 150.

Denise Ward

**B. Trafficking,** _18 U.S.C. § 1590_

_Section 1590 of Title 18_, pertaining to **Trafficking** With Respect to Peonage, Slavery, Involuntary, Servitude, or Forced Labor, provides:

> Whoever knowingly recruits, harbors, transports, provides, **[*80]** or obtains by any means, any person for labor or services _in violation of this chapter_ shall be [subject to criminal penalties].

_18 U.S.C.A. § 1590_ (West 2000 & Supp. 2001) (emphasis added). [38] The specific violations of Chapter 77 that Plaintiffs allege underlie their _§ 1590_ trafficking claims, in addition to the violations of _§ 1589_ regarding forced labor, are _§ 1583_ (Enticement into slavery), _§ 1584_ (Sale into involuntary servitude), _§ 1592(a)_ (Unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor), and _§ 1594(a)_ (Attempted violations of _§§ 1583_, _1584_, _1589_, & _1590_).

For the reasons explained in the _§ 1589_ forced labor section above, the Court is persuaded that a human trafficking claim premised on a violation of the forced labor statute cannot be tried on a class-wide basis. Although a trafficking claim will focus to a great extent on the conduct of the defendant, it remains that a trafficking claim under _§ 1590_ must be premised on a violation of one of the involuntary servitude statutes, even if indirectly so as is **[*81]** the case with _§ 1592(a)_, pertaining to the claim that Dewan confiscated passports while Plaintiffs

were still in India. Under the facts of this case, individual issues will play a significant part in any claim premised on a violation of the statutes prohibiting forced labor, slavery, and involuntary servitude. Plaintiffs cannot satisfy the predominance requirement of _Rule 23(b)(3)_ even though common issues are present in their trafficking claims. Therefore, Plaintiffs' trafficking claims under _§ 1590_ are not amenable to class certification and the motion is DENIED as to these claims.

**2. Racketeer Influenced and Corrupt Organizations Act (RICO)**

The second set of claims that Plaintiffs seek to certify for class-wide treatment pursuant to _Rule 23(b)(3)_ are their claims under the Racketeer Influenced and Corrupt Organizations Act or RICO, _18 U.S.C. §§ 1962(c)_ and _1962(d)_. Plaintiffs' RICO claims are brought against all defendants.

The RICO statutory scheme is aimed at combating organized crime—RICO is located in Title 18 of the criminal code—and the Act imposes criminal and civil liability upon those who engage in certain "prohibited activities" which are listed in _18 U.S.C. § 1962 (a) through (c)_. **[*82]** [39] _Section 1962(c)_, which is Plaintiffs first RICO claim, prohibits "any person employed by or associated with any enterprise" from participating in or conducting the affairs of that enterprise through a "pattern of racketeering activity." [40] _St. Paul Mercury Ins. Co. v. Williamson_, 224 F.3d 425, 445 (5th Cir. 2000); _18 U.S.C. § 1962(c)_. _Section 1962(d)_, which is Plaintiffs' second RICO claim, prohibits a conspiracy to violate the provisions of _§ 1962(c)_. Regardless of the subsection,

---

[38]   Congress amended _§ 1590_ in 2008. That amendment is not applicable to Plaintiffs' claims.

[39]   The prohibited activities are:

> **(a)** It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a **[*83]** principal within the meaning of _section 2, title 18, United States Code_, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce . . . .

> **(b)** It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> **(c)** It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> **(d)** It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

_18 U.S.C.A. § 1962 (a) - (c) (West 2000)_.

[40]   "Racketeering activity" means, in **[*84]** relevant part, any act which is indictable under any of the following provisions of _Title 18 of the United States Code: section 1341_ (mail fraud), _section 1343_ (wire fraud), _section 1546_ (fraud and misuse of visas, per-

2012 U.S. Dist. LEXIS 114247, *82

RICO claims under *§ 1962* have three common elements: 1) a person who engages in, 2) a pattern of racketeering activity, 3) connected to the acquisition, establishment, conduct, or control of an enterprise. *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007) (quoting *Word of Faith v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996)). Private individuals who are injured by criminal RICO activity can recover damages in a civil action. [41] *18 U.S.C. § 1964 (c)*.

Plaintiffs allege three association-in-fact RICO enterprises in support of their RICO claims. "RICO Enterprise I" is defined as "[a]ll Defendants and the United [*85] States Consular officers in India." (SAC ¶ 290). Plaintiffs allege that the common purpose of this enterprise is recruiting, transporting, providing, processing, and obtaining foreign workers to work on shipyards in the United States, including Signal's operations in Texas and Mississippi. (Id. ¶ 293).

"RICO Enterprise II" is defined as the "Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal." (SAC ¶ 291). Plaintiffs allege that the common purpose of this enterprise is selling United States green cards, visas, and work opportunities to Indian workers to convince such workers to pay fees and travel to the United States to work for companies, including Signal. (Id. ¶ 299).

"RICO Enterprise III" is defined as the "Recruiter Defendants, Defendant Signal, Legal Facilitator Defendants, Swetman Security, and M & M Bank." [42] (SAC ¶ 292). Plaintiffs allege that the common purpose of this enterprise is providing and maintaining a consistent and acquiescent labor force at Signal's operations. (Id. ¶ 304).

Plaintiffs rely upon the following predicate acts of racketeering activity for their RICO violations under *18 U.S.C. §§ 1962(c)-(d)*: a) enticement into slavery in violation of *18 U.S.C. § 1583*; b) involuntary servitude in violation of *18 U.S.C. § 1584*; c) forced labor in violation of *18 U.S.C. § 1589*; d) trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of *18 U.S.C. § 1590*; e) unlawful document-related practices in furtherance of trafficking in violation of *18 U.S.C. § 1592(a)*; f) mail fraud in violation of *18 U.S.C. § 1341*; g) wire fraud in violation of *18 U.S.C. § 1343*; and h) immigration document fraud in violation of [*87] *18 U.S.C. § 1546*.

Plaintiffs allege that as a result of Defendants' RICO violations they have sustained similar injuries such as payment of high fees, assumption of significant interest bearing debt, loss of real and personal property, lost work opportunities, lost or unpaid wages and additional legal fees. (SAC ¶¶ 327, 331). Plaintiffs seek treble damages, attorneys' fees, and costs. (Id. ¶ 332).

Plaintiffs argue that their RICO claims are amenable to certification because the answer to the core question of whether Signal and each of the other defendants conducted or participated in RICO enterprises through a pattern of racketeering activity will be the same for all putative class members. Plaintiffs contend that the trafficking and forced labor-based RICO claims are certifiable for the same reasons that the TVPA claims are certifiable. Regarding the mail/wire/visa fraud claims, Plaintiffs contend that Signal and Burnett filed attestations with the Department of Labor and United States Citizenship and Immigration Services of a 10-month labor need in order to obtain H-2B visas for the plaintiff class all the while knowing that Signal's labor need was really two to three years and perhaps [*88] permanent; that Dewan, Pol, Burnett and Signal fraudulently promised United States green cards, visa extensions, and jobs; that all Defendants designed and carried out the fraudulent recruitment scheme by use of the phones, e-mail, and the mails.

Plaintiffs stress that they are not seeking to certify fraud claims that require proof of individualized reliance. In

---

mits, and other documents), and sections 1581-1592 (peonage, slavery, and trafficking in persons). 18 U.S.C.A. § 1961(1)(B) (West 2000 & Supp. 2011). The foregoing predicate acts are only those relevant to this lawsuit. The RICO statute contains a lengthy and exhaustive list of criminal acts that can serve as predicate acts. A "pattern of racketeering activity" requires at least two acts of racketeering activity. Id. § 1961(5).

[41]   RICO's civil enforcement provision provides in relevant part:

    Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .

18 U.S.C.A. § 1964 (c) (West 2000).

[42]   Swetman Security and M & M Bank are not parties to this litigation. Plaintiffs contend that Swetman Security assisted Signal in effectuating forced labor and trafficking [*86] at Signal by participating in the forced detention and attempted deportation of several plaintiffs and perhaps by conducting other security activities at Signal's Pascagoula facility. (RICO Case Stmt. ¶ 3B).

Plaintiffs contend that M & M Bank, at the direction of Signal, opened accounts for Plaintiffs and agreed to have their wages directly deposited into these accounts. Plaintiffs contend that when some workers departed Signal the bank denied them access to their bank accounts at Signal's behest. (Id. ¶ 3J).

2012 U.S. Dist. LEXIS 114247, *88

that vein, the first theory that Plaintiffs rely upon in support of certifying their fraud claims is that in issuing the H-2B visas the U.S. government relied on the false attestations of a 10 month labor need at Signal. Plaintiffs argue that they suffered injury as a direct result of this fraud directed at the U.S. government because but for the government having issued the H-2B visas, Plaintiffs would have never made the final installment payment to defendant Dewan, Pol, and Burnett. Plaintiffs argue that because there is a direct relationship between their injury and Defendants' mail and wire fraud upon the U.S. government, they need not show individualized, first party reliance in order to support their RICO fraud claims. This theory of third-party reliance is referred to throughout the parties' briefing as the Bridge [43] [*89] claim.

Plaintiffs' second theory of RICO fraud is a "market approach" [*90] theory. Plaintiffs contend that a jury could validly infer from the identical contracts that they signed and the exorbitant fees that they paid that the plaintiff class relied on Defendants' fraudulent representations regarding green cards. Without the promise of a green card no plaintiff would have paid the exorbitant fees that they paid to participate in the program and work at Signal. Plaintiffs contend that the evidence adduced thus far demonstrates that the prices that Defendants charged were commensurate with what would be charged for green cards, not temporary work visas. Plaintiffs advise that they will introduce expert testimony showing that in the Indian market for foreign visas no applicant would have paid the money that Plaintiffs paid without the expectation of a green card. Thus, Plaintiffs argue that they can prove reliance for their fraud claims on a class-wide basis without the need for individualized proof. According to Plaintiffs, there is no need to ask each of them individually if he relied on the contents of the contract that he signed.

Defendants argue that Plaintiffs' RICO claims cannot be certified for class treatment because RICO claims simply defy certification [*91] in any form and RICO's legal requirements preclude certification of the trafficking and fraud-based claims. Defendants argue that RICO claims premised on the trafficking and involuntary servitude predicate acts cannot be certified for the same reasons that the TVPA claims are not subject to certification, i.e., that trafficking and other coercion claims are implicitly based upon reliance on threats—something that can only be proven on an individual basis. Defendants also argue that RICO causation cannot be proven on a class-wide basis because a RICO plaintiff must establish that his injury is caused by conduct that is wrongful under RICO—again, something that can only be proven on an individual basis. Signal argues that Plaintiffs' fraud-based RICO claims are founded on allegations of first-party individual reliance and under the law in this cir-

cuit such claims cannot be certified under *Rule 23(b)(3)* because individual issues will predominate.

### A. *Section 1962(c)*—Substantive RICO Violation

#### *Trafficking Predicate Acts*

Plaintiffs' RICO claims premised on the predicate acts of enticement into slavery in violation of *18 U.S.C. § 1583*, involuntary servitude in violation of *18 U.S.C. § 1584*, [*92] forced labor in violation of *18 U.S.C. § 1589*, trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of *18 U.S.C. § 1590*, and unlawful document-related practices in furtherance of trafficking in violation of *18 U.S.C. § 1592(a)* cannot be certified for the same reasons that the claims cannot be certified when sued upon directly under the TVPA. Plaintiffs will be required to prove that the defendant committed the predicate acts upon which they rely for the pattern of racketeering activity. As previously explained in the section addressing certification of the TVPA claims, proof of these predicate acts, which are all premised on coercion, cannot be made without resort to individualized proof in light of the facts of this case. Common issues will not predominate and certification under *Rule 23(b)(3)* is therefore not appropriate.

#### *Fraud-Based Predicate Acts*

Plaintiffs also rely upon the following fraud-based predicate acts in support of their *§ 1962(c)* RICO claims: mail fraud in violation of *18 U.S.C. § 1341*, wire fraud in violation of *18 U.S.C. § 1343*, and immigration document fraud in violation of *18 U.S.C. § 1546*. As explained above, [*93] Plaintiffs urge two arguments in support of their contention that common issues will predominate under *Rule 23(b)(3)* with these fraud-based claims: 1) that a fraud-on-the-government Bridge claim requires no individualized proof of reliance, and 2) that first-party reliance can be proven via common evidence under Plaintiffs' market approach theory.

#### 1) Bridge claim

#### a. Motion to Strike-1012 and Motion to File Third Amended Complaint

In response to Plaintiffs' Bridge claim of third party reliance, Signal has filed a Motion to Strike-1012 arguing that Plaintiffs did not adequately plead a third party reliance claim for the predicate acts of visa document fraud under *18 U.S.C. § 1546(a)*. According to Signal, Plaintiffs only pled first-party reliance and those claims are not subject to certification. Even so, Signal argues that the *§ 1546* Bridge claim cannot be certified because RICO proximate cause will not be satisfied.

---

[43]   *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008).

2012 U.S. Dist. LEXIS 114247, *93

The Motion to Strike-1012 is DENIED and the Motion to File Third Amended Complaint is DENIED AS MOOT. The Court is persuaded that Plaintiffs adequately pled their RICO claims and that there is no need to amend their complaint. Signal and the other defendants will suffer no prejudice [*94] at this juncture because the Court has determined that the RICO claims premised on predicate acts under 18 U.S.C. § 1546 are not amenable to certification anyway. As the case moves into the merits phase, notice as to the scope of Plaintiffs' § 1546 claims will not be an issue because Defendants are now all well aware of Plaintiffs' various fraud theories, and Defendants will be free to conduct whatever discovery they believe to be necessary to defend the RICO claims premised on violation of § 1546.

The Court is not moved by Signal's contention that evidence elicited at their representatives' depositions should be stricken. Signal's representatives were testifying as to facts about which they had first-hand knowledge and the questions that Plaintiffs' counsel asked were fair game.

**b. Analysis**

Causation is a crucial element of every civil RICO claim. In Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992), the Supreme Court held that factual or "but for" causation alone is insufficient to prove causation for a civil RICO claim. Proximate cause is also required. Id. Proximate cause requires a direct relation between the injury asserted and the injurious conduct alleged. [*95] Id. When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged RICO violation led directly to the plaintiff's injuries. Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006). With RICO claims, the compensable injury at issue is the harm caused by the predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise. Sedima v. IMREX Co., 473 U.S. 479, 497, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985). Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the predicate acts. Id.

When the predicate acts are fraud-based, proof of reliance on the fraud is often a necessary prerequisite to establishing the causation required by § 1964(c). Anza, 547 U.S. at 478 (Thomas, J., concurring in part and dissenting in part). Prior to the Supreme Court's decision in Bridge, the law in this circuit required a RICO plaintiff to prove individual, first-party reliance on alleged fraud as part of the element of causation. See Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co., 319 F.3d 205 (5th Cir. 2003). In Sandwich Chef the Fifth [*96] Circuit explained that RICO fraud actions require a showing of detrimental reliance *by the plaintiff* on the alleged fraud in order to satisfy proximate cause. Id. at 219 (quoting Summit Props., Inc. v. Hoechst Celanese Corp., 214 F.3d 556, 560 (5th Cir. 2000)). Fraud actions that require proof of individual reliance cannot be certified for class treatment under Rule 23(b)(3) because individual rather than common issues will predominate. Id. at 211, 219; Castano, 84 F.3d at 745. Essentially, Sandwich Chef all but foreclosed the possibility of Rule 23(b)(3) certification of fraud-based RICO actions in this circuit. [44]

In 2008 the Supreme Court decided Bridge, which held that first-party reliance is not an element of a civil RICO claim premised on mail fraud. 553 U.S. at 641. The plaintiffs in Bridge were participants in a local tax sale. They claimed that the defendants' acts of mail fraud against the county gave the defendants an unfair advantage at tax sale auctions. The district [*97] court dismissed the plaintiffs' RICO claims because the plaintiffs were not the direct recipients of the allegedly fraudulent statements and therefore could not have relied upon them.

The Seventh Circuit reversed and the Supreme Court granted certiorari to address whether first-party reliance is an element of a civil RICO claim predicated on mail fraud. Bridge, 553 U.S. at 646. The Supreme Court held that first-party reliance is not an element of a civil RICO claim predicated on mail fraud. Id. at 649. The Court reasoned that neither the mail fraud statute nor the RICO statute imposed a requirement of first-party reliance. Id. A person can be injured by reason of a pattern of mail fraud even if he has not relied on any misrepresentations. Id. at 649.

The Court also rejected the contention that proof of first-party reliance is necessary to establish proximate causation. Bridge, 553 U.S. at 654-55. But a RICO plaintiff will have to establish that *someone* relied upon the defendant's misrepresentation because without such reliance even "but for" causation will probably be lacking. [45] Id. at 658-59.

Thus, while Bridge overruled cases like Sandwich Chef to the extent that they conflicted with the decision by requiring first-party reliance as part of a RICO fraud claim, see St. Germain v. Howard, 556 F.3d 261, 263

---

[44]   Sandwich Chef expressly held open the possibility that proof of fraud upon a third party could constitute proof of reliance by the plaintiff under circumstances not present in that case. 319 F.3d at 223 n.13.

[45]   The Fifth Circuit made a very similar observation in Sandwich Chef, noting that for a misrepresentation [*98] to cause injury there must be reliance somewhere. 319 F.3d at 218-19. After all, knowledge of the truth defeats a claim of fraud because it eliminates the deceit as the "but for" cause of the damages. Id. (citing Summit, 214 F.3d at 560 n.19).

2012 U.S. Dist. LEXIS 114247, *97

(5th Cir. 2009), Bridge did not eliminate the need for reliance *by someone* when proof of the element of proximate cause necessitates it. Bridge likewise does not foreclose that in some situations proof of first-party reliance might very well be necessary to establish causation. And where proof of first-party reliance breaks down into individual determinations of reliance then Sandwich Chef's admonitions about why certification under *Rule 23(b)(3)* is not likely still survive. Further, causation can be more challenging to prove when the plaintiff relies upon fraud perpetrated on a third party. See, e.g., *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 175 L. Ed. 2d 943 (2010); *Anza*, 547 U.S. at 457.

Turning now to the Bridge claim herein, the contention [*99] is that defendants Signal and Burnett lied on forms submitted to the U.S. government in order to obtain approval to bring temporary H-2B workers into the United States to work for Signal. The "lies" at issue are the assertions that Signal's labor needs were temporary and limited to a 10 month period. According to Plaintiffs, the government clearly relied on these misrepresentations because otherwise Signal would not have received approval to hire H-2B foreign workers. Plaintiffs contend that this third-party reliance by the government on Signal's and Burnett's fraudulent statements does not implicate individual proof the way that first-party reliance does and therefore does not create an impediment to certification under *Rule 23(b)(3)*. The Bridge claim implicates fraud under *18 U.S.C. § 1546* [46] most strongly but *§1341* and *§ 1343* are also implicated because the mails and wires were surely used to transmit the H-2B documents to the government.

Plaintiffs are of course correct in their contention that proving that the government relied on misrepresentations in approving H-2B status for Signal, and ultimately in issuing the hundreds of H-2B visas when the individual plaintiffs applied for them, does not trigger the individual questions that can often derail certification of fraud-based RICO actions. It does not necessarily follow, however, that Plaintiffs can nevertheless prove causation for their RICO injuries without resort to individual proof of reliance. In fact, the Court is persuaded that they cannot.

In order to understand why individual proof of reliance is necessary to the element of causation in this case notwithstanding Plaintiffs' fraud on the government theory, one must consider the nature of the RICO violations alleged in this case and the specific injuries that Plaintiffs' attribute to those RICO violations. Plaintiffs' claim in a nutshell is that the defendants engaged in a scheme to defraud them by making false promises regarding green cards. (RICO Case Stmt.¶ 5D). Fraud on the government aside, it has always been [*102] and remains Plaintiffs' contention that without the fraudulent promise of a green card they would not have paid the significant recruitment fees, would not have burdened themselves with massive amounts of debt, and would not have come to the United States to work for Signal. (Id. ¶ 9). Plaintiffs claim to have endured great financial, personal, and familial sacrifices in reliance on Defendants' misrepresentations. The most significant of the specific injuries that Plaintiffs attribute to Defendants' fraudulent scheme are the exorbitant fees that they paid to Dewan, Pol, Rao, and Burnett, and the interest on the loans that Plaintiffs incurred to finance their way into the program. (Id. ¶¶ 4, 17). But these injuries were not the consequence of the alleged fraud that Signal and Burnett directed at the U.S. government when applying for H-2B status. In fact, for many of the plaintiffs the green card scheme began before Signal even entered the picture and applied for H-2B status. As to every plaintiff in this case, his RICO injuries arose directly out of the allegedly false and fraudulent green card promises that De-

---

[46] Section 1546, entitled Fraud and misuse of visas, permits, and other documents, provides in relevant part:

Whoever knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa, permit, border crossing card, alien [*100] registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained; or

. . . .

Whoever knowingly makes under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact—

Shall be fined under this [*101] title or imprisoned not more than 25 years . . . .

18 U.S.C.A. § 1546(a) (West 2000 & Supp. 2011).

wan, Pol, Rao, and Burnett made to him. And the only way that any individual [*103] plaintiff could sustain an injury from that fraud was to rely upon it in ignorance of the truth.

Plaintiffs do not attempt to argue that the entirety of their injuries are attributable to Signal's and Burnett's alleged fraud on the government. Instead, Plaintiffs point out that the third installment payment that they paid to the recruiters is attributable to the government having approved Signal's H-2B status, the government having done so in reliance on misrepresentations as to Signal's labor needs. Moreover, Plaintiffs have made the allegation that once they arrived in the United States Signal continued to use the false promise of a green card in order to placate them, and therefore they continued to sustain injury from the fraudulent green card scheme after arriving at Signal via the H-2B program.

The fact that Signal received approval to bring H-2B workers into this country is surely a but for cause of some portion of each plaintiff's alleged injuries—for those plaintiffs who were recruited specifically for Signal after it had obtained approval to bring H-2B workers into the United States, the fraud on the government is probably *one* but for cause of every aspect of those plaintiffs' [*104] injuries; for those plaintiffs who were recruited and began incurring payments and debt *before* Signal entered the picture, the fraud on the government is perhaps one but for cause of a latter portion of their injuries. But for every plaintiff in this case, the totality of the injuries alleged, or at the very least the most significant of the injuries alleged, were not proximately caused by fraudulent representations made to the government—they were proximately caused by Defendants' false representations to the plaintiff of receiving a green card. It was the fraudulent conduct directed specifically at the plaintiffs that injured them.

In a fraudulent scheme like the one alleged in this case that spans several years and the globe, and involves numerous players to effect its purpose, the instances of fraud that occur might very well be legion. But the fact that Plaintiffs can identify one narrow aspect of fraud and prove that someone relied upon it, does not strip the question of RICO causation in this case of its individual nature. It is important at this juncture to recognize exactly what Bridge teaches about reliance in a RICO fraud case —reliance is *not* an element of the case. Reliance [*105] is important only insofar as it is necessary to prove causation. And while causation fails at the outset if no one relies on a fraudulent misrepresentation, it does not follow that causation between a RICO violation and the injury alleged is satisfied simply because the plaintiff can identify one aspect of fraudulent conduct that occurred in furtherance of the scheme to defraud and show that someone relied on it. RICO injuries must arise out of the unlawful conduct that constitutes the predicate acts. The injuries asserted in this case are not proximately caused by any predicate act premised on fraud

on the government. That's not to say that the alleged fraud on the government is not relevant to some aspect of Plaintiffs' RICO claims, including the element of causation. But the Court is persuaded that in light of the specific scheme to defraud that Plaintiffs allege in this case, they will still have to prove first-party reliance on the alleged fraud that was directed at them—the fraud that most proximately caused their injuries.

Furthermore, in Bridge, the entirety of the fraudulent conduct alleged was directed at third parties whose reliance on it *directly* injured the plaintiff. In [*106] this case, the majority of the injurious fraudulent conduct was directed specifically and directly to Plaintiffs. The fraud on the government that Plaintiffs allude to herein is not the fraud that directly injured Plaintiffs.

To be sure, there will be significant overlap in the evidence if each Plaintiff is required to present his RICO claim to a jury. And surely there will be numerous common issues amongst the cases. But in light of the issue of individual reliance, those common issues will not predominate even if they happen to outnumber the individual issues. The question of individual reliance will be paramount to resolving whether Plaintiffs' injuries were caused by a RICO violation. Therefore, Plaintiffs' reliance on Bridge in support of certification under *Rule 23(b)(3)* is misplaced.

### 2) Market Approach Theory

#### a. Motion to Strike-1082

Signal has filed a second Motion to Strike-1082 arguing in essence that Plaintiffs' contention that they can prove reliance via written contracts is new. Plaintiffs' market approach theory is simply one way that they hope to show causation with respect to their RICO claims. As explained above, reliance is not an element of the claims, and therefore [*107] neither is the method that Plaintiffs intend to rely upon to show it. The motion is DENIED.

#### b. Analysis

Regarding Plaintiffs' "market approach" theory of reliance, Defendants argue that Plaintiffs cannot obtain certification in this manner because they are essentially arguing for a presumption of reliance based on circumstantial evidence. Defendants contend that certification on this theory would likely run afoul of Defendants' *Seventh Amendment* right to a jury trial.

In contrast to certification under Bridge, Plaintiffs' market approach theory is grounded on first-party reliance -Plaintiffs' own reliance on Defendants' fraudulent promises regarding green cards. However, Plaintiffs contend that first-party reliance can be proven via circumstantial, class-wide evidence that eliminates the need for individualized proof. Plaintiffs point to the decision in *Klay*

*v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004), as an example of how common evidence can be used to establish first-party reliance.

Certainly evidence such as the contracts that Plaintiffs signed, the slide show presentations that were made at recruitment seminars, and even the quantum of the fees that Plaintiffs paid will be relevant  [*108] to establishing individual reliance on the green card promise. But the Court is not persuaded that this case presents a situation like *Klay* where first-party reliance can be established based solely on this type of evidence. Plaintiffs' contention in this case is that they were defrauded by a false promise of a green card into joining Dewan's recruitment program, traveling to the United States to work for Signal under conditions so deplorable that they were violative of the criminal laws of this country, and then duped once again into staying on at Signal based on Signal's own false representations regarding green cards and permanent employment. Plaintiffs allege injuries arising out of each leg of the fraudulent scheme. But while the circumstantial evidence that Plaintiffs point to for proving first-party reliance might be sufficient to permit a jury to infer that a plaintiff signed up for the program and paid the first installment in reliance on the promise of a green card, it is not necessarily sufficient to carry the entire claim to its conclusion at Signal.

Each plaintiff who came to the United States had to apply for an H-2B temporary visa in order to enter the country. Some plaintiffs  [*109] like Dhananjaya had previously worked in the United States under the temporary H-2B guest-worker program and therefore must have understood the temporary nature of the visa. Plaintiffs understood that they could not divulge to consular staff that they were expecting to get green cards or to stay in the United States permanently. Arguably, Plaintiffs had to be willing to misrepresent the truth during those interviews and some presumably did just that. Plaintiffs arrived at Signal in waves and the first group to arrive began protesting immediately about the lack of green cards yet others continued to go to Signal voluntarily on H-2B visas, presumably based on representations made by Signal personal to other class members. Although Plaintiffs maintain that Dewan lied to them about the ramifications of going to Signal on temporary visas, Dewan testified that some of the class members were so adamant about coming to the United States that they were willing to do so even though it might mean not getting a green card. Once arrived at Signal some of the plaintiff class was in Texas and some was in Mississippi, and perhaps subject to differing representations by Signal personnel.

All of these  [*110] facts, and many others, must be weighed in light of the fact that the plaintiff class as a whole did not labor under any specific vulnerabilities when they decided to join the green card program. That's not to say that they were not the victims of fraud but Plaintiffs are not a class of children or mentally challenged persons. Plaintiffs were adult men, some of whom had worked overseas before and some of whom were well-educated and savvy. All of the Plaintiffs knew that green cards were difficult to get and could only be obtained from the United States government. Plaintiffs were clearly eager to come to the United States—some individuals tried to obtain employment with Signal even without going through the recruiting scheme. A jury could find, for any given individual plaintiff, that given the nature of green cards, the significant money that Defendants were demanding, and a plaintiff's own complicity in doing whatever was necessary to enter this country, that the injuries alleged were not proximately caused by Defendants' conduct. On the other hand, a jury could find, for any given individual plaintiff, that Defendants' conduct did cause the plaintiff's injuries. The Court is persuaded  [*111] that Defendants have the right to test each plaintiff's claim of reliance to the jury.

None of the foregoing necessarily means that any given plaintiff did not rely on Defendants' allegedly fraudulent representations when choosing to join the program, travel to the United States, and work for Signal. And the Court is not disputing Plaintiffs' contention that many members of the class faced a Hobson's choice of either coming to the United States on a temporary H-2B visa or losing all of their money. But it is clear that in order to get from point A, which is joining the recruitment program, to point C, which is staying on as part of Signal's compliant workforce, far more fraud must have been involved than the class-wide evidence that Plaintiffs point to in this case. In fact, Plaintiffs claim exactly that. Plaintiffs contend that they were lied to about the temporary nature of an H-2B visa and lied to about whether green card processing would continue once they arrived at Signal. But these alleged misrepresentations, which would have been crucial to understanding why Plaintiffs came to Signal, were made individually. And in contrast to the *Klay* case, which seemingly involved no direct  [*112] communication of misrepresentations by the defendants to the plaintiffs, the plaintiffs in this case had direct contact with the recruiters and the Signal personnel who allegedly lied to them about green cards and permanent residency. Those lies form a crucial part of each plaintiff's reliance on the fraud at issue in this case.

For the foregoing reasons the Court is persuaded that Plaintiffs cannot prove their *§ 1962(c)* substantive RICO claims without resort to individualized proof in light of the facts of this case. Common issues will not predominate and certification under *Rule 23(b)(3)* is therefore

2012 U.S. Dist. LEXIS 114247, *112

not appropriate. [47] The motion to certify is therefore DE-NIED as to Plaintiffs' RICO claims under *18 U.S.C. § 1962(c)*.

## B. *Section 1962(d)*—RICO Conspiracy

RICO criminalizes conspiracy to violate any of its substantive provisions. *United States v. Delgado*, 401 F.3d 290, 296 (2005) [*113] (citing *18 U.S.C. § 1962(d)*). In the criminal setting, the government must establish that two or more people agreed to commit a substantive RICO offense, and that the defendant knew of and agreed to the overall objective of the RICO offense. Id. (quoting *United States v. Posada-Rios*, 158 F.3d 832, 855 (5th Cir. 1998)). The conspirator need not have committed or agreed to commit two predicate acts. Id. (citing *Salinas v. United States*, 522 U.S. 52, 61-66, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997)).

The core of a RICO civil conspiracy is an agreement to commit predicate acts. *Abraham*, 480 F.3d 351, 357 (5th Cir. 2007). A plaintiff can use *§ 1962(d)* to sue a defendant or co-conspirator who might not have violated one of the substantive provisions of *§ 1962*. *Beck v. Prupis*, 529 U.S. 494, 506-07, 120 S. Ct. 1608, 146 L. Ed. 2d 561 (2000). But while *§ 1962(d)* criminalizes an illegal agreement, *§ 1964(c)* imposes civil liability and therefore asks whether an admittedly illegal agreement gives rise to damages. *Beck*, 529 U.S. at 507 (Stevens, J., dissenting). In Beck, the Supreme Court held that a civil RICO conspiracy plaintiff cannot establish injury for purposes of *§ 1962(d)* by relying on an overt act that is not unlawful under the RICO statute. *Beck*, 529 U.S. at 505-06. [*114] The injury recoverable for a RICO conspiracy violation must result from either an act of racketeering or conduct otherwise unlawful under the statute. *Id.* at 507. An agreement alone will not give rise to civil liability under *§§ 1962(d)* and *1964(c)*. *Id.* at 508 n.1 (Stevens, J., dissenting).

The implication of the foregoing discussion is clear. Proving the mere existence of a RICO conspiracy might be sufficient to trigger criminal sanctions but it is not sufficient to recover damages in a civil suit. Plaintiffs will have to prove that their injuries were caused by the predicate acts that they have alleged. But as the Court explained in the section discussing RICO liability under *§ 1962(c)*, the predicate acts are not amenable to certification under *Rule 23(b)(3)* because common issues will not predominate. The motion to certify is therefore DE-NIED as to Plaintiffs' RICO claims under *18 U.S.C. § 1962(d)*.

## 3. Civil Rights Claims (*42 U.S.C. § 1981*)

The third set of claims that Plaintiffs seek to certify for class-wide treatment are their disparate treatment claims under *42 U.S.C. § 1981* for discriminatory employment practices. Plaintiffs' *§ 1981* claims are brought against defendant Signal. In [*115] support of their *§ 1981* claims, Plaintiffs allege that Signal discriminated against them with respect to the mandatory room and board arrangements at the Signal labor camps, which the non-Indian and/or U.S. citizen employees were not subject to. (SAC ¶¶ 336, 337). Plaintiffs also allege that Signal discriminated against them with respect to job assignments and other conditions of employment. (Id. at ¶ 378). Plaintiffs allege that Signal maintained an objectively hostile and abusive work environment based on their race, national origin, and/or alienage. (Id. at ¶¶ 339-342). Plaintiffs seek damages, including compensatory and punitive damages, attorney's fees, and costs. [48] (Id. at ¶ 345).

*Section 1981*, Equal Rights Under the Law, provides:

> (a) Statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons [*116] and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "Make and enforce contracts" defined
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c) Protection against impairment
>
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

*42 U.S.C.A. § 1981 (West 2003)*.

---

[47]   The Court also notes that some of the injuries/damages that Plaintiffs allege in conjunction with the RICO violations are highly individualized in nature and not subject to formulaic calculation: Assumption of significant interest bearing debt, interest on loans, lost work and professional opportunities, and lost and unpaid wages.

[48]   Again, this claim does not include all members of the plaintiff class because it only involves those plaintiffs who actually worked at Signal. See note 7, *supra*.

*Section 1981* provides a federal remedy for workplace discrimination in private employment on the basis of race or ethnicity. See *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S. Ct. 1716, 44 L. Ed. 2d 295 (1975); *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 107 S. Ct. 2022, 95 L. Ed. 2d 582 (1987). To establish a prima facie case under *§ 1981*, a plaintiff must show: 1) that he is a racial minority, 2) that the defendant intended to discriminate against him on the basis of race, and 3) that the discrimination concerns one or more of the activities enumerated in the statute. *Wesley v. Gen. Drivers, Warehousemen & Helpers Local 745*, 660 F.3d 211, 2011 WL 4579133, at *2 (5th Cir. Oct. 5, 2011) [*117] (citing *Felton v. Polles*, 315 F.3d 470, 483 (5th Cir. 2002), abrogated on other grounds, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)). Proof of intentional discrimination is essential for relief under *§ 1981*. Id. (citing *Gen. Bldg. Contractors Ass'n v. Penn.*, 458 U.S. 375, 389, 102 S. Ct. 3141, 73 L. Ed. 2d 835 (1982)).

Plaintiffs argue that their *§ 1981* claims are amenable to certification because they are grounded on Signal's uniform corporate policies toward the putative class. Plaintiffs contend that they will prove their *§ 1981* claims with generalized proof applicable to the class as a whole—Signal's executives' testimony, Signal's emails, employee writings, etc. According to Plaintiffs, common issues not only predominate the *§ 1981* claims, they constitute the only issues.

Plaintiffs point out that Signal's basis for resisting certification of their *§ 1981* claims is that individualized proof will be necessary to prove subjective harm and mental distress injury. But Plaintiffs contend that this will not be an issue because they will not seek emotional distress injury as part of their claim for compensatory damages. Further, the compensatory damages that they do seek are "refund-type" recovery [*118] of the recruitment fees and man camp fees, which are subject to a formulaic calculation. Therefore, according to Plaintiffs, issues pertaining to individual damage awards do not foreclose certification.

In Allison v. Citgo Petroleum Corp., the Fifth Circuit addressed the issue of whether claims of disparate treatment race discrimination were subject to class certification under either *Rule 23(b)(2)* or *(b)(3)*. *151 F.3d 402 (5th Cir. 1998)*. The Fifth Circuit explained that compensatory damages *for intangible injuries* are not presumed merely because the plaintiff proves that a statutory violation has occurred. *Id.* at 416-17. Specific individualized proof is necessary and compensatory damages may be awarded only if the plaintiff submits proof of actual injury. *Id.* at 417 (citing *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 938-40 (5th Cir. 1996); *Brady v. Fort Bend County*, 145 F.3d 691, 717-20 (5th Cir. 1998)).

The very nature of compensatory damages for intangible injuries necessarily implicates the subjective differences of each plaintiff's circumstances so that they constitute an individual, not a class-wide remedy. *Allison*, 151 F.3d at 417. Allison explains why a plaintiff class [*119] seeking compensatory damages for a discrimination claim faces great difficulty in obtaining certification under *Rule 23(b)(3)* because individual issues will typically predominate.

While Plaintiffs are likely correct in their assertion that intentional discrimination by Signal can be proven via class-wide, non-individualized evidence, Plaintiffs' attempt to circumvent the predominance problem surrounding damages is unconvincing for several reasons. Aside from punitive damages, all of the relief that Plaintiffs seek for the *§ 1981* claims are compensatory in nature. In other words, there are no back pay issues or front pay issues or other remedies that would normally pertain to an ongoing employment relationship. [49] But compensatory damages arising out of workplace discrimination are not presumed to be owed simply because the plaintiff establishes that the employer maintained a discriminatory work environment. In order to obtain compensatory damages the plaintiff must prove actual injury to himself and that injury must be attributable to (caused by) the defendant's disparate treatment. Thus, while Plaintiffs have attempted to define their compensatory damage claims in formulaic "refund" [*120] terms, it is clear that the significant recruitment fees that they are trying to recoup as compensatory damages—fees that were paid to third parties before the plaintiffs even arrived at Signal—are not an element of damages attributable to discrimination at Signal's facilities. Plaintiffs cannot change the nature of *§ 1981* recovery by defining their own damages scheme based on what they believe would be a just result under the bigger picture of facts. Plaintiffs are only entitled to recover for those damages that they can prove were caused by Signal's alleged race discrimination.

Further, the Court finds Plaintiffs' suggestion that they will forego any type of emotional distress recovery perplexing. The class representatives willingness to forego a claim that would preclude certification is not per se invalid but the Court is persuaded that it does create serious concerns for the rights of the plaintiff class. See *Colindres v. Quietflex Manuf.*, 235 F.R.D. 347, 375 (S.D. Tex. 2006). Based on Plaintiffs' own assertions about employment at Signal, the Court would assume that emotional injury would not be an insignificant [*121] part of Plaintiffs' claims. Plaintiffs have argued repeatedly about how Signal created a psychologically coercive work environment that basically turned them into modern day slaves. Their entire cause of action under the TVPA was based on conduct supposedly so psychologically coercive as to cause them to render labor involuntarily. Plaintiffs have characterized life at Signal

---

[49]  None of the members of the plaintiff class remain employed at Signal.

as a "racialized ghetto" where they experienced feelings of isolation and segregation, as "prisoners" in the man camps, subject to abuse, threats, and exploitation. Plaintiffs allege that some class members became physically ill and required hospitalization while living in the man camps. Plaintiffs have pointed to the Black Friday suicide incident as evidence of how emotionally abysmal and untenable the situation at Signal had become for them. Plaintiffs allege that they were subjected to offensive language and threats (SAC ¶ 210) and that they were frightened and confused while at Signal (SAC ¶ 233 -35). The Court finds it questionable that this case, which again is a case grounded on claims of psychological coercion and manipulation, can be certified for class treatment based on the assertion that the class representatives [*122] are not making claims for psychological injury—an assertion that would eventually bind the entire plaintiff class if the *§ 1981* were certified. And to the extent that the class representatives are willing to waive emotional damages in this case, this militates against a finding of adequacy under *Rule 23(a)(4)* for these representatives.

Moreover, Plaintiffs have pled a claim for punitive damages in addition to the compensatory damages that they seek. (SAC ¶ 345). Punitive damages cannot be assessed merely upon a finding that the defendant discriminated against the class and the award is based only in part upon the defendant's conduct. *Allison*, 151 F.3d at 417. A punitive damage award turns on the recovery of compensatory damages and must be reasonably related to the plaintiff's compensatory damage award. *Id.* at 417-18 (citing *Patterson*, 90 F.3d at 943-44). Punitive damages are not capable of computation by reference to objective standards. *Id.* at 418.

Plaintiffs have not suggested that the issues of liability and damages can be severed and tried separately in order to facilitate certification. Of course, bifurcation carries with it the danger of *Seventh Amendment* problems if a second [*123] jury is called upon to reexamine facts and issues addressed by the first jury. *Castano*, 84 F.3d at 750; *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 628 (5th Cir. 1999). The Court is persuaded that at the very least the claim for punitive damages would carry the risk of *Seventh Amendment* problems in a bifurcated scenario. Punitive damages are necessarily based in part upon the evidence used to establish liability because punitive damages are a measure of the reprehensibility of the defendant's discriminatory conduct. But punitive damages are not appropriate until the plaintiff proves actual harm and compensatory damages and therefore cannot be awarded in the liability phase of a trial.

Finally, even aside from the predominance problem that the damages aspect of the *§ 1981* claims creates, the most compelling rationale for finding superiority in a class action is not present in this case. Plaintiffs' *§ 1981* claims do not present a negative value suit situation in which the paltry award that each plaintiff might recover

precludes prosecution of individual claims. See *Castano*, 84 F.3d at 748. And the potential for recovery of attorney's fees and punitive damages makes the case even [*124] less compelling for finding class action treatment superior to individual trials. See id.

In sum, the Court is persuaded that neither the predominance nor superiority requirements of *Rule 23(b)(3)* are satisfied for Plaintiffs' *§ 1981* claims. The motion to certify is therefore DENIED as to the *§ 1981* discrimination claims

## 4. The Ku Klux Klan Act of 1871, *42 U.S.C. § 1985*, and the Thirteenth Amendment

The last set of claims that Plaintiffs seek to certify for class -wide treatment are their claims under *42 U.S.C. § 1985(3)*. Plaintiffs' *§ 1985* claims are brought against defendants Signal, Pol, and Dewan. The gist of Plaintiffs' *§ 1985* claim is that Defendants conspired to subject Plaintiffs to involuntary servitude based on their race, ethnicity and alienage. (Rec. Doc. 994-1, at 67-68). In support of the *§ 1985* claim, Plaintiffs allege that Signal, Pol, and Dewan conspired with other non-defendant parties, including Swetman Security and M & M Bank, for the purpose of depriving Plaintiffs of equal protection of their rights under the Thirteenth Amendment and its implementing and enforcing statutes, *18 U.S.C. §§ 1589* and *1590*, to be free from forced labor, involuntary servitude, and trafficking [*125] in persons. (SAC ¶ 348). Plaintiffs allege that Defendants were motivated by racial, anti-Indian, and/or anti-immigrant animus when they conspired to deprive Plaintiffs of their rights. (Id. ¶ 349). Plaintiffs allege that they have suffered damages as a result and they seek compensatory damages, punitive damages, and attorney's fees and costs. (Id. ¶¶ 351-52).

*Section 1985(3)*, Conspiracy to Interfere With Civil Rights, provides in relevant part:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;. . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

*42 U.S.C.A. § 1985(3) (West 2003)*.

2012 U.S. Dist. LEXIS 114247, *125

In  [*126]  order to prove a conspiracy under *§ 1985(3)*, a plaintiff must show inter alia 1) that some racial, or perhaps otherwise class-based, invidiously discriminatory animus lay behind the conspirators' action, and 2) that the conspiracy aimed at interfering with rights that are protected against "private as well as official, encroachment." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68, 113 S. Ct. 753, 122 L. Ed. 2d 34 (1993) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971); *Carpenters v. Scott*, 463 U.S. 825, 833, 103 S. Ct. 3352, 77 L. Ed. 2d 1049 (1983)). *Section 1985(3)* provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates. *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372, 99 S. Ct. 2345, 60 L. Ed. 2d 957 (1979).

Conspiracies among private actors (as opposed to state actors) are within the scope of *§ 1985(3)* so long as the right at issue is one guaranteed against private (as opposed to state) infringement. Id. (citing *Carpenters*, 463 U.S. at 833). There are few such rights but the Supreme Court has expressly acknowledged that the right to involuntary servitude, as guaranteed by the Thirteenth Amendment, is one such right. [50] Id. (citing *Kozminski*, 487 U.S. at 942).

The Thirteenth Amendment states that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." *U.S. Const. amend. XIII, § 1*. The primary purpose of the amendment was to abolish the institution of African slavery as it had existed in the United States at the time of the Civil War, although the amendment has not been limited to that application. *Kozminski*, 487 U.S. at 942. [*128] Rather, the Thirteenth Amendment extends to cover "those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results." Id. (quoting *Butler v. Perry*, 240 U.S. 328, 332, 36 S. Ct. 258, 60 L. Ed. 672 (1916)).

The Court is persuaded that Plaintiffs' *§ 1985(3)* claim cannot be certified for class treatment. In Kozminski, the Supreme Court discussed the types of coercion that must be shown under the Thirteenth Amendment. Those types of coercion are physical coercion and legal coercion in which the victim is compelled to work by law. Nei-

ther type of coercion is at issue in this case. The TVPA, which sought to criminalize involuntary servitude based other forms of coercion, did not change the scope of the Thirteenth Amendment. And even if this Court errs as a matter of law in concluding that Plaintiffs have no "rights" under *§§ 1589* and *1590* to vindicate via *§ 1985(3)*, see note 50, supra, a claim premised on a violation of *§§ 1589* and *1590* is not subject to certification for the same reasons that none of the TVPA claims are certifiable, as explained above. The motion to certify is therefore DENIED as to the *§ 1985(3)* conspiracy claims.

## IV. CLASS CERTIFICATION  [*129] PURSUANT TO *RULE 23(b)(2)*

For the reasons given on the record in open court on November 10, 2010, the Motions to Certify are DENIED insofar as Plaintiffs seek certification of a class under *Rule 23(b)(2)*.

Accordingly, and for the foregoing reasons;

IT IS ORDERED that the **Motion to Certify Class (Rec. Doc. 165)** and **Supplemental Motion to Certify Class (Rec. Doc. 994)** filed by plaintiffs Kurian David, et al. is **DENIED**;

IT IS FURTHERED ORDERED that the **Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1012)** filed by defendant Signal International, LLC is **DENIED**;

IT IS FURTHERED ORDERED that the **Motion for Leave to File a Third Amended Complaint (Rec. Doc. 1031)** filed by plaintiffs Kurian David, et al. is **DENIED AS MOOT**;

IT IS FURTHERED ORDERED that the **Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1082)** filed by defendant Signal International, LLC. is **DENIED.**

January 3, 2012

/s/ Jay C. Zainey

JAY C. ZAINEY

UNITED STATES DISTRICT JUDGE

---

[50]  The contours of a *§ 1985(3)* claim  [*127] are often nebulous in light of the varied jurisprudence addressing the cause of action. This Court is convinced that the "right" to be free from involuntary servitude for purposes of a *§ 1985(3)* claim derives not from *§§ 1589* & *1590*, as Plaintiffs suggest, but from the Thirteenth Amendment itself otherwise every criminal statute that involves a victim could potentially give rise to a "right." This would be contrary to the admonition that the Supreme Court has long held since *Griffin v. Breckenridge*, 403 U.S. 88, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971), that *§ 1985(3)* cannot be interpreted in such a way so as to render it "a general federal tort law." *Bray*, 506 U.S. at 268 (quoting *Griffin*, 403 U.S. at 102).



Neutral
As of: October 11, 2013 10:41 AM EDT

# Haley v. Merial, Ltd.

United States District Court for the Northern District of Mississippi, Greenville Division
April 1, 2013, Decided; April 1, 2013, Filed
CIVIL ACTION NO. 4:09-CV-00094-GHD-JMV

**Reporter:** 2013 U.S. Dist. LEXIS 46825

NEAL HALEY, SHERRY HALEY, and CLAYTON DAVIS, on behalf of themselves and others similarly situated, PLAINTIFFS v. MERIAL, LIMITED; MERIAL, LLC; and MERIAL, INC., DEFENDANTS

**Prior History:** *Haley v. Merial, Ltd., 2011 U.S. Dist. LEXIS 143708 (N.D. Miss., Dec. 13, 2011)*

| Core Terms |
| --- |

heartworm, veterinarian, class certification, class member, dog, predominate, advertize, efficacy, injunctive relief, disease, putative class member, misrepresent, class action, court finds, injunction, putative class, deceptive, zoonotic, bridge, monetary, pattern of racketeering activity, individualized proof, predicate, named plaintiff, mail fraud, transmission, declaratory, mail, disseminate, wire

**Counsel:** [*1] For Neal Haley, on behalf of himself and others similarly situated, Sherry Haley, on behalf of herself and others similarly situated, James Schoffner, on behalf of himself and others similarly situated, Lee Ann Schoffner, on behalf of herself and others similarly situated, Darla Mahalitc, on behalf of herself and others similarly situated, Clayton Davis, On behalf of himself and others similarly situated, Plaintiffs: C. W. Walker, III, LEAD ATTORNEY, LAKE TINDALL, LLP, Greenville, MS; Archie I Grubb, II, W. Daniel Miles, III, PRO HAC VICE, William E. Hopkins, Jr., PRO HAC VICE, BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C, Montgomery, AL; Heath S. Douglas, LAKE TINDALL, LLP - Greenville, Greenville, MS; Lawrence E. Abernathy, III, LAWRENCE E. ABERNATHY, III, ATTORNEY, Laurel, MS.

For Merial, Limited, Merial, LLC, Merial, Inc., Defendants: Michael E. McWilliams, LEAD ATTORNEY, Lee Davis Thames, BUTLER, SNOW, O'MARA, STEVENS & CANNADA, Jackson, MS; Kyle V. Miller, BUTLER, SNOW, O'MARA, STEVENS & CANNADA - Jackson, Ridgeland, MS.

**Judges:** Glen H. Davidson, SENIOR UNITED STATES DISTRICT JUDGE.

**Opinion by:** Glen H. Davidson

| Opinion |
| --- |

## MEMORANDUM OPINION DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Presently before [*2] the Court is Plaintiffs' motion for class certification [248]. Having carefully considered the motions, responses, replies, class-certification hearing testimony and exhibits, and parties' supplementations, the Court finds that the motion for class certification [248] should be denied.

### A. Factual and Procedural Overview

Defendants Merial, Limited and Merial, LLC manufacture, market, and sell HeartGard and HeartGard Plus, heartworm preventatives for dogs administered monthly in the form of beef-flavored chewable tablets containing the active ingredients ivermectin and pyrantel. Merial apparently sells HeartGard and HeartGard Plus at wholesale prices to veterinarians, who set the retail prices of the drugs, and then prescribe the drug to particular dogs, whose owners administer the doses to the dogs.

Plaintiffs Neal Haley, Sherry Haley, and Clayton Davis ("Plaintiffs") [1] bring this putative RICO class action against Merial alleging that their dogs and a multitude of other dogs have contracted heartworms, despite their reliance on HeartGard or HeartGard Plus, which are mar-

---

[1] On March 9, 2011, Plaintiffs filed a motion for the voluntary dismissal [198] of three of the Plaintiffs named in the complaint. "The decision was made in order to best prosecute the claims of the remaining Plaintiffs (Neal Haley, Sherry Haley and Clayton Davis) while protecting the interests of putative class members, and in the interest of judicial economy by making the case as straightforward and simple as possible." Pls.' Mot. Voluntary Dismissal [198] ¶ 4. The Court entered an Order [226] granting the motion as unopposed and dismissing the specified named Plaintiffs from the case.

keted as heartworm preventatives. [2] Plaintiffs assert that Merial initially marketed HeartGard and HeartGard Plus as [*3] 100% effective against heartworms despite Merial's actual knowledge that such efficacy claims were false. [3] Plaintiffs further assert that the lack of effectiveness of HeartGard and HeartGard Plus became apparent once numerous post-approval adverse drug events were reported. Plaintiffs allege that Merial's actions constitute violations of RICO, certain provisions of the Federal Food, Drug, and Cosmetic Act (the "FDCA"), and *18 U.S.C. §§ 1341* and *1343*.

Although Merial disputes most of the Plaintiffs' allegations against them—including that Merial ever engaged in false or fraudulent conduct, or that it engaged in any scheme to defraud veterinarians, pet care professionals, American consumers, or Plaintiffs—the following facts apparently are not in dispute: The Food and Drug Administration (the "FDA") approved HeartGard and HeartGard Plus for use in dogs to help prevent [*5] canine heartworm disease and for the treatment and control of ascarids and hookworms. Prior to the time Plaintiffs filed their initial complaint, Merial distributed promotional and/or marketing material related to HeartGard and HeartGard Plus to veterinary clinics throughout the United States wherein Merial represented that HeartGard and HeartGard Plus were 100% effective against heartworms. The FDA subsequently sent Merial and its competitors letters requesting that the drug manufacturers stop promoting the heartworm preventatives as 100% effective and modify their labels. In 2005, the FDA sent Merial a letter repeating its request that Merial discontinue promotion and advertising activities claiming 100% effectiveness at heartworm prevention. [4] In 2006, the FDA sent Merial warning letters stating that Merial had promotional material on websites regarding HeartGard and HeartGard Plus which overstated the efficacy of the drugs and constituted misbranding in violation of federal law. [5] The FDA instructed Merial to present to the FDA a comprehensive plan for correcting the false impressions given to the public about the effectiveness of the drugs. In 2007, the FDA sent Merial a letter [*6] stating that a Merial ad had overstated the effectiveness of HeartGard and HeartGard Plus with respect to preventing and controlling zoonotic diseases. Merial agreed to

remove certain language from promotional materials concerning the 100% effectiveness of HeartGard and HeartGard Plus. The parties apparently agree that Merial has never specifically instructed veterinarians' offices to remove the advertising and promotional materials containing the 100% efficacy claims.

Plaintiffs allege that despite receiving warning letters from the FDA concerning the marketing and promotion of HeartGard and HeartGard Plus as 100% effective at heartworm prevention, Merial continued and even strengthened its deceptive advertising, until Merial finally agreed to discontinue promotion and advertising 100% efficacy for HeartGard and HeartGard Plus. Plaintiffs allege that although Merial apparently amended some of [*7] its promotional material to remove "100%," Merial took no other action to correct the impression of 100% effectiveness previously given to nationwide veterinarians, pet care professionals, and dog owners. Plaintiffs aver that Merial continues to benefit from fraudulent advertisements that have been placed on the Internet either by Merial or by others who sell Merial's products with Merial's knowledge.

Plaintiffs further allege that Merial engaged in the practice of employing fraudulent scare tactics to encourage sales of HeartGard and HeartGard Plus to prevent the transmission of certain zoonotic diseases from dogs to humans, including certain diseases caused by roundworms and hookworms in its advertising and promotion of HeartGard and HeartGard Plus. Plaintiffs aver that despite the FDA's warnings with respect to the claims of 100% effectiveness in preventing the transmission of certain zoonotic diseases to humans, Merial continues to furnish veterinarians and other pet care professionals with false promotional materials that remain on display in veterinarians' offices for consumers to review.

Plaintiffs allege the following facts in support of their claims: Named Plaintiffs Neal and [*8] Sherry Haley (the "Haleys") have two dogs, a chocolate Labrador retriever named Mack and a rat terrier named Buddy. Mack contracted heartworms while on a different heartworm preventative medication than HeartGard Plus. After Mack was treated for heartworms, the Haleys consulted with

---

[2]   In the original complaint, Plaintiffs sought damages for eight stated causes of action: fraud; breaches of express and implied warranties under the Uniform [*4] Commercial Code; breach of written warranty under the Magnusson-Moss Act; racketeering under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. § 1962*; unjust enrichment; constructive trust; and injunctive relief. After Merial filed a motion to dismiss the Magnusson-Moss written warranty claims and the RICO violations claims, the Court dismissed the Magnusson-Moss written warranty claims and sustained the RICO claims. Thereafter, Plaintiffs were granted leave to amend their complaint to plead only the RICO claim.

[3]   Merial argues that its "100% efficacy" claims were supported by research and that other brand-name and generic heartworm preventative market competitors also advertised and promoted their drugs as "100% effective" against heartworms.

[4]   Merial maintains that all brand-name and generic heartworm preventative market competitors were given the same warnings by the FDA.

[5]   Merial maintains that it does not engage in internet sales and thus has limited control over any "100% effective" claims that may appear on third-party websites.

Denise Ward

their veterinarian concerning a change of medication for Mack to prevent another infestation of heartworms. Mack's veterinarian recommended that the Haleys change Mack's heartworm medication to HeartGard Plus, because it was guaranteed to be 100% effective against heartworms. Neal Haley reviewed some of the promotional material in the veterinarian's office, and comforted by the claims of 100% efficacy, agreed to place Mack on a regimen of monthly doses of HeartGard Plus in February of 2006—even though HeartGard Plus was more expensive than Mack's previous heartworm medication. Mack tested negative for heartworms in August of 2006. Although Neal Haley administered the doses of HeartGard Plus to Mack in full and complete compliance with the instructions from Merial, Mack contracted and tested positive for heartworms in February of 2009, while on HeartGard Plus. Neal Haley testified at the class-certification [*9] hearing that he decided not to put Mack through heartworm treatment, because of what Mack had gone through during heartworm treatment while Mack was on the previous heartworm preventative, and also due to Mack's advanced age and his veterinarian's advice concerning the same.

Later, in August of 2007, the Haleys acquired a second dog, Buddy, who was a rat terrier. Buddy tested negative for heartworms. Neal and Sherry Haley began giving Buddy HeartGard Plus in approximately August of 2007, in reliance of the 100% efficacy claims with respect to HeartGard Plus. Although Neal Haley administered the doses of HeartGard Plus to Buddy in full and complete compliance with the instructions from Merial, Buddy contracted heartworms in August of 2008, while on HeartGard Plus. Neal Haley testified at the class-certification hearing that he decided not to put Buddy through heartworm treatment, and that Buddy is still alive.

Named Plaintiff Clayton Davis has three dogs named Duke, Haus, and Jazz. Based on his veterinarian's recommendations and the assurances made by Merial's advertisements and promotions concerning the 100% efficacy of HeartGard Plus, Davis chose to place all three of his dogs on a [*10] strict regimen of HeartGard Plus in accordance with the manufacturer's directions from the time the three dogs were several months old. In June of 2006, Duke tested positive for heartworms. After Duke was treated for heartworms, he was then placed on a twice-monthly regimen of Interceptor and HeartGard Plus. Haus and Jazz both tested positive for heartworms in May of 2007. Following this positive test, both Haus and Jazz were treated for heartworm infection and were then placed on a twice-monthly regimen of In-

terceptor and HeartGard Plus—just like Duke. Nevertheless, all three dogs once more contracted heartworms. The dogs have been treated again, and are now on a different heartworm medication than HeartGard Plus.

The named Plaintiffs bring this action on behalf of a putative class called "the drug purchase class," which would be composed of "[a]ll individuals who purchased HeartGard or HeartGard Plus from and after September 1, 2005, until the date upon which Merial ceases making, or causing to be made, false claims regarding 100% efficacy, and false claims regarding transmission of zoonotic diseases in humans, excluding any members who have taken bankruptcy." [6] Pls.' Suppl. Br. Supp. [*11] Mot. Class Certification [335] at 1-2 (citing Pls.' Am. Compl. [81] ¶ 60). Plaintiffs maintain that their intent is to include as class members only those consumers who paid retail price for HeartGard or HeartGard Plus in purchasing the drugs either from their particular veterinarians or over the Internet. Plaintiffs allege that they have suffered monetary and emotional damages as a result of their reliance on HeartGard or HeartGard Plus for heartworm prevention, because their dogs have contracted heartworms and may not survive treatment. Plaintiffs seek actual damages including, but not limited to, the following:

> the prices paid by the [P]laintiffs to purchase HeartGard and HeartGard Plus since the inception of the false advertisements and false promotional materials; costs incurred by the [P]laintiffs resulting from the failures of HeartGard and HeartGard Plus, and the amounts by which [Merial] has been unjustly enriched at the [P]laintiffs' expense by false and fraudulent advertising and promotional claims of excessive efficacy; . . . divestiture of any and all of [Merial]'s interest in the enterprise . . . ; [t]reble damages, costs[,] and attorney's fees and expenses . . . ; and [*12] [d]ivestiture of all proceeds received from the sale of HeartGard and/or HeartGard Plus for dogs to the extent to which [Merial has] been unjustly enriched at the Plaintiffs' expense.

Pls.' Am. Compl. [81] ¶¶ 2-5. Plaintiffs additionally seek punitive and exemplary damages and any other legal or equitable relief deemed just under the circumstances. Id. ¶¶ 6-7.

## B. Class-Certification Standard

---

6   In the amended complaint, Plaintiffs refer to a proposed "drug class" subclass [all members of "Drug Purchase" class whose dog(s) experienced failure of drug to perform as advertised]. However, Plaintiffs state in their motion to certify class that they no longer wish to have this certified as a subclass: "During [the class-certification stage,] much proof has been developed regarding whether the cause of an individual dog's heartworm disease was the result of drug failure, or the dog owner's failure to properly administer the drug. Plaintiffs[] concede that . . . individualized proof would be required in each instance"; accordingly, Plaintiffs no longer seek certification of the "drug class" subclass. Pls.' Br. Supp. Mot. Certify Class [253] at 2 n.7.

2013 U.S. Dist. LEXIS 46825, *12

Plaintiffs maintain that their RICO case should **[\*13]** be certified as a class action under *Rule 23 of the Federal Rules of Civil Procedure*. The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01, 99 S. Ct. 2545, 61 L. Ed. 2d 176 (1979). "Class actions promote efficiency and economy in litigation and permit multiple parties to litigate claims that otherwise might be uneconomical to pursue individually." *In re Wilborn*, 609 F.3d 748, 755 (5th Cir. 2010); *see Credit Suisse Sec. (USA) LLC v. Simmonds*, __ U.S. __, 132 S. Ct. 1414, 1419 n.6, 182 L. Ed. 2d 446 (Mar. 26, 2012) (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974) ("efficiency and economy of litigation" is "a principal purpose" of class actions)).

The district court has "wide discretion" in determining whether to certify a class. *Allard v. Anderson*, 260 F. App'x 711, 716 (5th Cir. 2007) (citing *McGrew v. Tex. Bd. of Pardons & Paroles*, 47 F.3d 158, 162 (5th Cir. 1995)). However, "[a] district court must rigorously analyze *Rule 23*'s prerequisites before certifying a class." *Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 345 (5th Cir. 2012) **[\*14]** (internal citation omitted). "This requires an understanding of 'the relevant claims, defenses, facts, and substantive law presented in the case,'" *id.* at 345-46 (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998)), and often "entail[s] some overlap with the merits of the plaintiff's underlying claim . . . that cannot be helped," *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S. Ct. 2541, 2551 -2552, 180 L. Ed. 2d 374 (June 20, 2011) (internal quotation marks and citations omitted).

Class certification is only appropriate if the Court is satisfied after conducting a rigorous analysis that the party seeking class certification has met its burden of demonstrating that (1) all four general class action prerequisites of *Rule 23(a)* are met, and (2) that the action is maintainable under one of the three categories set forth in *Rule 23(b)*. *See In re Rodriguez*, 695 F.3d 360, 365 (5th Cir. 2012); *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007).

## C. *Rule 23(a)* Prerequisites

The putative class must first meet the prerequisites of *Rule 23(a) of the Federal Rules of Civil Procedure* which provides:

> One or more members of a class may sue or be sued as representative **[\*15]** parties on behalf of all members only if:

> > (1) the class is so numerous that joinder of all members is impracticable;

> > (2) there are questions of law or fact common to the class;

> > (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> > (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

### (1)Numerosity

The first requirement of *Rule 23(a)* is that the class must be so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. ofNW., Inc. v. EEOC*, 446 U.S. 318, 330, 100 S. Ct. 1698, 64 L. Ed. 2d 319 (1980).

Plaintiffs, all adult citizens of Mississippi, maintain that the putative "drug purchase class" of dog owners who purchased HeartGard or HeartGard Plus from September 1, 2005 "until the date upon which Merial ceases ... [its] false claims regarding 100% efficacy" against heartworms and the transmission of zoonotic diseases to humans, will have in excess of 4 million class members. Plaintiffs maintain in support of numerosity **[\*16]** that Merial has admitted that more than 40 million doses of HeartGard Plus have been sold in the United States since September 1, 2005, and further that Merial has allegedly produced more than 10,000 notices of adverse drug events related to the failure of HeartGard to prevent heartworm infestation despite administering HeartGard to the particular dog as directed. See Pls.' Suppl. Br. Supp. Mot. Class Certification [335] at 3. Thus, Plaintiffs contend that the class is so numerous that joinder of all members is impracticable. The Court finds that Plaintiffs have satisfied the numerosity requirement.

### (2)Commonality

The second requirement of *Rule 23(a)* is that there must be at least one question of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). The United States Supreme Court stated in *Dukes* that the mere recitation of common questions among the class members, which occurs in "[a]ny competently crafted class action complaint," is not sufficient to obtain class certification. *Dukes*, 131 S. Ct. at 2551 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L. REV. 97, 131-32 (2009)). Commonality requires the plaintiff to demonstrate not only **[\*17]** that the class members "have all suffered a violation of the same provision of law," but that they "have suffered the same injury" such that "all [of the class members'] claims can productively be litigated at once." *Id.* (internal citation omitted; emphasis added). The commonality requirement is not met "when the proposed class

merely establishes that there is at least one issue whose resolution will affect all or a significant number of the putative class members." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (internal citation omitted). "Rather, *Rule 23(a)(2)* requires that all of the class member's claims depend on a common question of law or fact whose resolution 'will resolve an issue that is central to the validity of each one of the [class member's] claims in one stroke.'" *Id.* (citing *Dukes*, 131 S. Ct. at 2551). An example of a question that could satisfy *Rule 23(a)*'s commonality requirement is one which "invite[s] a 'yes' or 'no' answer." *See Ahmad v. Old Republic Nat'l Title Ins. Co.*, 690 F.3d 698, 704 (5th Cir. 2012) (internal citation omitted).

Plaintiffs argue that they have satisfied commonality, as the predominant issues in this case are the same for [*18] all class members: that is, Medal's alleged violations of RICO, the FDCA, federal mail fraud statutes, and federal wire fraud statutes. Plaintiffs maintain that the specific questions raised in the case are the following:

(1) Has Merial engaged in a pattern of racketeering activity?

(2) Has Merial engaged in RICO "predicate acts" by using the mail and wire to disseminate false and misleading advertisements?

(3) Did Merial market HeartGard as 100[%] effective while knowing this claim was false?

(4) Did Merial receive and retain monies due to false and misleading statements contained within its marketing materials?

(5) Did Merial continue to disseminate deceptive marketing information to class members after being told by the FDA to cease dissemination of such materials?

(6) Has Merial conducted or participated in a RICO enterprise?

(7) Has Merial's pattern of racketeering activity, through its false marketing campaign, injured class members, including the named [P]laintiffs, in their "business or property"?

(8) Have [*19] Merial's deceptive practices caused class members to pay more for HeartGard despite it not providing any more protection against heartworm disease than less expensive competing products?

(9) What injunctive or declaratory relief is required to enjoin and otherwise remedy Merial's false marketing of HeartGard?

Plaintiffs' Suppl. Br. Supp. Mot. Class Certification [335] at 4. Plaintiffs further maintain that "the very gravamen of the RICO claims is the pattern of racketeering activity and the existence of a national conspiracy," which "constitute essential elements of each plaintiff's RICO claim." *Id.* at 17 (quoting *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009)). Plaintiffs maintain that questions concerning whether Merial has continued to distribute its products through websites that post HeartGard advertisements, and whether Merial has failed to abide by the FDA's warning concerning its efficacy claims of HeartGard and HeartGard Plus, are questions common to the class. Finally, Plaintiffs maintain that "[t]he alleged existence and operation of a nationwide corporate[-] level policy" satisfies commonality. *Id.* at 19.

Merial argues that Plaintiffs have failed to [*20] satisfy commonality, as key questions in the case are anything but common to the putative class members, and instead are individualized issues, such as issues concerning the pricing of the drug that would vary from veterinarian to veterinarian and from Plaintiff to Plaintiff.

As stated above, the recitation of questions—even if they are important questions to be answered in the course of litigation on the RICO claim—alone does not satisfy commonality. Instead, the Court looks to see if the Plaintiffs have suffered the same injury and that the Plaintiffs' claims depend upon a common contention whose truth or falsity will be established, and when established, will resolve a central issue in one stroke. The Court finds that some of the questions focused on Merial's alleged participation in a RICO enterprise clearly satisfy the commonality requirement. These questions include whether Merial engaged in a pattern of racketeering activity, engaged in "predicate acts" by using the mail and wire to disseminate false and misleading advertisements, and marketed the drugs as 100% effective while knowing these claims were false. The answer to any of these questions is common among the class members, [*21] and answers would decide an issue that is central to the RICO claim of every putative class member at the same time. For example, the answer of "yes" or "no" to whether Merial engaged in "predicate acts" by using the mail and wire to disseminate false and misleading advertisements of 100% efficacy would resolve that integral question in the RICO claim for all putative class members in one stroke. These common questions would "generate common answers apt to drive the resolution of the litigation," *see Dukes*, 131 S. Ct. at 2551, and thus, the Court finds that Plaintiffs have satisfied the commonality requirement.

### (3) Typicality

The third requirement of *Rule 23(a)* is that the plaintiff's claims must be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). The United States Supreme Court stated in *Dukes*: "We have previously stated . . . that '[t]he commonality and typicality requirements of *Rule 23(a)* tend to merge. Both serve as guideposts for deter-

2013 U.S. Dist. LEXIS 46825, *21

mining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately **[*22]** protected in their absence." *Dukes*, 131 S. Ct. at 2551 n.5 (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 157-58 n. 13, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)).

Plaintiffs maintain that their claims are typical of the claims of the putative class in that the proof of racketeering activity would be the same whether this were an individual plaintiff's RICO action or class action, and this consumer protection issue is well suited for a class action. Plaintiffs specifically allege in this respect that

> **(1)** Merial's advertisements were designed to and did in fact exaggerate the effectiveness of the drug to veterinarians and dog owners alike in a deceptive manner;

> **(2)** Merial knew that its product did not provide 100[%] protection against heartworms as advertised, yet intended for the false statements to justify price difference between it and the generics;

> **(3)** The claims of excessive effectiveness elevated the desirability of the drugs in the minds of the veterinarians causing them as a whole to recommend HeartGard over its competitors;

> **(4)** Each class member purchased Merial's products, paying more money per dose for a product that was advertised to "Provide 100% Protection Against **[*23]** Heartworm Disease," when in reality Merial's products provided no more protection against heartworm disease than Merial's competitors' less expensive products; [and]

> **(5)** The claims of the proposed class representatives and of the putative class arise from a similar course of conduct and share the same legal theories.

Pls.' Suppl. Br. Supp. Mot. Class Certification [335] at 6-7 (internal footnotes and citations omitted).

Merial argues that there is a lack of typicality among the named Plaintiffs and absent putative class members, and maintains in support that testimony at the class-certification hearing indicated that one of the named Plaintiffs viewed the "100% effectiveness" statement, and one did not view the statement prior to purchasing HeartGard Plus; one was informed by his veterinarian that HeartGard Plus was 100% effective, and one was not informed of the same; and one relied <u>in part</u> on his veterinarian's recommendation, while one relied <u>solely</u> on his

veterinarian's recommendation. The Court finds that despite these possible discrepancies, Plaintiffs have demonstrated that their claims are typical of the putative class. Thus, the Court finds that Plaintiffs have satisfied the **[*24]** typicality requirement.

**(4)Adequate Representation**

The fourth requirement of *Rule 23(a)* is that the representative parties must "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). "Because absent class members will be bound by the judgment in a class action law suit, strict review of the adequacy of representation is required." *Dodson v. Hillcrest Sec., 95 F.3d 52, 1996 WL 459770, at *6 (5th Cir. 1996)*; *see Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 90 (7th Cir. 1977). The adequate representation requirement is satisfied if "(1) the [proposed] representative [has] common interests with the unnamed members of the class; and (2) it . . . appear[s] that the [proposed] representative will vigorously prosecute the interests of the class through qualified counsel." *Dodson*, 95 F.3d 52, 1996 WL 459770, at *6 (citing *Gonzales v. Cassidy*, 474 F.2d 67, 72 (5th Cir. 1973)).

Plaintiffs maintain that the class representatives will fairly and adequately protect the interests of the class, as Plaintiffs' counsel will prosecute the action zealously and competently and have substantial litigation experience and familiarity with the particular issues in the case; to date, Plaintiffs' **[*25]** counsel have competently and vigorously maintained the suit by undertaking extensive written discovery, taking and defending a number of depositions in at least seven states, engaging in extensive motion practice, and litigating the recent class-certification hearing; the named Plaintiffs possess a sufficient level of knowledge about the litigation, as they each own one or more dogs for which they purchased HeartGard Plus based on the efficacy claims and allegedly paid more per dose for HeartGard Plus than they would have paid for a less expensive product of equal protection; the named Plaintiffs have taken an active role in the litigation, as evidenced by their efforts in responding to discovery, appearing for depositions, and traveling across the State of Mississippi to testify at the recent class-certification hearing; and no conflict of interest exists between the named Plaintiffs and absent putative class members. Pls.' Suppl. Br. Supp. Mot. Class Certification [335] at 22-23. Although Merial offers several arguments against adequate representation, the Court is satisfied that Plaintiffs have demonstrated that the representative parties would fairly and adequately protect the **[*26]** interests of the class. Having found that the Plaintiffs have satisfied the four prerequisites of *Rule 23(a)*, the Court now must determine whether the Plaintiffs' putative class fulfills at least one requirement of *Rule 23(b)*.

***D. Rule 23(b)*** *Class-Certification Criteria*

Because Plaintiffs have met the prerequisites of *Rule 23(a)*, the Court must determine whether Plaintiffs' putative class may be certified under *Rule 23(b)*. To obtain class certification, a plaintiff must show the Court that certification is proper under one of the *Rule 23(b)* criteria. Plaintiffs have moved to have the putative class certified under *Rule 23(b)(2)* or *Rule 23(b)(3)*.

*Rule 23(b)* provides in pertinent part:

> A class action may be maintained if *Rule 23(a)* is satisfied and if:
>
> . . .
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly [*27] and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
>> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>>
>> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>>
>> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>>
>> (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b).

### *Rule 23(b)(2)* Certification

Plaintiffs maintain that certification is proper under *Rule 23(b)(2)*. *Rule 23(b)(2)* provides that class certification is proper when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). To satisfy *Rule 23(b)(2)*, a plaintiff must show that "(1) the defendant's actions or refusal to act are generally applicable to the class as a whole and (2) injunctive relief predominates over dam-

ages sought." *In re Rodriguez*, 695 F.3d at 365 (citing *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 975 (5th Cir. 2000) [*28] (internal footnote and citation omitted)).

The Court must be satisfied that the defendant's unlawful conduct has harmed the class members "in essentially the same way," *see Maldonado*, 493 F.3d at 524, that is, that there was "common behavior by the defendant towards the class," *see Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185, 198 (5th Cir. 2010). The Court simultaneously must be satisfied that "the relief sought [would] perforce affect the entire class at once." *See Dukes*, 131 S. Ct. at 2558. "[I]f relief specifically tailored to each class member would be necessary to correct the allegedly wrongful conduct of the defendant," *Rule 23(b)(2)* would not be an appropriate class-certification vehicle. *Perry*, 675 F.3d at 847 (citing *Shook v. Bd. of Cnty. Comm'rs*, 543 F.3d 597, 604 (10th Cir. 2008)). "The key to the *[Rule 23](b)(2)* class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Dukes*, 131 S. Ct. at 2557 (quoting Nagareda, 84 N.Y.U.L. REV. at 132). The Supreme Court has explained:

> *Rule 23(b)(2)* [*29] applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a <u>different</u> injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

*Id.* "*Rule 23(b)(2)* anticipates cases such as "[c]ivil rights cases against parties charged with unlawful, class-based discrimination." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) (citing FED. R. CIV. P. 23 advisory committee's note, 28 U.S.C. App. 696, 697); *see Casa Orlando Apartments*, 624 F.3d at 200-01 ("While *[Rule 23] (b)(2)* classes are not exclusively reserved for civil rights disputes, this class type is especially suited for those plaintiffs.").

The Court notes that, as Merial argues, it is unlikely that injunctive relief is even available to the Plaintiffs in this RICO action. RICO contains a private right of action providing in pertinent part that "[a]ny person injured in his business or property by reason of a violation [*30] of *section 1962* of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of

2013 U.S. Dist. LEXIS 46825, *30

the suit, including a reasonable attorney's fee." *18 U.S.C. § 1964(c)*. This statutory language explicitly refers to the possibility of monetary relief in a RICO action, but is silent as to the possibility of injunctive relief in a RICO action. Case law does not shed any further light on the issue. The Fifth Circuit "has not decided whether equitable relief is available to a private civil RICO plaintiff." *Richard v. Hoechst Celanese Chem. Gp., Inc., 355 F.3d 345, 354 (5th Cir. 2003)* (citing *Price v. Pinnacle Brands, 138 F.3d 602, 605 n.5 (5th Cir. 1998)*). However,

> [t]here is considerable doubt that injunctive relief is available to private plaintiffs under RICO. *See Conkling v. Turner, 18 F.3d 1285, 1296 n.8 (5th Cir. 1994)* (listing cases). The only court of appeals to directly address this issue has held that RICO does not allow private injunctive relief, *see Religious Technology Ctr. v. Wollersheim, 796 F.2d 1076, 1082-89 (9th Cir. 1986)*, and we have agreed in dicta. *See In re Fredeman Litig., 843 F.2d 821, 830 (5th Cir. 1988)* [*31] ("We find the analysis contained in the *Wollersheim* opinion persuasive .... We need not decide, however, whether all forms of injunctive or other equitable relief are foreclosed to private plaintiffs under RICO.").

*Bolin, 231 F.3d at 977 n.42*.

However, even if injunctive relief is allowed in a RICO action, the Court finds that class certification under *Rule 23(b)(2)* would be improper in this particular case, because injunctive relief does not predominate over the monetary damages sought by Plaintiffs. The Court also notes the presence of separation-of-powers concerns that granting any of the equitable relief sought would potentially usurp the powers of the FDA to police such conduct.

Plaintiffs maintain that the class should be certified under *Rule 23(b)(2)*, because the class is a cohesive unit harmed in the same ways by Merial's systematic and uniform false marketing of HeartGard and HeartGard Plus. Plaintiffs request both monetary and injunctive relief in this case, but maintain that injunctive remedies would provide the most appropriate relief for the class members' common injury. Plaintiffs specifically maintain that the following injunctive relief would be proper: (i) a permanent [*32] injunction preventing Merial from marketing HeartGard and HeartGard Plus as 100% effective at heartworm prevention and as 100% effective at preventing the transmission of zoonotic diseases in humans; (ii) a mandatory injunction requiring Merial to recall from

veterinarians' offices all marketing material stating the foregoing; (iii) a mandatory injunction prohibiting Merial from knowingly selling or otherwise providing HeartGard and HeartGard Plus to any Internet seller or other person or entity which advertises or promotes HeartGard and HeartGard Plus as 100% effective at heartworm prevention or 100% effective in the prevention of zoonotic diseases in humans; (iv) the Court's establishment of specific requirements supplemental to FDA regulations for Merial to follow in marketing and distribution of the product and in reporting to the FDA regarding the product's efficacy; and (v) the Court's appointment of an independent monitor to review Merial's marketing campaigns of the product.

Plaintiffs have also requested actual damages for (1) the prices paid by Plaintiffs to purchase HeartGard and HeartGard Plus since the inception of the false advertisements and false promotional materials; [*33] (2) the costs incurred by Plaintiffs resulting from the failures of HeartGard and HeartGard Plus; (3) the amounts by which Merial has been unjustly enriched at Plaintiffs' expense by false and fraudulent advertising and promotional claims of excessive efficacy of the product; (4) divestiture of any and all of Merial's interest in the enterprise; (5) treble damages, costs, and attorney's fees and expenses; and (6) divestiture of all proceeds received from the sale of HeartGard and/or HeartGard Plus for dogs to the extent to which Merial has been unjustly enriched at Plaintiffs' expense. Plaintiffs additionally seek punitive and exemplary damages and any other legal or equitable relief deemed just under the circumstances.

Plaintiffs' request of both monetary and injunctive relief in this case is not in and of itself fatal to *Rule 23(b)(2)* class certification. [7] However, *Rule 23(b)(2)* class certification would not be proper in this case, because Plaintiffs fail to demonstrate that the injunctive relief they request predominates over any monetary damages sought. The Fifth Circuit has held that any requested "[m]onetary relief predominates unless it is 'incidental' to the requested injunctive [*34] or declaratory relief." *Casa Orlando Apartments, 624 F.3d at 199* (citing *Allison, 151 F.3d at 415*). The Fifth Circuit has defined "incidental" to mean "damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief' and has explained that "[s]uch incidental damages should only be those to which class members would be automatically entitled once liability to the class is established." *Id.* (citing *Allison, 151 F.3d at 415*). The Fifth Circuit has also explained that "damages may be incidental when they are 'capable of computation by means of objective standards and not dependent in any significant way on the

---

7    The Court notes that the Advisory Committee's note to *Rule 23(b)(2)* cites no cases containing requests for both monetary and injunctive relief as examples of *Rule 23(b)(2)* classes. *See* FED. R. CIV. P. *23(b)(2)* advisory committee's note, 39 F.R.D. 69, 102 (1966) (citing cases); *Dukes, 131 S. Ct. at 2558*.

intangible, subjective differences of each class member's circumstances." *Bolin*, 231 F.3d at 976. Plaintiffs request monetary relief based on prices the Plaintiffs paid to purchase HeartGard or HeartGard Plus from their respective veterinarians, the costs the Plaintiffs have incurred in treating their respective dogs for heartworms and otherwise resulting from the failures of HeartGard or HeartGard Plus, the amounts by which Merial has been unjustly enriched by false claims of the efficacy of HeartGard or HeartGard [*35] Plus, and other damages. The Court finds that the Plaintiffs' requested monetary relief would not flow from the injunctive relief requested, including permanent injunctions against Merial relating to the marketing of HeartGard and HeartGard Plus as 100% effective at preventing heartworms and as 100% effective at preventing the transmission of zoonotic disease in humans, the Court's establishment of more stringent requirements for the marketing of HeartGard and HeartGard Plus and taking on a more active role in the marketing and promotion of HeartGard and HeartGard Plus in general. Instead of flowing from the injunctive relief requested, the monetary relief requested would depend on the specific circumstances of each class member relating to the amount each Plaintiff was charged for HeartGard and/or HeartGard Plus. The retail prices paid by Plaintiffs for HeartGard and HeartGard Plus apparently are not determined by Merial but by the veterinarians who sell the products to consumers. The computation of monetary relief to the Plaintiffs would likely "entail complex individualized determinations," which are not characteristic of "incidental damage." *See Allison*, 151 F.3d at 415. Such individual [*36] considerations belie the fact that injunctive relief would be proper, because Plaintiffs have failed to demonstrate that the injunctive relief would predominate over any monetary relief requested.

Of further concern to the Court is the nature of the injunctive relief requested by the Plaintiffs, which would entail policing the marketing and promotion of HeartGard and HeartGard Plus and imposing more stringent regulations than the FDA. The FDA has warned Merial that its advertisement and promotion of HeartGard and HeartGard Plus as 100% effective at preventing heartworms and as preventing the transmission of zoonotic diseases from animals to humans was not in compliance with federal law. The FDA has policed the matter, and continues to do so, and it is not this Court's office to usurp the FDA's expertise in such matters. It is apparent to this Court that because the FDA continues to regulate [*37] the advertising and promotion of HeartGard and HeartGard Plus, the majority of the putative class members will not face future harm and thus will not receive any benefit from injunctive relief. *See Maldonado*, 493 F.3d at 525 ("*Rule 23(b)(2)* certification is also inappropriate when the majority of the class does not face future harm."); *In re Monumental Life*, 365 F.3d 408, 416 (5th Cir. 2004) ("[C]ertification under *[R]ule 23(b)(2)* is appropriate only if members of the proposed class would benefit from the injunctive relief they request."). Therefore, "[t]hese [P]laintiffs have nothing to gain from an injunction, and the declaratory relief they seek serves only to facilitate the award of damages. Thus, the definition of the class shows that most of the plaintiffs are seeking only damages." *See Bolin*, 231 F.3d at 978. The Court is left to wonder how it could define or enforce meaningful injunctive relief in light of these concerns. [8] For these reasons, the Court finds that *Rule 23(b)(2)* certification is not warranted in this case.

*Rule 23(b)(3)* **Certification**

Plaintiffs also maintain that class certification is proper under *Rule 23(b)(3)*. *Rule 23(b)(3)* provides that class certification is proper only when "[1] the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . [2] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). [9] When the Court makes the *Rule 23(b)(3)* determination, it focuses not on adjudicating the case but on "select[ing] the metho[d] best suited to adjudication of the controversy fairly and efficiently." *See Amgen, Inc. v. Conn. Retirement Plans &*

---

[8]   Merial also argues that Plaintiffs' claim for injunctive relief is moot because Merial has already ceased claiming in advertising and promotional material [*38] that HeartGard Plus is 100% effective at heartworm prevention. The Court finds this argument is not well taken. Although federal courts do not decide cases in which the courts can provide no meaningful relief due to mootness, "as long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *See Ellis v. Brotherhood of Ry.*, 466 U.S. 435, 442, 104 S. Ct. 1883, 80 L. Ed. 2d 428 (1984). Further, although Merial may be in compliance with FDA requirements at present, and thus may have ceased any offensive activity, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," unless the party asserting mootness meets its "heavy burden of persuad[ing] the court" that "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) (internal citations and quotation marks omitted). The Court finds that Merial has not met this heavy burden. However, Rule 23(b)(2) class certification [*39] is not warranted on other grounds, as set forth in this opinion.

[9]   The Court notes the overlap between Rule 23(a)(2)'s commonality requirement and the predominance and superiority requirements of Rule 23(b)(3). The commonality requirement is "subsumed under, or superseded by, the more stringent Rule 23(b)(3) [*40] requirement that questions common to the class predominate over other questions." *See Amchem Prods.*, 521 U.S. at 609, 117 S. Ct. 2231; *see also O'Sullivan*, 319 F.3d at 737 (predominance and superiority requirements of Rule 23(b)(3) are "far more demanding" than Rule 23(a)(2)'s commonality requirement).

2013 U.S. Dist. LEXIS 46825, *37

*Trust Funds,* ___ U.S. ___, 133 S. Ct. 1184, 185 L. Ed. 2d 308, 2013 WL 691001, at *3, (Feb. 27, 2013). The Court will first examine the predominance prong and then will examine the superiority prong in the *Rule 23(b)(3)* analysis.

**(1)Predominance**

"*Rule 23(b)(3)* requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *133 S. Ct. 1184, Id.* at *4. This inquiry requires the Court to consider "how a trial on the merits would be conducted if a class were certified." *See Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) (internal citation omitted). Accordingly, the Court must identify the substantive issues that will control the outcome, assess which issues will predominate, and then determine whether the issues are common to the class. *See In re Wilborn*, 609 F.3d at 755. This entails an examination of the "elements of the underlying cause of action." *See Erica P. John Fund, Inc. v. Halliburton Co.*, ___U.S. ___, 131 S. Ct. 2179, 2184, 180 L. Ed. 2d 24 (June 6, 2011).

With the foregoing standard in mind, the Court will first [*41] lay out the elements of Plaintiffs' claims and what must be shown to prove a RICO violation in a class action context, and will then examine whether issues common to the class will predominate.

**(i)Substantive Issues**

Although a plaintiff can bring a civil RICO suit under *18 U.S.C. § 1964(c)*, it must first establish standing to do so. *See Beck v. Prupis*, 529 U.S. 494, 120 S. Ct. 1608, 146 L. Ed. 2d 561 (2000); *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425 (5th Cir. 2000). To establish standing, the plaintiff must show (1) injury to property and (2) causation. *Price*, 138 F.3d at 606. After the plaintiff establishes standing, it must then satisfy the elements of a RICO violation under *Section 1962*, that is, the plaintiff must show that there is "(1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of an enterprise.' " *St. Paul Mercury*, 224 F.3d at 439 (quoting *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988)).

Plaintiffs bring this RICO action against Merial under *18 U.S.C. § 1962(c)*, [10] which prohibits any person employed by or associated with any enterprise from participating [*42] in or conducting the affairs of that enter-

prise through a pattern of racketeering activity. Plaintiffs' RICO claim is based on the theory that Plaintiffs and the putative class members were injured by Medal's participation in an enterprise through a pattern of racketeering activity that constituted mail fraud in violation of *18 U.S.C. § 1341* and wire fraud in violation of *18 U.S.C. § 1343* against the American veterinarian community and dog owners when it advertised and promoted Heart-Gard and HeartGard Plus as 100% effective against heartworm prevention and against the transmission of certain zoonotic diseases to humans.

Plaintiffs specifically allege that Merial was an enterprise, that is, "an association in fact that includes Merial and third parties such as [I]nternet providers, the American Heartworm Society, and veterinarians," which "falsely represented the attributes and efficacy" of HeartGard and HeartGard Plus to consumers. Pls.' Br. Supp. Mot. Class Certification [249] at 30-31. Plaintiffs aver that the enterprise shared the common purpose of misleading the American veterinarian community and American dog owners with false and fraudulent claims of the efficacy of HeartGard and HeartGard Plus in order to capture the lion's share of Internet sales of heartworm preventatives and to be the overall number-one choice in the market for heartworm prevention. Plaintiffs further allege that Merial committed predicate acts of fraud consisting of false claims in advertising and promotional materials that HeartGard and HeartGard Plus were 100% effective at preventing heartworms and the transmission of certain zoonotic diseases from dogs to humans. Plaintiffs claim that each "click" on the Internet constitutes a separate predicate act. Plaintiffs aver that Merial's marketing [*44] materials were transmitted to veterinarians directly and/or indirectly by the use of the United States mail service and/or the Internet. Plaintiffs allege that veterinarians throughout the United States relied on Merial's alleged false claims of 100% efficacy, and prescribed HeartGard and HeartGard Plus to a multitude of dogs to prevent heartworm disease in the dogs. Plaintiffs further allege that they, and others in the putative class, relied on their veterinarians' recommendations and purchased HeartGard and/or HeartGard Plus at an inflated market price. Finally, Plaintiffs allege that although the FDA warned Merial that its 100% efficacy claims were false, Merial failed to take appropriate action to cease dissemination of the materials as demanded by the FDA, thus allowing the impression to remain with veterinarians and the consuming public that HeartGard and HeartGard Plus were 100% effective at prevention heartworms and the transmission of certain zoonotic diseases to humans.

---

10    Plaintiffs appear to have abandoned their additional, earlier-pled RICO claims for Merial's alleged use of the income it received from the sales of the product or by Merial's alleged investment of the income it received from the sales of the product in violation of *18 U.S.C. § 1962(a)*; Merial's alleged acquisition of the income it received from sales of the product in violation of *18 U.S.C. § 1962(b)*; and Merial's alleged participation in a conspiracy to commit RICO violations in violation of *18 U.S.C. § 1962(d)*. Thus, the Court cabins its analysis to Plaintiffs' RICO [*43] claim under *Section 1962(c)*.

(ii) <u>Which Issues Will Predominate and Whether Such Issues Are Common to Class</u>

The Court will now assess which issues will predominate, and then determine whether the issues are common to the class. In so doing, **[\*45]** the Court will analyze and balance the common issues against the individualized issues, and consider the administration of a trial on the merits.

Plaintiffs argue that the predominant issues in this case are the same for all class members: that is, Merial's alleged violations of RICO, the FDCA, federal mail fraud statutes, and federal wire fraud statutes. Plaintiffs maintain that the specific questions raised in the case which are common to class members are the following:

**(1)** Has Merial engaged in a pattern of racketeering activity?

**(2)** Has Merial engaged in RICO "predicate acts" by using the mail and wire to disseminate false and misleading advertisements?

**(3)** Did Merial market HeartGard as 100[%] effective while knowing this claim was false?

**(4)** Did Merial receive and retain monies due to false and misleading statements contained within its marketing materials?

**(5)** Did Merial continue to disseminate deceptive marketing information to class members after being told by the FDA to cease dissemination of such materials?

**(6)** Has Merial conducted or participated in a RICO enterprise?

**(7)** Has Medal's pattern of racketeering activity, through its false marketing campaign, injured class members, **[\*46]** including the named [P]laintiffs, in their "business or property"?

**(8)** Have Merial's deceptive practices caused class members to pay more for HeartGard despite it not providing any more protection against heartworm disease than less expensive competing products?

**(9)** What injunctive or declaratory relief is required to enjoin and otherwise remedy Medal's false marketing of HeartGard?

Plaintiffs' Supp. Br. Supp. Mot. Class Certification [335] at 4. Plaintiffs maintain that common issues predominate in this case because Plaintiffs' claim focuses on facts and issues common to Medal's alleged behavior rather than on facts and issues specific to individual class members. Plaintiffs assert that the putative class will be able to rely on common evidence at trial, including the same documents and testimony, to prove that Medal's conduct has violated RICO. Plaintiffs maintain that testimonial and documentary evidence concerning the existence of an enterprise will be common among the putative class members. Plaintiffs also maintain that the proof concerning the knowing commission of predicate acts would be common among the putative class members. Plaintiffs further contend that evidence concerning **[\*47]** a pattern of mail fraud in violation of *18 U.S.C. § 1341* and wire fraud in violation of *18 U.S.C. § 1343* would be based on common proof that would overlap with proof of the existence of an enterprise. Merial argues that although some of the elements of the RICO claim might be substantiated with common proof, individualized proof would be required to show injury and causation, and that the individualized issues present would predominate over any common issues in the case.

The issues Plaintiffs list are "common" in that each purported Plaintiff would need the questions answered, and indeed, several questions with respect to the elements of the RICO claim are common to the class, such as evidence concerning Merial's particular actions with respect to advertising and promotion of HeartGard and HeartGard Plus, the alleged existence of an enterprise, any alleged participation by Merial in the alleged enterprise, etc. However, many of the integral questions in the case cannot be determined on a class-wide basis using class-wide proof, specifically those concerning whether Merial's alleged pattern of racketeering activity through its alleged marketing campaign has injured class members in their **[\*48]** business or property, whether Merial's alleged deceptive practices have caused putative class members to pay more for HeartGard or HeartGard Plus despite it not providing any more protection against heartworms than its less expensive competing drugs, and what relief is appropriate. These questions pertaining to injury, causation, and damages must be proven in order for Plaintiffs to recover in this RICO action, and a determination at a trial on the merits would require the factfinder to engage in a determination of the facts and circumstances present in each Plaintiff's case, as more fully explained below. Thus, there are individualized issues present in this case that predominate over any common issues, making *Rule 23(b)(3)* class certification untenable.

**(a) Injury**

Plaintiffs maintain that the questions are common to the class concerning whether the named Plaintiffs and members of the putative class have suffered injury to their business or property by paying more for HeartGard or HeartGard Plus, despite it not providing any more protection against heartworm disease than less expensive competing products. Plaintiffs contend that these questions

2013 U.S. Dist. LEXIS 46825, *48

are focused on Merial's alleged behavior, **[*49]** which Plaintiffs allege has affected all the named Plaintiffs and putative class members by causing them to overpay for HeartGard and HeartGard Plus.

Merial argues that only individualized proof will ultimately prove injury of overpayment for HeartGard and HeartGard Plus by demonstrating the existence and amount of overpayment. Merial contends that additional individualized factual concerns with respect to proof of injury include, *inter alia*, the following: the alternative heartworm preventative the veterinarian would have prescribed is left to the veterinarian's independent medical judgment; the retail price paid by the owners varies from veterinarian to veterinarian; the prices of HeartGard and HeartGard Plus and its competitors changes over time; and some or all of the putative class members may have received the benefit of their bargain. Merial contends that these individualized factual concerns require individualized proof that would be fatal to *Rule 23(b)(3)* class certification.

The Court finds Merial's arguments in this respect to be well taken. Individualized issues exist with respect to proof of injury, and those issues, along with the individualized issues with respect to proof **[*50]** of causation and damages, predominate over any questions common to the class and make *Rule 23(b)(3)* class certification untenable in this case.

**(b) Causation**

Merial argues that the class should not be certified because the individualized proof required to prove proximate cause in the RICO claim predominates over any common questions of law or fact. [11] Merial contends that Plaintiffs have alleged proximate cause through first-party reliance when they allege in the amended complaint that dog owners who purchased HeartGard and/or HeartGard Plus did so in reliance on Merial's 100% efficacy claims in advertising and promotional items for the drug, and that first-party reliance would require proof that each individual Plaintiff relied on the alleged misrepresentation. Merial further contends that Plaintiffs plead third-party reliance when they allege in their amended complaint that veterinarians relied upon Merial's 100% efficacy claims in making the decision to prescribe HeartGard or HeartGard Plus over other heartworm preventative drugs, and that third-party reliance would require

proof that each individual veterinarian relied on the alleged misrepresentation.

Plaintiffs maintain that common proof is all that is needed to substantiate causation in this case. Plaintiffs contend that common questions pertaining to causation which lend themselves to common proof include the following:

> Has Merial's pattern of racketeering activity, through its false marketing campaign, injured class members, including the named [P]laintiffs, in their "business or property"?

> Have Merial's deceptive practices caused class members to pay more for HeartGard despite it not providing any more protection against heartworm disease than less expensive competing products?

Plaintiffs maintain that they will offer common proof to support the allegations that Merial's deceptive marketing scheme has caused injury by increasing the price of HeartGard and HeartGard Plus to all putative class members. Plaintiffs specifically contend that they will introduce documents and testimony that Merial knowingly and falsely claimed HeartGard and HeartGard Plus were 100% effective against heartworms and in the prevention of zoonotic diseases. Plaintiffs cite potential witnesses who Plaintiffs maintain would testify concerning Merial's alleged participation in a scheme to defraud **[*53]** and the alleged resulting increased retail price paid by its purchasers. Plaintiffs further maintain that they will rely on marketing data, including data related to wholesale and retail pricing, competitor pricing, and market share data as common proof of the alleged scheme to defraud and resulting overpayment by the members of the putative class. Plaintiffs maintain that they are not required to present individualized proof of reliance on any alleged misrepresentation to recover under RICO, based in part on the recent United States Supreme Court decision *Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 661, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008).*

In 2008, the Supreme Court held in *Bridge* that "a plaintiff asserting a RICO claim predicated on mail fraud

---

[11]  Merial also argues that Plaintiffs **[*51]** have attempted to assert a "fraud on the market" theory of recovery in order to avoid having to prove reliance, but that fraud on the market is not tenable in RICO litigation. Plaintiffs respond that their excess price theory is not based on a "fraud on the market" theory. Although the Court is satisfied that Plaintiffs do not appear to be attempting to assert a "fraud on the market" theory, the Court notes the following. Although there is a built-in presumption of reliance in "fraud on the market" theories of recovery, those theories are available in the context of securities litigation—not in RICO litigation. *See Amgen, Inc.,* 133 S. Ct. 1184, 2013 WL 691001, at *5 ("fraud-on-the-market theory ... facilitates class certification by recognizing a rebuttable presumption of classwide reliance on public, material misrepresentations when shares are traded in an efficient market"); *Summit Props. Inc. v. Hoechst Celanese Corp.,* 214 F.3d 556, 561 (5th Cir. 2000) ( "[n]o court has accepted the use of this theory outside of the context of securities fraud"). Because the "fraud on the market" theory is cognizable only in the context of securities litigation, the theory cannot be used to prove causation in a **[*52]** RICO action.

need not show, either as an element of its claim or as a pre-requisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentation." *See Bridge*, 553 U.S. at 661, 128 S. Ct. 2131 (emphasis added). In *Bridge*, respondents had filed RICO claims arising out of the petitioners' alleged misrepresentations to Cook County, Illinois officials in connection with Cook County's auction to sell its tax liens [*54] on delinquent taxpayers' property. Respondents and petitioners were competitors in the tax lien auction. Respondents argued that petitioners' misrepresentations had allowed them to gain an advantage over respondents in the auction; namely, respondents alleged that as a result of petitioners' fraud respondents had lost valuable liens they otherwise would have been awarded. Petitioners argued that respondents' RICO claim failed because respondents could not establish first-party reliance to state a mail-fraud-based RICO claim, as the misrepresentations at issue were made to Cook County, not to respondents.

Justice Thomas wrote for the unanimous Court:

> If petitioners' proposed requirement of first-party reliance seems to come out of nowhere, there is a reason: Nothing on the face of the relevant statutory provisions imposes such a requirement. Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under RICO, even if no one relied on any misrepresentation.

*Id.* at 648, 128 S. Ct. 2131. The Court found nothing in the statutory provisions required a showing of "justifiable reliance" in a RICO claim, even though [*55] "justifiable reliance" is a common-law requirement of a fraud claim. *Id.* at 648-49, 128 S. Ct. 2131; RESTATEMENT (SECOND) OF TORTS § 537 (1977). The Court stated that first-party reliance has no place in civil RICO actions predicated on mail, wire, or bank fraud. The Court found that accepting respondents' allegations as true, the petitioners clearly were injured by respondents' scheme "even though [respondents] did not rely on petitioners' false attestations of compliance with the county's rules." *Id.* at 649, 128 S. Ct. 2131. The Court further found that "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations." *Id.*, 128 S. Ct. 2131. The Court further explained:

> Respondents' alleged injury—the loss of valuable liens—is the direct result of petitioners' fraud. It was a foreseeable and natural consequence of petitioners' scheme to obtain more liens for themselves that other bidders would obtain fewer liens. And . . . there are no independent factors that account for

respondents' injury, there is no risk of duplicative recoveries by respondents removed at different levels of injury from the violation, and no more immediate victim [*56] is better situated to sue. Indeed, both the District Court and the Court of Appeals concluded that respondents and other losing bidders were the only parties injured by petitioners' misrepresentations.

*Id.* at 658, 128 S. Ct. 2131.

The Supreme Court provided an additional example of a case wherein third-party reliance would cognizably satisfy causation in a RICO action: "[S]uppose an enterprise that wants to get rid of rival businesses mails misrepresentations about them to their customers and suppliers, but not to the rivals themselves. If the rival businesses lose money as a result of the misrepresentations, it would certainly seem that they were injured in their business 'by reason of' a pattern of mail fraud, even though they never received, and therefore never relied on, the fraudulent mailings." *Id.* at 649-50, 128 S. Ct. 2131.

Prior to the *Bridge* decision, the Fifth Circuit had held that RICO plaintiffs generally were required to prove individual reliance on the defendant's misrepresentation to satisfy causation on their RICO claim, and that this required individualized proof would defeat class certification under *Rule 23(b)(3)* because individualized issues would predominate. *See,* [*57] *e.g., Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 219 (5th Cir. 2003) ("The pervasive issues of individual reliance that generally exist in RICO fraud actions create a working presumption against class certification."); *Patterson v. Mobil Oil Corp.*, 241 F.3d 417, 419 (5th Cir. 2001) ("Claims for money damages in which individual reliance is an element are poor candidates for class treatment, at best. We have made that plain."); *Bolin*, 231 F.3d at 978 ("the individual findings of reliance necessary to establish RICO liability and damages preclude not only [*Rule 23(b)(2)* certification of this class under RICO, but [*Rule 23(b)(3)* certification as well"). However, even pre-*Bridge*, the Fifth Circuit had recognized a "narrow exception to the requirement that the plaintiff prove direct reliance on the defendant's fraudulent predicate act . . . when the plaintiff can demonstrate injury as a direct and contemporaneous result of fraud committed against a third party." *See Sandwich Chef*, 319 F.3d at 223 (citing generally *Summit Props. Inc. v. Hoechst Celanese Corp.*, 214 F.3d 556 (5th Cir. 2000); *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539 (5th Cir. 2001)).

Although [*58] the Supreme Court's holding in *Bridge* did alter the general perception of whether causation in a RICO claim required a showing of individual reliance, the *Bridge* holding did **not** shift the ultimate focus of RICO causation, which was, and **still is**, on "whether

the alleged violation led directly to the plaintiff's injuries." *See Bridge*, 553 U.S. at 654, 661, 128 S. Ct. 2131 (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006)). Although causation in RICO need not be demonstrated by reliance on a misrepresentation, Justice Thomas wrote for the unanimous Court: "Of course, none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud **can** prevail without showing that someone relied on the defendant's misrepresentations. In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation." *Id.* at 658, 128 S. Ct. 2131 (citation omitted; emphasis added). A "complete absence of reliance may prevent the plaintiff from establishing proximate cause. . . . Accordingly, it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail  [*59] fraud must establish at least third-party reliance in order to prove causation." *Id.* at 658-59, 128 S. Ct.2131.

There have been no Fifth Circuit decisions regarding class certifications in RICO context since *Bridge*. However, case law does provide direction for navigating the waters post-*Bridge*. In *St. Germain v. Howard*, 556 F.3d 261 (5th Cir. 2009) (per curiam), the Fifth Circuit held that the district court erred in requiring plaintiffs "to demonstrate detrimental reliance when alleging injuries that resulted from fraud under RICO," and in so doing, "the district court relied on Fifth Circuit precedent that is no longer good law." *556 F.3d at 263*. The Fifth Circuit further stated: "The Supreme Court recently held that no reliance requirement exists for civil causes of action under RICO for victims of mail fraud. . . . Thus, to the extent that our prior cases are in conflict with *Bridge*, they are overruled." *Id.* And the United States District Court for the Southern District of Mississippi has indicated that "class certification may now be appropriate where, as in *Bridge*, causation is alleged through third-party reliance by a single entity ... and reliance would not need to be individually  [*60] determined for each class member." *See Warnock v. State Farm Mut. Auto. Ins. Co.*, 2011 U.S. Dist. LEXIS 37004, 2011 WL 1113475 (S.D. Miss. Mar. 24, 2011).

In the case *sub judice*, proof of causation at trial will involve evidence showing that Merial's alleged RICO violation led directly to the Plaintiffs' injuries of overpayment for HeartGard or HeartGard Plus, even though the drug was no more effective than its competitors. Even if Plaintiffs were able to demonstrate that Merial participated in a deceptive marketing scheme, to prove that Merial's participation in the deceptive marketing scheme caused injury by increasing the price of HeartGard and HeartGard Plus to all putative class members would likely require the fact finder to examine the prices paid by each individual putative class member for the drug and to examine other individualized factors to determine if Merial's participation in the deceptive marketing scheme directly led to any overpayment of the drug.

Merial apparently sells HeartGard and HeartGard Plus wholesale to veterinarian clinics; this wholesale price varies over time and is sometimes discounted by Merial. Each veterinarian clinic apparently sets the retail price of HeartGard and HeartGard  [*61] Plus by marking up the wholesale price. The purchase price of the drugs is thus likely to vary significantly across geographic markets and the Internet. As a further complication, some veterinarians and some websites also feature discounts and special deals that others do not. The purchase price also varies depending on the drug's dosage, which is in turn dependent on the weight of the particular dog which often fluctuates over time. The circumstances surrounding the purchase prices paid by Plaintiffs for HeartGard and/or HeartGard Plus would require an individual assessment of the claim of each particular Plaintiff.

Also involved in this determination would be considerations concerning the medical judgment of the veterinarians who prescribed HeartGard or HeartGard Plus over other heartworm preventatives to each particular dog. These considerations would entail individualized proof, because Plaintiffs have alleged misrepresentations regarding the pharmaceutical's safety and efficacy. Some of the possible considerations involved in prescribing one drug over another include the diagnosis, past and current medications, the prescriber's own experience with the drug, the prescriber's knowledge  [*62] regarding the drug's side effects, the dosage form, specific product taste, product cost, manufacturer differences affecting the product including history and years of market experience, and the attributes of the particular dog. These factors cannot be shown by common proof alone.

The individualized issues concerning causation, as well as injury and damages, predominate over any common issues, as is further illustrated by the following examination of what evidence could show damages at trial.

**(c)Damages**

Merial argues that a trial on the merits would require individualized proof of damages. Plaintiffs claim that this argument is unavailing, because the presence of individualized damages issues does not prevent a finding that common issues predominate. Plaintiffs contend that they will rely on testimony and other common proof to establish damages for each putative class member. Plaintiffs maintain that they will present testimony from Dr. Peter Rost, former Vice President of Marketing with Pfizer, demonstrating that HeartGard Plus is worth $1.50 to $2.50 less than charged, and that Plaintiffs do not seek damages based on the differences in price between HeartGard and/or HeartGard Plus and  [*63] generics. See Pls.' Suppl. Br. Supp. Mot. Certify Class [335] at 16. Plaintiffs characterize the basis for their claim for damages as "their overpayment for a product **worth less** than its inflated price at $1.50 to $2.50 per dose as a result of Merial's **uniform misrepresentations**." *See* Pls.' Reply Supp. Mot. Certify Class [265] at 10.

2013 U.S. Dist. LEXIS 46825, *63

Although the Court does not exclusively rely on the method of damages proof in reaching its conclusion that *Rule 23(b)(3)* class certification would be inappropriate, the Court finds that it is clear that determining the amount of damages for each putative class member would require individualized determinations with respect to each Plaintiff. The determination of damages would require the fact-finder to determine, *inter alia*, the calculation of damages, based on the prices paid by each individual Plaintiff to his or her respective veterinarian to purchase HeartGard and/or HeartGard Plus. The circumstances of the purchase prices charged may vary from Plaintiff to Plaintiff and illustrate the many underlying individual circumstances that would need to be considered. All of these individual inquiries would be part of the overall determination of any damages **[*64]** incurred as a result of Merial's alleged RICO violations.

The Fifth Circuit has held that the necessity of calculating damages on an individual basis, by itself, <u>can</u> be grounds for not certifying a class. *See Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 F. App'x 296, 297 (5th Cir. 2004) (citing *Bell Atlantic Corp. v. AT & T Corp.*, 339 F.3d 294, 301 (5th Cir. 2003), *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 745 (5th Cir. 2003), and *Allison*, 151 F.3d at 419)); *see also In re Wilborn*, 609 F.3d at 755 (finding plaintiffs' claims failed under the predominance and superiority inquiries because "individual issues for each class member, particularly with respect to damages, override class concerns when we consider how the case must be tried").

Although this Court finds that individualized proof would be required to substantiate the Plaintiffs' damages in the case *sub judice*, the Court also finds that individualized proof would be required on many of the integral issues with respect to injury and causation, and that all of these individual questions would predominate over any questions common to the class.

## (2)<u>Superiority</u>

The Court now turns to whether the class **[*65]** action vehicle would be the superior method of adjudication in the case *sub judice*. Plaintiffs of course maintain that class adjudication of their RICO action is the superior

method of adjudication, due to the complexity of RICO and the unrealistic alternative of a proliferation of individual lawsuits against Merial for deceptive marketing of HeartGard and HeartGard Plus. Plaintiffs contend that individual recoveries would be likely to be in the hundreds of dollars or less, making it economically unattractive for attorneys to take the risk of litigating individual cases that would require enormous effort and large expert witness fees. The Court is sympathetic to Plaintiffs' concerns, but cannot conclude that a class action would be the superior method for adjudicating this case, due to the vast amount of individualized proof that would be required at a trial on the merits. The presence of these individual issues indicates that a class action would be unmanageable and thus an inferior method of adjudication in this case. *See Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 604-05 (5th Cir. 2008); *Allison*, 151 F.3d at 419. For all the foregoing reasons, the Court finds that class certification **[*66]** is not warranted under *Rule 23(b)(3)*.

## E. Conclusion

In sum, the Court finds, after conducting a rigorous analysis of the requirements of *Rule 23*, that class certification is inappropriate under both *Rules 23(b)(2)* and *23(b)(3) of the Federal Rules of Civil Procedure*. The requested injunctive relief would not remedy the putative class, thus foreclosing class certification under *Rule 23(b)(2)*. Further, the individual issues of class members pertaining to injury, causation, and damages would predominate over any issues common to the class, and would make a class action not the superior method of adjudicating the case, thus foreclosing class certification under *Rule 23(b)(3)*.

ACCORDINGLY, the Court finds that Plaintiffs' motion for class certification [248] should be DENIED.

An order in accordance with this opinion shall issue this day.

THIS, the 1st day of April, 2013.

/s/ Glen H. Davidson

SENIOR JUDGE



Positive

As of: October 11, 2013 11:21 AM EDT

# Warnock v. State Farm Mut. Auto. Ins. Co.

United States District Court for the Southern District of Mississippi, Western Division

March 24, 2011, Decided; March 24, 2011, Filed

CIVIL ACTION NO. 5:08-cv-001-DCB-JMR

**Reporter:** 2011 U.S. Dist. LEXIS 37004; 2011 WL 1113475

TAMRA WARNOCK, PLAINTIFF VERSUS STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, J. PAUL CLINTON AND STOKES & CLINTON, P.C., DEFENDANTS

**Subsequent History:** Summary judgment granted by *Warnock v. State Farm Mut. Auto. Ins. Co., 2011 U.S. Dist. LEXIS 63473 (S.D. Miss., June 15, 2011)*

**Prior History:** *Warnock v. State Farm Mut. Auto. Ins. Co., 2008 U.S. Dist. LEXIS 102181 (S.D. Miss., Dec. 17, 2008)*

---

**Core Terms**

---

farm, proposed class, driver, class certification, predominate, foster, stoke, bricklayer, subrogate, automobile accident, class action, mail, subrogation action, docket entry, misrepresent, non-driver, individualized proof, wire fraud, individual issues, class member, certificate, third-party, fraudulent, drive

**Counsel:** [*1] For Tamra Warnock, Plaintiff: Christopher J. Graddock - PHV, Keenan R. S. Nix - PHV, LEAD ATTORNEYS, PRO HAC VICE, MORGAN & MORGAN, PA - Atlanta, Atlanta, GA; W. Richard Johnson, LEAD ATTORNEY, W. RICHARD JOHNSON, ATTORNEY, Vicksburg, MS; David M. Sessums, VARNER, PARKER & SESSUMS, Vicksburg, MS; J. Andrew Meyer - PHV, PRO HAC VICE, MORGAN & MORGAN, PA - Tampa, Tampa, FL; Omar Lamont Nelson, MORGAN & MORGAN, PA - Jackson, Jackson, MS; Scott Wm. Weinstein - PHV, PRO HAC VICE, MORGAN & MORGAN, PA - Fort Myers, Fort Myers, FL.

For State Farm Mutual Automobile Insurance Company, Defendant: John W. Bonds - PHV, Jr., LEAD ATTORNEY, PRO HAC VICE, SUTHERLAND, ASBILL & BRENNAN, LLP - Atlanta, Atlanta, GA; John A. Chandler - PHV, LEAD ATTORNEY, PRO HAC VICE, KING & SPALDING, LLP - Atlanta, Atlanta, GA; Martin R. Jelliffe, LEAD ATTORNEY, WISE, CARTER, CHILD & CARAWAY, Jackson, MS; Philip W. Gaines, LEAD ATTORNEY, CURRIE, JOHNSON, GRIFFIN, GAINES & MYERS, Jackson, MS; Jeremy T. Hutto, CURRIE, JOHNSON, GRIFFIN, GAINES & MYERS - Jackson, Jackson, MS.

For J. Paul Clinton, Stokes and Clinton, P.C., Defendants: Martin R. Jelliffe, LEAD ATTORNEY, Brenda Currie Jones, Gretchen Winstead Kimble, WISE, CARTER, [*2] CHILD & CARAWAY, Jackson, MS; Cory L. Radicioni, WISE, CARTER, CHILD & CARAWAY - Jackson, Jackson, MS; James Randolph Evans - PHV, PRO HAC VICE, MCKENNA LONG & ALDRIDGE, LLP - Atlanta, Atlanta, GA; Joanne Lydia Zimolzak - PHV, PRO HAC VICE, MCKENNA LONG & ALDRIDGE, LLP - Washington, DC, Washington, DC.

**Judges:** David Bramlette, UNITED STATES DISTRICT JUDGE.

**Opinion by:** David Bramlette

---

**Opinion**

---

**OPINION AND ORDER**

Before this Court is Plaintiff Tamra Warnock's Motion for Class Certification [docket entry no. 157]. Also before the Court are Warnock's Motion for Leave to Exceed the Page Limitation of *Local Rule 7(b)(5)* for her Reply in support of that Motion [docket entry no. 167] and Warnock's Motion to Strike Affidavit of Dale Jones, filed by Defendant State Farm [docket entry no. 169]. Having carefully considered the Motions, responses thereto, and applicable statutory and case law, the Court finds and orders as follows:

## I. BACKGROUND AND PROCEDURAL HISTORY

Defendant State Farm Mutual Automobile Insurance Company is an automobile insurer whose services include providing coverage for its customers when they are involved in automobile accidents. After paying claims to its customers, State Farm often institutes subrogation [*3] actions to pursue any legal claims its customers may have against the other parties at fault in the accidents. Defendant Stokes & Clinton, P.C., is a law firm that often represents State Farm in such subrogation actions and

2011 U.S. Dist. LEXIS 37004, *3

Defendant J. Paul Clinton is the partner in that firm who primarily handles such actions.

Billy Bridges, a State Farm policyholder, was involved in an automobile accident with Jake Foster, a minor, on June 25, 2001. The vehicle driven by Foster in the accident was owned by the Plaintiff, Tamra Warnock. At the time of the accident, Foster was in a relationship with Warnock's daughter and was a daily visitor at Warnock's home. The parties dispute whether Foster lived at Warnock's home and whether he had permission to drive the vehicle. Bridges filed a claim under his State Farm insurance policy and State Farm paid Bridges some portion of the losses he incurred as a result of the accident. After paying Bridges' claim, State Farm, represented by Stokes & Clinton, filed a subrogation action against both Foster and Warnock, as Foster's guardian, to recover the amount it paid to Bridges. That action, filed in the County Court of Warren County, Mississippi, alleged that [*4] Warnock and Foster were both "operators" of the vehicle involved in the accident with Bridges. Warnock was served with process in the Warren County action on October 12, 2006. State Farm obtained a default judgment against her on November 22, 2006, which it later recorded and attempted to collect.

On January 16, 2007, Warnock sought to set aside the default judgment. In addition, she sought damages and sanctions against Stokes & Clinton for filing a "deliberately misleading and false statement" because the subrogation complaint alleged that she was the operator of the vehicle. Specifically, Warnock claimed that State Farm and its attorneys should have known that she was not the driver of the vehicle and that she was not the guardian of the driver, Foster. The County Court of Warren County set aside the default judgment on February 26, 2007, but denied Warnock's request for sanctions against Stokes & Clinton. The Warren County Order setting aside the judgment did not state the court's reasons for doing so.

On January 7, 2008, Warnock filed her initial complaint in this action, alleging that Defendants are liable under *18 U.S.C. § 1964(c)* for violating various provisions of the Racketeer [*5] Influenced and Corrupt Organizations ("RICO") Act. Specifically, Warnock claims that Defendants violated *18 U.S.C. §§ 1962(c)* & *(d)*, which prohibit participating or conspiring to participate in "a pattern of racketeering activity or collection of unlawful debt." The underlying racketeering activity alleged by Warnock is mail and wire fraud in violation of *18 U.S.C. §§ 1341* & *1343* through Defendants' filing a complaint alleging that she was the operator of the vehicle when they knew she was not driving at the time of the accident and thus could not be liable. On February 18, 2008, Warnock filed an Amended Class Action Complaint [docket entry no. 11] alleging RICO claims on behalf of herself and "all persons who were not drivers or operators of vehicles involved with insureds of State Farm who were nevertheless sued by State Farm and Clinton and Clinton and Stokes [sic] wrongfully seeking

money damages." Amended Compl. ¶ 64. This Court denied Defendants' Motion to Dismiss and Motion for Judgment on the pleadings on October 14, 2008 [docket entry no. 38].

The parties then conducted class discovery. Defendants contend that the evidence obtained reveals that Defendants did not have uniform [*6] practices with respect to their subrogation claims and that Stokes & Clinton investigated each one before determining whether to file suit and if so, how to draft the complaint. Defendants admit, however, that because of the high volume of subrogation lawsuits that Stokes & Clinton filed on behalf of State Farm, Stokes & Clinton often used form complaints. Stokes & Clinton referred to the form complaint at issue in this litigation (which described both non-driver owners and drivers as "operators") as the "MT2 Complaint." Warnock contends that the MT2 Complaint was necessarily false because it is common sense knowledge that two individuals cannot simultaneously operate a vehicle. Warnock further argues that the use of the form MT2 Complaint indicates that Defendants did not sufficiently investigate the underlying facts of the various subrogation actions. Stokes & Clinton argue that it used different form complaints depending on the facts of the automobile accident at issue. It further argues that in the instances it used the MT2 Complaint, the word "operator" was intended to be broad enough to cover both a driver and a non-driving owner, in the latter case indicating legal and practical [*7] control over the vehicle, for example, where a company "operates" a delivery truck driven by an employee. Warnock now moves, pursuant to *Federal Rule of Civil Procedure 23*, to certify the following class of individuals:

> All persons who were owners of vehicles involved in accidents with insureds of State Farm but who were not operators of those vehicles and were nevertheless sued by State Farm, through its counsel J. Paul Clinton and/or Stokes & Clinton, P.C., in a subrogation action alleging that the owner was an operator and against whom a judgment was obtained.

## II. STANDARD FOR CLASS CERTIFICATION

Under *Rule 23(a)*, a plaintiff seeking to certify a class must satisfy four threshold requirements: "(1) numerosity (a class so large that joinder of all members is impracticable); (2) commonality (questions of law or fact common to the class); (3) typicality (named parties' claims or defenses are typical of the class); and (4) adequacy of representation (representatives will fairly and adequately protect the interests of the class)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613, 117 S. Ct.

2011 U.S. Dist. LEXIS 37004, *7

2231, 138 L. Ed. 2d 689 (1997) (citing *Fed. R. Civ. P. 23(a)*).

In addition to satisfying *Rule 23(a)*'s prerequisites, parties seeking **[*8]** class certification must show that the action is maintainable under *Rule 23(b)(1)*, *(2)*, or *(3)*. *Id.* at 614. Here, Warnock seeks to certify the class under *Rule 23(b)(3)*, which demands two further requirements: (1) that questions common to the class members predominate over questions affecting only individual members, and (2) that class resolution is superior to alternative methods for adjudication of the controversy. *Id.* at 615. Warnock bears the burden of proving each of the four elements of *Rule 23(a)* and the two elements of *Rule 23(b)(3)*. *Applewhite v. Reichhold Chems., Inc.*, 67 F.3d 571, 573 (5th Cir. 1995).

## III. ANALYSIS

Defendants argue that Warnock has not met her burden to show that the required elements for class certification are met for multiple reasons: she has not established any of the four required elements of *Rule 23(a)*; she has not established that common issues predominate over individual ones and that a class action is the superior method for adjudicating these claims as required by *Rule 23(b)(3)*; the proposed class is overbroad because it includes persons who (1) were not defrauded and (2) have no injury; and the proposed class is comprised of plaintiffs whose claims **[*9]** are barred by *res judicata* and thus over whom this Court has no jurisdiction pursuant to the Rooker-Feldman doctrine.

### A. *Rule 23(b)(3)*

Because the thresholds to satisfy the requirements of *Rule 23(a)* are not high, *Gene and Gene LLC v. Biopay LLC*, 541 F.3d 318, 325 (5th Cir. 2008) (citing *James v. City of Dallas*, 254 F.3d 551, 557 (5th Cir. 2001)), this Court will begin its analysis with the more demanding requirements of *Rule 23(b)(3)*.

### 1. Predominance

*Rule 23(b)(3)*'s predominance requirement tests "whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 622. The standard for certification imposed by *Rule 23(b)(3)* is more demanding than the commonality requirement of *Rule 23(a)*, and as such, mandates caution, particularly where "individual stakes are high and disparities among class members great." *Id.* at 625; see also *Fed. R. Civ. P. 23* advisory committee's note ("In the situations to which this subdivision [*Rule 23(b)(3)*] relates, class-action treatment is not as clearly called for as in those described above, but it may nevertheless be convenient and desirable depending upon the particular facts.").

Determining whether **[*10]** the plaintiffs can clear the pre-

dominance hurdle set by *Rule 23(b)(3)* also requires the Court to consider "how a trial on the merits would be conducted if a class were certified." *Sandwich Chef of Texas, Inc. v. Reliance Nat'l Ins. Indem. Co*., 319 F.3d 205, 218 (5th Cir. 2003). This, in turn, "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class," a process that ultimately "prevents the class from degenerating into a series of individual trials." *O'Sullivan v. Countrywide Home Loans, Inc*., 319 F.3d 732, 738 (5th Cir. 2003).

Warnock asserts two civil RICO claims against Defendants under *18 U.S.C. § 1964(c)*, each based on the theory that they engaged in a pattern of mail and wire fraud against non-driver owners of vehicles involved in accidents with State Farm insureds. As addressed in the Court's October 14, 2008 Order, *§ 1964(c)* requires a finding that a person was "injured in his business or property by reason of a violation of *section 1962*," which is often referred to as "standing." *Price v. Pinnacle Brands, Inc*., 138 F.3d 602, 606 (5th Cir. 1998). In other **[*11]** words, standing requires a two-part analysis of whether a plaintiff has shown: (1) injury to property; and (2) causation. *Id.* at 606. After the plaintiff establishes standing, it must then sufficiently allege the elements of the substantive RICO violation under *18 U.S.C. § 1962*, which are: (1) a person who engages in; (2) a pattern of racketeering activity; (3) connected to the acquisition, establishment, conduct or control of an enterprise. *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995). Defendants argue that individual issues predominate over common ones and preclude certification of the proposed class because the issues of causation, damages, and falsity of the subrogation complaints require individualized proof. The Court will address these issues in turn.

### a. Causation/Reliance

Defendants argue that establishing causation for the RICO claims alleged here will require an individual inquiry into whether Stokes & Clinton and J. Paul Clinton knew that the "operator" allegations in the complaints that they filed against non-driver owners were false in each case. The Fifth Circuit has consistently declined to certify RICO class actions predicated on mail and wire fraud because individual **[*12]** issues of causation (which generally take the form of reliance in a RICO fraud claim) predominate over common issues. *Sandwich Chef*, 319 F.3d at 219 ("The pervasive issues of individual reliance that generally exist in RICO fraud actions create a working presumption against class certification."); *Patterson v. Mobil Oil Corp*., 241 F.3d 417, 419 (5th Cir. 2001) ("Claims for money damages in which individual reliance is an element are poor treatments for class treatment, at best. We have made that plain."); *Bolin v. Sears, Roebuck & Co*., 231 F.3d 970, 978 ("the individual findings of reliance necessary to estab-

2011 U.S. Dist. LEXIS 37004, *12

lish RICO liability and damages preclude not only (b)(2) certification of this class under RICO, but (b)(3) certification as well").

The Fifth Circuit's staunch position against civil RICO fraud class actions contrasts with the pattern in other circuits where courts often certify RICO fraud class actions by holding that reliance can be presumed under certain circumstances and thus need not be proved individually. E.g., *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)(affirming certification of class of millions of consumers alleging RICO violations arising out [*13] of income tax refund loans); *Chisolm v. TranSouth Fin. Corp.*, 184 F.R.D. 556, 562-63 (E.D.Va. 1999) (certifying class of consumers alleging RICO violations arising out of "churning" scheme in connection with financing of vehicles). Representative of such decisions is *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004), in which the plaintiffs alleged that a number of health maintenance organizations had conspired in a scheme to cheat doctors by underpaying billed reimbursements. Id. The Eleventh Circuit held that the plaintiffs could show class-wide reliance circumstantially, stating "[i]t does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amount they were due." Id.

In 2008, the Supreme Court held that though causation is required to establish a civil RICO claim under *§ 1964(c)*, causation can be shown in ways other than first-party reliance by the plaintiff. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008). There, the Respondents filed RICO claims arising out of the Petitioners' alleged misrepresentations to officials of Cook County, [*14] Illinois in connection with the County's auction to sell its tax liens on delinquent taxpayers' property. Respondents and Petitioners were competitors in the tax lien auction and Respondents argued that Petitioners' misrepresentations had allowed them to gain an advantage over Respondents in the auction. Petitioners argued that Respondents could not establish the required element of reliance to state a mail-fraud based RICO claim because the misrepresentations at issue were made to Cook County and not to Respondents. The Supreme Court disagreed and held that because "the common-law requirement of justifiable reliance plainly has no place in the mail, wire, or bank fraud statutes," first-party reliance likewise has no place in civil RICO actions predicated upon those crimes. Id. at 648-49 (citing *Neder v. United States*, 527 U.S. 1, 24-25, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)).

The Court pointed out that a person can be injured "by rea-

son of" a pattern of mail fraud, as required by *§ 1964(c)*, even without relying personally on the fraudulent misrepresentations. Id. at 649. The Bridge Respondents instead alleged third-party reliance, i.e., that Cook County had relied on Petitioners' misrepresentations, thereby harming [*15] Respondents. The Court emphasized that while first-person reliance by the plaintiff was not necessary, "none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that someone relied on the defendant's misrepresentations." Id. at 658 (emphasis in original). Indeed, "in most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation." Id.

The Fifth Circuit has not addressed Bridge's impact on the presumption against class cetification for RICO claims based on mail and wire fraud. This Court's reading of Bridge and the relevant Fifth Circuit precedent is that class certification may now be appropriate where, as in Bridge, causation is alleged through third-party reliance by a single entity (there, Cook County) and reliance would not need to be individually determined for each class member. But that is not the case here. Warnock does proceed on a theory of third-party reliance in that the alleged misrepresentations at issue were made not to the proposed class members but to judges in the various Mississippi state courts in which State Farm asserted subrogation [*16] claims using the MT2 Complaint. See October 14, 2008 Order at 14. But this case is clearly distinguishable from Bridge in that the relevant third-party is different for each class member and that the causation determination depends heavily on the circumstances of each underlying automobile accident in relation to the allegations of the MT2 Complaint.

The facts of the automobile accident at issue in Warnock's case illustrate the myriad individual issues involved in determining causation here. The police report for the automobile accident between State Farm's insured Bridges and Foster (who was driving Warnock's vehicle) listed Foster as having the same address and same telephone number as Warnock. The report also identified both Warnock and Foster as the driver of the vehicle at different places in the report, leaving the true driver of the vehicle unclear. [1] Accordingly, assuming for these purposes that the judgment was litigated and not a default judgment, the Warren County judge in the subrogation action could have understood the "operating" allegation to mean that Warnock was driving the vehicle at the time of the accident and found that allegation to be supported by the police report's [*17] notation that she was the driver. Alternatively, the Warren County judge may have understood that Warnock was a non-driver owner but held her liable for the accident through a theory of negligent entrustment of her vehicle to Foster given

---

[1]   All parties seem to agree for the purposes of this litigation that Warnock was *not* the driver of the vehicle at the time of the accident, despite the ambiguity in the police report.

2011 U.S. Dist. LEXIS 37004, *17

that he apparently resided at her address. Either of these two readings of the MT2 Complaint is supported by the evidence and thus in these instances, the complaint would not be baseless.

Warnock advances a third understanding of the "operating" allegation, that Warnock was the driver of the vehicle despite clear evidence that Foster was the driver and thus that the Warren County judge was misled to find Warnock liable for subrogation. While this third understanding is certainly possible, the only way to determine at trial what each judge took the word "operating" to mean in each subrogation action would be through testimony from the individual judge as to his or her understanding of the facts and evidence of each underlying automobile accident. [2] In other words, to try [*18] a class action in this case would require individualized proof of reliance which dooms class certification under longstanding Fifth Circuit precedent. *Sandwich Chef,* 319 F.3d at 219; *Patterson,* 241 F.3d at 419; *Bolin,* 231 F.3d at 978. The fact that the reliance here is third-party, as permitted in Bridge, is of no moment.

**b. Damages**

Defendants also argue that a trial on the merits would require individualized proof of damages. Warnock asserts as damages the fact that she had a judgment entered against her and the attorneys' fees she spent to set aside that judgment. Amended Compl. ¶¶ 47, 52. Ignoring the fact that most proposed class members likely did not hire attorneys to seek to have the judgments against them set aside, it is clear that determining the amount of damages [*19] for each potential class member would require individualized determinations regarding the amounts of the judgment against them and any additional monetary losses resulting from those judgments (or from setting them aside). The Fifth Circuit has held that "the necessity of calculating damages on an individual basis, by itself, can be grounds for not certifying a class." *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.,* 100 Fed.Appx 296, 297 (5th Cir. 2004) (citing *Bell Atlantic Corp. v. AT&T Corp.,* 339 F.3d 294, 301 (5th Cir. 2003); *O'Sullivan v. Countrywide Home Loans, Inc.,* 319 F.3d 732, 745 (5th Cir. 2003); and *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 419) (5th Cir. 1998)). Warnock relies on *Bertulli v. Indep. Ass'n of Cont'l Pilots,* 242 F.3d 290, 298 (5th Cir. 2001), in which the Fifth Circuit upheld a district court's certification of a class despite damages requiring individualized determination and argues that it stands for the proposition that individualized damage issues do not defeat predominance. But the Fifth Circuit specifically rejected that notion, stating that "Bertulli merely held that the dis-

trict court had not abused its discretion; it does not hold [*20] that the calculation of damages can never be a grounds for denying class certification." *Piggly Wiggly,* 100 Fed.Appx. at 298. Moreover, Bertulli is distinguishable on its facts because "virtually every issue prior to damages [was] a common issue." *Bertulli,* 242 F.3d at 298. That is certainly not the case here, as the above discussion regarding causation makes clear.

**c. Falsity of the Subrogation Complaints**

For much the same reason that the Court finds that reliance requires individualized proof, the existence of fraud *vel non* would require individualized inquiry into whether the allegations of each underlying subrogation action were false. This is because whether the "operating" allegations were fraudulent and constituted mail or wire fraud turns on the facts of the automobile accidents themselves and whether there was any basis for an allegation that the non-driver owner operated the vehicle involved in the accident with a State Farm insured. Assuming without deciding that Warnock is correct and "operator" necessarily means driver and not one in legal control of a vehicle, it may be true in some cases that Defendants knew the owner was not driving and thus the "operating" allegation [*21] was intentionally false and misleading. But it may also be true that, as in Warnock's case where an ambiguous police report listed her *and* Foster as the driver of her vehicle, sufficient evidence existed to support the conclusion that the owner was also the driver and thus the "operating" allegation was true (or at least not intentionally false). Accordingly, to determine at a trial whether Defendants made intentionally false or misleading statements regarding each proposed class member would require individualized proof.

In sum, the Court agrees with Defendants that the issues of causation, damages, and falsity of the subrogation complaints would require individualized determination here and thus individual issues predominate over common ones in this proposed class. A trial on the merits of this action would devolve into mini-trials regarding the facts of the automobile accident in which each class member's vehicle was involved, which would undermine the efficiencies intended by the class action procedure. Indeed, the fact that any one of these issues would require individualized proof could in itself defeat class certification. E.g., *Piggly Wiggly,* 100 Fed.Appx at 297 (necessity to [*22] prove individualized damages undermines predominance); *Sandwich Chef,* 319 F.3d at 219 (necessity to prove individualized reliance undermines predominance). The fact that there are at least three distinct issues that require individualization here cer-

---

[2]   The Order of the Warren County Court setting aside the default judgment against Warnock in the subrogation action [docket entry no. 26-3 at 39] does not indicate its reasons for doing so, although Defendant Stokes & Clinton represents to this Court that it consented to the judgment being set aside. Therefore, this Court can only speculate as to the Warren County Court's understanding of the "operating" allegation.

2011 U.S. Dist. LEXIS 37004, *22

tainly does so. [3]

## 2. Superiority

This Court's finding that multiple individual issues exist also impacts a determination on superiority because "the greater the number of individual issues, the less likely superiority can be established." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.19 (5th Cir. 1996)(citing *In re Am. Medical Sys.*, 75 F.3d 1069, 1084-85 (6th Cir. 1996)). Here, there are at least three issues that would require individualized proof at a trial on the merits of the proposed class which indicates that a class action would be unmanageable and therefore an inferior method of adjudication. *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 604-605 (5th Cir. 2008); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998).

Moreover, **[*23]** the "most compelling" ground for finding superiority of the class procedure is a negative value suit, *Castano*, 84 F.3d at 748, which does not exist here. There is nothing to indicate that the RICO claims alleged would cost more to litigate than the individual plaintiffs could recover. Warnock asserts that proposed class members' claims are "relatively small," and that efficiencies could be achieved in regards to attorneys' fees and costs through the class action mechanism but that does not mean these civil RICO claims are negative value suits. Indeed, disputes arising out of automobile accidents are routinely brought by individual claimants and the exact subrogation judgments disputed by the proposed class action were litigated by State Farm on an individual basis. Additionally, the civil RICO statute under which Warnock proceeds, *18 U.S.C. § 1964(c)*, provides for treble damages and attorneys' fees, both of which undercut any suggestion of a negative value suit. *Castano*, 84 F.3d at 748 (fact that statute under which claims asserted allowed for attorneys' fees argued against existence of a negative value suit). Because there are multiple individual issues at stake in the proposed class **[*24]** claims and these are not negative value suits, Warnock has also failed to establish superiority as required by *Rule 23(b)(3)*.

## B. Overbreadth/Typicality as Required by *Rule 23(a)(3)*.

Having determined that the proposed class fails to meet the predominance requirement of *Rule 23(b)(3)* for multiple reasons, a fact that in itself forbids class certification, the Court need not address the threshold requirements of *Rule 23(a)*. It will nonetheless briefly address *Rule 23(a)(3)*'s typicality requirement because the preceding discussion is determinative of this issue as well. Defendant State Farm argues that class certification should be denied because the proposed class is overbroad, and the overbreadth cannot be cured because it is impossible to objectively define the victims of the alleged fraud here. These arguments bear on *Rule 23(a)(3)*'s requirement of typicality [4] with respect to the proposed class because "'if proof of the representatives' claims would not necessarily prove all the proposed class members' claims, the representatives' claims are not typical of the proposed members' claims.'" *Ruiz v. Stewart Assocs, Inc.*, 167 F.R.D. 402, 405 (N.D. Ill. 1996) (quoting *Hickey v. Great W. Mortg. Corp.*, 1995 U.S. Dist. LEXIS 3357, 1995 WL 121534, at *8 (N.D. Ill. Mar. 17, 1995)).

The Court agrees with Defendants that the proposed class is overbroad because it includes people who may not have been the victims of mail or wire fraud and thus who may not have RICO claims against Defendants. Again, the proposed class is:

> All persons who were owners of vehicles involved in accidents with insureds of State Farm but who were not operators of those vehicles and were nevertheless sued by State Farm, through its counsel J. Paul Clinton and/or Stokes & Clinton, P.C., in a subrogation action alleging that the owner was an operator and against whom a judgment was obtained.

Thus, the proposed **[*26]** class includes every non-driver owner against whom a judgment was obtained through the use of an "operator" allegation. As discussed above, there are any number of ways in which legitimate, non-fraudulent judgments could have been obtained against non-driver owners of vehicles, including where the owner negligently entrusted the vehicle to the driver and where the evidence supported that the owner was, in fact, the driver. [5] Warnock's memoranda to this Court in support of her Motion for Class Certifica-

---

[3]  This Court does not dispute that certain common issues do exist here, for example, with respect to whether Defendants' conduct was a pattern of racketeering activity (excluding whether the activity was in fact fraudulent) and whether a RICO enterprise existed.

[4]  Defendants **[*25]** contend, citing, *inter alia*, DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir. 1970), that there is a threshold requirement of an "objectively ascertainable" class implicit in Rule 23(a), separate and apart from the four elements listed at 23(a)(1)-(4). More recent authorities suggest that concerns regarding the ascertainability of the proposed class are "handled more properly under requirements governing pleading, standing, and Rule 23 prerequisites" as opposed to implying any threshold requirements to Rule 23(a). 1 William B. Rubenstein et al., Newberg On Class Actions § 2.3 (4th ed. 2010).

[5]  Because it is not necessary for the purposes of this analysis, this Court does not reach the theory advanced by Defendants that "operate" does not **[*27]** mean drive but instead indicates legal control over the vehicle.

tion illustrate the problem. For example, Warnock argues that the class includes "only persons against whom Defendants obtained judgments by engaging in mail and wire fraud and by filing complaints falsely alleging that they were operating a vehicle involved in an accident with a State Farm insured." Pl. Rebuttal [docket entry no. 168] at 3-4. But the proposed class does not contain any reference to fraud or false allegations and thus could include any number of persons against whom the "operating" allegation was neither false nor fraudulent.

The Court further agrees that the proposed class could not be limited to only those persons as to whom the "operating" allegation was false or fraudulent by any objective criteria. The salient inquiry in all *Rule 23(a)* analysis is whether "it is administratively feasible for the court to determine whether a particular individual is a member." 7A Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 1760 (3d ed. 2010). This requires that the class be defined "in objective terms" and without reference to "criteria that are subjective or depend on the merits of the claim." Federal Judicial Center, <u>Manual for Complex Litigation</u> § 32.42 (4th ed., 2008). Here, if the proposed class were only people as to whom the "operating" allegation was false (as Warnock suggests in her Rebuttal), then the bounds of the class would depend on the merits of the underlying RICO claim, which is impermissible under *Rule 23(a)*. Accordingly, this Court doubts that the proposed class could be redefined in a way that satisfies the Rule.

## III. CONCLUSION

The Court agrees with Defendants that the Motion to Certify Class should be denied because **[*28]** individual issues predominate over common ones, because a class action is not the superior method of adjudication for these claims, and because the proposed class is overbroad in that it includes persons as to whom the subrogation claims may not have been fraudulent. Accordingly, it does not reach Defendants' remaining arguments as to overbreadth for lack of injury, res judicata, or the requirements of *Rule 23(a)(1)*,*(2)*, and *(4)*.

For the foregoing reasons,

**IT IS HEREBY ORDERED THAT** Plaintiff's Motion to Certify Class [docket entry no. 157] is **DENIED**.

**IT IS FURTHER ORDERED THAT** Plaintiff's Motion for Leave to Exceed the Page Limitation of the Local Rules regarding her Reply [docket entry no. 167] is **GRANTED**.

**IT IS FURTHER ORDERED THAT** Plaintiff's Motion to Strike Affidavit of Dale Jones [docket entry no. 169] is **MOOT** because the Court did not need to reach the facts at issue in the affidavit in order to rule on the class certification motion.

**SO ORDERED AND ADJUDGED** this the 24th day of March 2011.

/s/ David Bramlette

**UNITED STATES DISTRICT JUDGE**