IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

Juan Ramon Torres and Eugene Robison,          Civil Action No. 4:09-cv-2056

     Plaintiffs,                            Jury Demanded

vs.

SGE Management, LLC; Stream Gas &
Electric, Ltd.; Stream SPE GP, et al,

     Defendants.
_____/


**PLAINTIFF' REPLY TO DEFENDANTS' RESPONSE TO
PLAINTIFFS' MOTION FOR PARTIAL
<u>SUMMARY JUDGMENT AS TO LIABILITY</u>**

## <u>TABLE OF CONTENTS</u>

INDEX OF AUTHORITIES ................................................................................................... II

INTRODUCTION ................................................................................................................. 1

REPLY TO ARGUMENTS .................................................................................................. 1

    1)      REPLY TO FACTS ................................................................................ 1

    2)      REPLY TO STANDING ARGUMENT .................................................. 2

    3)      REPLY TO ENTERPRISE ARGUMENT .............................................. 4

    4)      REPLY TO CAUSATION ARGUMENT ................................................ 5

    5)      REPLY TO PYRAMID SCHEME ARGUMENT .................................... 8

    6)      REPLY TO ARGUMENT ABOUT MISREPRESENTATION SCHEME ......... 12

    7)      REPLY TO ARGUMENT CONCERNING "CERTAIN" DEFENDANTS' CONDUCT OF THE ENTERPRISE ...................................... 12

    8)      REPLY TO ARGUMENT CONCERNING DEFENDANTS PARTICIPATION IN THE ENTERPRISE ........................................................ 13

    9)      REPLY TO ARGUMENT RE: §1962(D) ............................................ 14

## <u>INDEX OF AUTHORITIES</u>

<u>Cases</u>

*Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U. S. 519, 536 (1983)...................7

*Boyle v. United States*, 556 U.S. 938, 129 S. Ct. 2237, 2246 (2009) ..............................4

*Bridge v. Phoenix Bond & Indemnity Co.,* 553 U.S. 639, 128 S. Ct. 2131 (2008)................5, 6, 7

*Cedrick Kushner Promotions, Ltd. v. King,* 533 U.S. 158 (2001) ...................................5

*Davis-Lynch, Inc. v. Jose Alvarado Moreno*, 667 F.3d 539 (5th Cir. 2012) ..........................13, 14

*DeMent v. Abbott Capital Corp.,* 589 F. Supp. 1378 (N.D. Ill. 1984)...........................4

*Diaz v. Gates,* 420 F. 3d 897 (9th Cir. 2005).....................................................3

*Farmers & Merchants Nat'l Bank v. San Clemente Fin. Group Sec., Inc.,* 174 F.R.D. 572, 582 (D.N.J. 1997)..............................................................................3

*Haley v. Merial, Ltd.,* 2013 U.S. Dist. LEXIS 46825 (N.D. Miss, 4/1/2013) ...............................6

*Handeen v. Lemaire,* 112 F. 3d 1339, 1354 (8th Cir. 1997)....................................3

*Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258 (1992)..........................7

*Ideal Steel Supply Corp. v. Anza,* 373 F. 3d 251 (2d. Cir 2004)..................................3, 7

*In re Mastercard Int'l Internet Gambling Litig.*, 313 F.3d 257, 259 (5th Cir. La. 2002) .............13

*Isquith ex rel. Isquith v. Middle South Utilitia, Inc.*, 847 F. 2d 186, 199 (5th Cir. 1988) ..............2

*ISystems v. Spark Networks, Ltd.,* 2012 U.S. App. LEXIS 6197 (5th Cir. March 21, 2012) ..........5

*Lauter v. Anoufrieva,* 642 F. Supp. 2d 1060, 1085 n. 33 (C.D. Cal. 2009) ...................................3

*Lemelson v. Wang Lab., Inc.,* 874 F. Supp. 430 (D. Mass. 1984) .................................3

*Negrete v. Allianz Life Ins. Co. of North America,* 2012 U.S. Dist. LEXIS 182796 (C.D. Cal. Dec. 27, 2012)...........................................................................3

*Reve v. Ernst &Young,* 507 U.S. 170, (1993) ............................................13

*Salinas v. United States, 522 U.S. 52, 65 (U.S. 1997)* .........................................14, 15

ii

*Schmuck v. United States,* 489 U. S. 705, 712 (1989) .................................................................. 6

*St. Germain v. Howard*, 556 F.3d 261 (5th Cir. 2009) ................................................................ 7

*Standardbred Owners Association v. Roosevelt Raceway Associates,* 985 F. 2d 102 (2d Cir. 1993) ........................................................................................................................................ 3

*Stochastic Decisions, Inc. v. DiDomenico,* 995 F. 2d 1158, 1167 (2d Cir. ___) ........................ 3

*United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1982) .......................................................... 12

*United States v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992) .......................................................... 15

*United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. Tex. 1998)........................................ 14

*Webster v. Omnitrition Int'l. Inc.*, 79 F.3d 776, 782 (9th Cir. 1996) .......................................... 11

*Whelan v. Winchester Prod. Co.,* 319 F. 3d 225, 229 (5th Cir. 2003)........................................ 4, 5

## **Statutes**

18 U.S.C. § 1961(3) ...................................................................................................................... 2, 6

18 U.S.C. § 1964(a), (c) ................................................................................................................... 2

18 U.S.C. §§1341, 1343, 1961(1)(B), 1962........................................................................................ 2, 6

## **Rules**

F.R.C.P. 56(c) ................................................................................................................................... 2

## INTRODUCTION

Rather than focus on the actual facts and law underpinning the motion for partial summary judgment filed by Plaintiff Juan Ramon Torres ("Torres"), Defendants cast around for an issue of fact that would defeat the motion. Among the many deficiencies in Defendants' response is their avoidance of the fact that no court anywhere has ever ruled that the multi-level marketing scheme they operate is *not* a pyramid scheme. Defendants cite not a single case where a multi-level marketer like SGE has *not* been found, after looking at its actual operation, to be a pyramid scheme. Worse, Defendants persist in pretending that whether or not they operate a pyramid is the entirety of the RICO scheme at issue. It is not. The RICO scheme has swindled over 200,000 people through a variety of fraudulent actions—a pattern of racketeering activity— in which the operation of the Ignite marketing plan is but a part. Defendants' response fails to address, much less dispute, the detailed factual allegations that they misrepresented the business opportunity to the investing public. Thus they fail to address the contention that *standing alone* these misrepresentations constitute a RICO scheme to defraud regardless of any finding that the operation of the scheme is or is not a pyramid. Because they simultaneously filed a stand-alone motion that is essentially identical to the response, this reply will note the major legal deficiencies, which will be expanded upon in Plaintiffs' response to the stand-alone motion.

## REPLY TO ARGUMENTS

### 1)    REPLY TO FACTS

The facts cited by the Defendants (Response at 2-6) have no relevance to Plaintiff's motion. They apparently simply fail to address the nearly 40 pages of detailed factual allegations in Plaintiff's motion.[1]

**2)     <u>REPLY TO STANDING ARGUMENT</u>**

Torres has standing to enforce a RICO action. 28 U.S.C.  Section 1964(c) authorizes persons "injured" in their "business or property" "by reason of " a RICO violation  to sue for (1) equity relief, (2) treble damages, and (3) attorneys' fees. 18 U.S.C. § 1964(a), (c) (emphasis added). RICO is violated if a "person," ("individuals and entities," *id.,* § 1961(3)), uses the mails or wire facilities in the execution of "any scheme to defraud." 18 U.S.C. §§1341, 1343, 1961(1)(B), 1962. Under the Second Amended Complaint, Torres sought all three recoverable forms of relief: damages, injunctive relief, and attorney fees. Even allowing for Defendant's evidentiary failing to support the issue, according to SGE's unauthenticated records[2], Torres received approximately $5 more in bonuses than he paid Ignite Holdings. That fact standing alone does not mean Torres individually did not suffer a RICO injury sufficient to confer

---

[1] Incredibly, Defendants admit they "will not respond here to Torres's factual allegations … to the extent they are unsupported" (Response at 7). Each of Torres's factual allegations is supported by citations and nearly 200 exhibits. In this circuit as elsewhere, failure to deny is deemed an admission, and the defending party has the burden of pointing the court to genuine issues of material fact to defeat the motion. F.R.C.P. 56(c); *Isquith ex rel. Isquith v. Middle South Utilitia, Inc.*, 847 F. 2d 186, 199 (5th Cir. 1988). By failing to point the court to any mis-citation, or offering its own documents contradicting Plaintiff's factual recitation beyond a pair of self-serving and irrelevant affidavits, Defendants have allowed the court to adopt Plaintiff's factual allegations.

[2] There is no reference supporting the hearsay contention in the Defendants' response to this, beyond an unsupported statement in the Smith Affidavit at Par. 25 that Torres "earned more money than he paid in fees to Ignite…" According to computer records maintained by DPI, Torres may have received $5 more than his investor buy-in and homesite fees.

standing.[3] Under RICO, Torres can seek damages for lost opportunity or property injury—as part of being an IA and signing the IA Terms and Conditions and Policies and Procedures, Torres agreed to a non-competition clause prohibiting him from being an independent representative of other companies. *See Diaz v. Gates,* 420 F. 3d 897 (9th Cir. 2005) (per curiam) (en banc) (property injury of interference with current or prospective contractual interests is a RICO injury); *Ideal Steel Supply Corp. v. Anza,* 373 F. 3d 251 (2d. Cir 2004), *rev'd in part,* 547 U.S. 451 (2006) (RICO damages for injury to competition); *Standardbred Owners Association v. Roosevelt Raceway Associates,* 985 F. 2d 102 (2d Cir. 1993) (costs incurred in reliance upon false representations/scheme are recoverable RICO injuries and damages). Torres could also seek damages for added expenses and inconvenience to his business function occasioned by SGE's causing him to invest in an illegal pyramid scheme. *Farmers & Merchants Nat'l Bank v. San Clemente Fin. Group Sec., Inc.,* 174 F.R.D. 572, 582 (D.N.J. 1997). Or he can seek, according to the RICO statute itself, damages for attorney fees pursued in this dispute. *Stochastic Decisions, Inc. v. DiDomenico,* 995 F. 2d 1158, 1167 (2d Cir. 1993); *Lauter v. Anoufrieva,* 642 F. Supp. 2d 1060, 1085 n. 33 (C.D. Cal. 2009); *Handeen v. Lemaire,* 112 F. 3d 1339, 1354 (8th Cir. 1997); *Lemelson v. Wang Lab., Inc.,* 874 F. Supp. 430 (D. Mass. 1984) ("persuasive authority" allows recovery of fees as RICO injury). Any of these would and will constitute a

---

[3] References to Schedule 1 prepared by Plaintiffs' Expert Paul Taylor, that identify Torres as one of the 14% of IAs who did not receive back less than they invested are irrelevant. That schedule was created to show the court the class damages upon certification of the class sought by Robison. Torres has available to him, as would many others within the 14% that are specifically not identified as this putative class, remedies under RICO that differ from the certified class remedies. The damages sought by the putative class fall in the out-of-pocket type of damages uniformly allowed in RICO class actions. *See Negrete v. Allianz Life Ins. Co. of North America,* 2012 U.S. Dist. LEXIS 182796 (C.D. Cal. Dec. 27, 2012).

compensable RICO injury sufficient to confer standing.[4] As admitted by the Defendants, Torres spent time and effort trying to "work" the illusory business, suffering lost costs, opportunity, time, and attorney fees. Finally, Torres has standing to seek an injunctive remedy under Section 1964(a) and (c) even in the absence of any quantifiable damages.

**3)      REPLY TO ENTERPRISE ARGUMENT**

Defendants are confused about the enterprise requirement. They claim that the complaint and motion treats "persons" and the SGE and other companies as an "enterprise" without a distinction between the two, and cite to *Whelan v. Winchester Prod. Co.,* 319 F. 3d 225, 229 (5th Cir. 2003) for the proposition. But both the pleaded and identified enterprise here *expressly* distinguishes between a company and its employees, the example in *Whelan*, and includes the combination of SGE, its subsidiaries and officers *and* non-employee Presidential Directors such as Presley Swagerty, Donnie Anderson, and Randy Hedge, *and* their operational entities (such as Swagerty Energy LLC, etc.) within the identified enterprise definition. By no stretch could that combination —which includes companies and individuals who are expressly not employed by SGE or Ignite Holdings or any other corporate defendants, and who (as described in Section A of the Memorandum In Support of Class Action Certification) met and acted on a common course of conduct—the carrying out of the pyramid scheme and dissemination of false statements associated with that scheme—not be,  "a group with a common purpose and a course of conduct." *Boyle v. United States*, 556 U.S. 938, 129 S. Ct. 2237, 2246 (2009). *Whelan* states the rule that one cannot create an "enterprise" from a combination of a corporation and its

---

[4] For purposes of this motion, of course, Torres has no need to quantify the extent of his damages, as the motion seeks a finding of liability only. Quantifying the damages is straightforward. Torres would have the full panoply of fraud-related damages proximately caused by the pyramid scheme, or contract-based damages (benefit of the bargain, including lost opportunity and interference damages). *See, e.g., DeMent v. Abbott Capital Corp.,* 589 F. Supp. 1378 (N.D. Ill. 1984).

employees.[5] Here, the enterprise ranges beyond that limitation, both in the pleading stage and in the proofs. Defendants cannot create a genuine issue of fact under this argument.

### 4) <u>REPLY TO CAUSATION ARGUMENT</u>

Defendants make a confusing argument about causation, when it appears they are referring to *reliance.* In doing so they ignore controlling law on the subject. Whether Torres met or talked to a single defendant before investing, or can identify a particular misrepresentation that he saw before investing, is irrelevant for purposes of the *proximate cause* argument.[6] The Supreme Court's decision in *Bridge v. Phoenix Bond & Indemnity Co.,* 553 U.S. 639, 128 S. Ct. 2131 (2008) controls the causation issue as framed by the Defendants, and holds that Torres need not plead or prove first-party reliance to make out a mail fraud and wire fraud RICO scheme. The Supreme Court in a unanimous decision (Justice Thomas) unequivocally rejected the notion that a RICO plaintiff under mail and wire fraud must prove that he directly relied on the defendant's alleged misrepresentations. Just as here, the defendant sent "hundreds of mailings," (the mail fraud that comprised the predicate acts) but *not* to the plaintiffs. *Bridge*, 128 S. Ct. at

---

[5] *Whelan* is actually not entirely correct even in that proposition, although the distinction is immaterial in light of the facts here. Even one of the cases cited by the Defendants, *ISystems v. Spark Networks, Ltd.,* 2012 U.S. App. LEXIS 6197 (5th Cir. March 21, 2012) (substituted op. for citation in 428 Fed. Appx. 368), makes the point that "Not every wholly owned and controlled subsidiary is an agent of its parent" (at 17), thus the rule is a pleading one first and foremost. *Whelan* appears to ignore the Supreme Court in *Cedrick Kushner Promotions, Ltd. v. King,* 533 U.S. 158 (2001), which made clear that a person who is a sole shareholder and president of a corporation and who acted within the scope of his authority as the company's employee is both a "person" and a RICO "enterprise." Id. at 160." The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more "separateness" than that." *Id*. at 163. Kushner emphasized that employees working within the scope of their authority (the argument made by Defendants) are not insulated from simultaneously being a RICO enterprise, as doing so, "would immunize from RICO liability many of those at whom this Court has said RICO directly aims -- *e.g.*, high-ranking individuals in an illegitimate criminal enterprise, who, seeking to further the purposes of that enterprise, act within the scope of their authority." *Id*. at 165.

[6] As acknowledged by Defendants, Torres was recruited by another IA who, typically, "sponsored" him. The sponsoring process involves making the Ignite marketing material available—just as SGE intended. There does not appear to be any question that Torres stumbled into the program on his own, but was exposed to the material in precisely the way and means intended by the Defendants that all potential IAs get exposed. *See* Torres Dep. at 27-30 (Before joining Torres attended meeting at a Mexican restaurant in Angleton, TX to learn about the "opportunity" where he was shown Ignite marketing materials including videos). The other Plaintiff in this case testified similarly. Robison Dep. at 37-48 (Robison met with an IA at Denny's to discuss the "opportunity" before joining Ignite).

2136. Striking down the same defense as attempted here, that the plaintiffs could not have relied on mailings not sent to them, the Supreme Court, reading the plain text of both the "scheme to defraud" language of the mail and wire fraud statutes and the plain text of RICO[7] said:

> The upshot is that RICO provides a private right of action for treble damages to any person injured in his business or property by reason of the conduct of a qualifying enterprise's affairs through a pattern of acts indictable as mail fraud. Mail fraud, in turn, occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice or attempting so to do." §1341.[8] The gravamen of the offense is the scheme to defraud, and any "mailing that is incident to an essential part of the scheme satisfies the mailing element," *Schmuck v. United States,* 489 U. S. 705, 712 (1989) (citation and internal quotation marks omitted), even if the mailing itself "contain[s] no false information," id., at 715.

*Bridge* plainly did away with the *very argument* proposed by the Defendants here, that first-party reliance is necessary to sustain a RICO action. As Justice Thomas put it, "If [defendants'] proposed requirement of first-party reliance seems to come out of nowhere, there is a reason: Nothing on the face of the relevant statutory provisions imposes such a requirement." *Id.* at 2145.

> It thus seems plain—and indeed petitioners do not dispute—that no showing of reliance is required to establish that a person has violated §1962(c) by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail fraud.

*Id.* at 2146.[9]

---

[7] RICO's causation element is simple. Section 1964(c) grants standing to plaintiffs "injured" in their "business or property" "by *reason of* " RICO's violation. RICO is violated if a "person," ("individuals and entities," *id.,* § 1961(3)), uses the mails or wire facilities in the execution of "any scheme to defraud." 18 U.S.C. §§1341, 1343, 1961(1)(B), 1962. Thus, RICO expressly envisions that civil responsibility attaches to those who engage in "schemes to defraud." Mail and wire fraud is a scheme to defraud.

[8] As the Court noted (and Defendants here ignore) the document itself used as a mailing as part of the scheme does not have to contain a misrepresentation; it must simply be a part of a mail-based scheme to defraud. "The indictable act under §1341 is not the fraudulent misrepresentation, but rather the use of the mails with the purpose of executing or attempting to execute a scheme to defraud." *Id.* at 2147. Thus, Torres (or any IA) need only to have been an intended target of the scheme (as he obviously was) to proximately connect with the mailings or wire (electronic) statements employed by the Defendants in the RICO scheme.

[9] This is understood in this judicial district. As succinctly put by a district court in this judicial district:

Unlike Defendants' response, the Court distinguished between the concepts of reliance and RICO causation:

> Proximate cause, we explained, is a flexible concept that does not lend itself to "'a black-letter rule that will dictate the result in every case.'" Id.,at 272, n.20 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U. S. 519, 536 (1983)). Instead, we "use[d] 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts," *Holmes* [*v. Securities Investor Co.,* 503 U. S. 258], at 268, with a particular emphasis on the "demand for some direct relation between the injury asserted and the injurious conduct alleged," ibid.; [citation omitted]… there is no general common-law principle holding that a fraudulent misrepresentation can cause legal injury only to those who rely on it. … And any such notion would be contradicted by the long line of cases in which courts have permitted a plaintiff directly injured by a fraudulent misrepresentation to recover even though it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation.[10]

As in *Bridge*, the causation here, even in the absence of Torres looking at a single document before investing, is a "direct," "foreseeable," and "natural" result of the fraudulent scheme.

---

[C]ase law does provide direction for navigating the waters post-*Bridge*. In *St. Germain v. Howard*, 556 F.3d 261 (5th Cir. 2009) (per curiam), the Fifth Circuit held that the district court erred in requiring plaintiffs "to demonstrate detrimental reliance when alleging injuries that resulted from fraud under RICO," and in so doing, "the district court relied on Fifth Circuit precedent that is no longer good law." 556 F.3d at 263. The Fifth Circuit further stated: "The Supreme Court recently held that no reliance requirement exists for civil causes of action under RICO for victims of mail fraud. . . . Thus, to the extent that our prior cases are in conflict with *Bridge*, they are overruled."

*Haley v. Merial, Ltd.,* 2013 U.S. Dist. LEXIS 46825 (N.D. Miss, 4/1/2013)

---

[10] To the extent the Defendants seek to cite pre-2008 law from both the Supreme Court (*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992)) (Response at 12-13) for heightened proximate cause requirements in RICO cases, these cases have little to no relevance. But even under *Holmes* or *Anza* the proximate cause requirement would have been met here. In *Holmes* the proximate cause was defined as "some direct relation between the injury asserted and the injurious conduct alleged." 504 U.S. at 268. In *Anza* the clear victim of the scheme was the State of New York, as the action was brought by plaintiff, a competitor to a company that it claimed had defrauded the State by failing to pay taxes, causing its competitive injury by being able to undercut plaintiff's prices. The Supreme Court found the causation too "attenuated." *Hemi*, 130 S. Ct. 983, a post-*Bridge* case, was a causation case also predicated on a tax-avoidance scheme, in which the Court found that the City of New York did not suffer damages because Hemi failed to register and file reports identifying out-of-state cigarette purchasers; a classic 'disconnect' between the alleged fraud and the alleged injury (since a fourth party, the taxpayer, was alleged to be the actor who failed to remit the taxes).

**5)    REPLY TO PYRAMID SCHEME ARGUMENT**

Defendants persist in feigning ignorance about the allegations of this case, this in spite of a lengthy Second Amended Complaint that spells out the two bases for the single RICO scheme at issue. Torres is *not* making a "novel argument that by operating a network marketing program, [SGE] per se operates a pyramid scheme." (Response at 13). Torres, in fact, spelled out *why* the *particular* program that SGE runs is not a "legal" multi-level marketing program: (1) because the *particular* program run by SGE emphasizes recruiting over sales[11], (2) because the *particular* program run by SGE pays and paid bonuses directly tied to recruiting and not to sales to outside parties[12]; (3) because in the *particular* program run by SGE the size of the bonuses paid for recruiting—directly or indirectly—dwarf what is paid for procuring customers[13]; (4) because the *particular* program run by SGE  is designed to and in fact does cause the vast majority of its participants to lose money[14], which is paid instead to the participants who are both corporate

---

[11]  *See* memorandum in support of motion for class certification and related unrebutted evidence ("Memo") at Section B.3, pp. 11-15; sec B.4, pp. 15-18; sec. B.5, pp. 20-26.

[12] See Memo at Section B. 8, pp. 34-36, incorporating the (unrebutted) forensic findings of Plaintiffs' Expert, Paul Taylor. Defendants chose not to have any forensic, or any other putative expert witness look at the actual data on payments by all IAs, payments to all IAs, or details of what bonuses were paid for what activity made available by an examination of the reams of data kept and maintained by DPI, SGE's software vendor.

[13] *Id.* Among the findings that Defendants simply failed to rebut, either by expert testimony or in defense of this motion, were that almost $68 million in direct "Leadership" bonus payments for *per capita* recruitment was paid to a small number of IAs, or twice as much as the Quick Start bonuses, nor that $144 million in MEI bonuses was paid to less than 6% of the IAs (Memo at pp. 35-36). Defendants also failed to rebut anywhere that the MEI bonuses went exclusively to the IAs with the largest "downlines," sometimes numbering in the hundreds of thousands of people, while each of the recipients of the bonus payments (including defendants and corporate insiders) had at most 20 "personal" energy accounts. In contrast, of course, *de minimis* bonus payments of $0.50/month were paid to the actual procurers of all of the energy accounts, the vast majority of the swindled IAs who on average got fewer than 4 customers (including themselves of course) and who paid the company for the trouble of getting them.

[14] Among other findings that Defendants failed to rebut is the fact that 86% of all participants have lost up to $2,000 in fees to SGE. Memo at Sec.B. 7, pp.33-34.

insiders[15] and those willing to recruit many others to invest their money in the program[16]; (5) because the particular program run by SGE relies on exaggerated, scripted claims of potential wealth from innocent persons' participation[17]; (6) because the participants in the *particular* program run by SGE mostly sell the electricity and gas products to each other, and make paltry sales to the outside world[18]; and (7) because the pyramid aspect to the *particular* program run by SGE results in market saturation.[19] Taken *together with the related misrepresentations* about expected financial success and the rest of it, the *combination* of a structural pyramid and the misrepresentations are the RICO scheme.

Defendants' narrow pyramid position misses the mark in any event. There may very well be "legal" multi-level marketing programs in existence —Defendants like this always like to hide their name among famous companies that operate on multi-level commissions like Mary Kay— whose actual experience may not include the types of predatory activity at issue here, and whose investing participants may not have an 86% loss rate. But in this case, Plaintiff marshaled extensive, detailed evidence that SGE (and its) associated entities and hand-picked Presidential Directors, set up a system in which the only feasible, realistic way that an IA could make money was through recruiting others who in turn would recruit others.

---

[15] See Memo at Sec. B. 6, pp. 26-29, detailing the payments made to Defendants Doug Witt, Chris Domhoff and a relative of Pierre Koshakji's well as Witt's relatives and Domhoff's friend Brett Miller. This evidence is also unrebutted.

[16] *Id.* Unrebutted evidence also shows that Presidential Directors Presley Swagerty, Steve Fisher, Donnie Anderson, and Randy Hedge all were given special "leadership" privileges, and that the insiders who formed the top of the pyramid before sales could even begin are the primary beneficiaries of tens of millions of dollars in payments.

[17] *See* unrebutted evidence at Memo, Sec. B. 1, p. 5; sec. B. 5, pp. 20-26.

[18] *See* unrebutted evidence at Memo, Sec. B. 7, pp. 30-33

[19] *See* unrebutted evidence at Memo, Sec. B. 7, pp. 29-30; sec. B. 9, pp. 36-37.

In their response, Defendants trot out a paid apologist for the multi-sales industry, Professor Anne Coughlan[20], to put a gloss on the scheme. Professor Coughlan (whose report will be the subject of a *Daubert* motion, inasmuch as she admitted at her deposition she never looked at the actual operation of the SGE scheme[21], purported to give a purely legal opinion, barely understood SGE's complex bonus system, and never examined the actual sales and bonus data of the 274,000 people in the system) was hired in effect to do one thing that anyone with a pencil and pad could do: assume (against all actual experience) that an IA could procure 10 customer accounts, wait a number of years, keep those accounts active for those years, and after those years, assuming he or she didn't spend anymore money on a homesites, the amount of $0.50/month payments per account dribbling in would equal the $329 investment fee (Response at 18, citing Coughlan report at Pr. 48-79). That report fails any basic evidentiary foundation and cannot prop up the Defendants' position.[22] More to the point, it makes an irrelevant point: in every pyramid scheme, like every Ponzi scheme, *someone* can make money in some fashion. Typically, as here, it is the early entrants into the system or the entrants willing and able to recruit others who benefit.  Here, there is unrebutted evidence that virtually no one obtained 10 customers (why would they, it would pay $5/month), but in fact the majority of the users generated one to two. The fact that someone could in theory recover their investment by performing an unlikely and largely pointless task (when the other activity emphasized by the

---

[20] Coughlan is a marketing professor at Northwestern University who writes "white papers" for companies like SGE accused of being pyramid schemes. Defendants' other proposed expert (whose report is not even being offered in opposition) is a paid lawyer lobbyist for the Direct Sales Association, a trade group for multi-level marketing companies.

[21] *See* fn. 14 Plaintiff's motion for partial summary judgment, that the FTC looks to the actual operation of the pyramid, not its compensation plan description.

[22] The *Daubert* motion will be filed contemporaneously with the response to Defendants' summary judgment motion, which raises essentially the same arguments.

compensation plan, recruiting other gullible people, paid literally hundreds of times more than finding customers) cannot mask the pyramid structure and nature of the program.

Defendants harp on one point, claiming it is "undisputed," when it is actually both irrelevant and factually disputed: that "Every dollar of compensation... is directly tied to a legitimate sale to a real consumer." (Response at 15). That position is irrelevant because there is no court *anywhere* that has said, in essence, that paying for recruiting others into the system is legal so long as the new recruit also buys $1 worth of product.[23] It is factually inaccurate because, as the compensation plan itself says, and as the records show, there are set fees paid to IAs upon successful recruitment of a set number of other IAs. *See* Memo at Sec. B. 2. And there are set Leadership Bonuses paid tied directly to recruiting success.[24] Adding the fillip that the new recruit must buy something *in addition to* the entrance fee from SGE does not save the day. As discussed in Plaintiff's motion, even those courts that are more lenient towards pyramid-like sales schemes have required that the "commissions" on downline sales come from *true* outside sales. *Webster v. Omnitrition Int'l. Inc.*, 79 F.3d 776, 782 (9th Cir. 1996). Here, as admitted by

---

[23] As discussed in the reply to the response to Plaintiff's class certification motion filed simultaneously, making the added requirement that a new recruit not only must pay a fee to the company but must also cause a sale to be made, either by himself or by friends or family, before the company pays a *per capita* fee has the economic structure entirely backward if the goal is to avoid being a pyramid scheme. The bonus structure pushed by SGE ensures that IAs will recruit first and foremost if payments for gathering customers are a fraction of the payments for gathering new recruits. In cases that look at pyramid schemes the courts look whether there is an emphasis to recruiting over actual retail sales because the lure of recruiting others who in turn can only recoup their investment by recruiting yet other people that is the economic wrong behind a pyramid scheme.

[24] Defendants completely ignore *and do not rebut* the factual findings of Plaintiffs' forensic expert, who found that only about $35 million (the Quick Start) in bonus payments occurred as a result of the IA satisfying the 4 "Energy Point" requirement, obtaining at least one "outside" account. More than $77 million was paid in *per capita*, pre-set amounts in the Leadership Bonuses, and *only* to participants who had moved up in the Leader level by satisfying a recruiting quota (itself a much more narrow group of recipients). *See* Memo at Sec. B. 8; App. II, Expert Report of Paul Taylor. Similarly, the over $144 million in MEI bonuses was paid as a reward for and direct consequence of having a sufficient number of recruits in one's downline. *See App. III,* Exhibit 4 to Ellis Aff., Fed. R. Evid. 1006 Summary of Relationships. Each of these people had sold thirty or fewer energy accounts. Yet most have been paid bonuses on tens or hundreds of thousands of downline-recruited people. The leadership Bonus was *per capita*: the MEI is limited by active customer counts. Both are "based on" having recruits in the downline. In contrast to these findings, Defendants submit an affidavit from Darryl Smith that summarizes the Compensation Plan (not the actual workings of the system) and makes conclusory, and unsupported, references. Portions of that Affidavit will also be the subject of a motion to strike.

defendant Snyder as much as one-half of the compensation an IA receives comes from Stream's energy sales *to other IAs. See* Memo at Sec. B.7, Exh. 114. SGE cannot get around—and no court in any case it cited has so ruled—that by adding the extra purchase requirement to a new IA before paying a *per capita* bonus changes the fundamental nature of the illegality of the pyramid structure. Plaintiff will discuss certain of the case law cited by Defendants in its response to the contemporaneous motion for summary judgment as necessary.

### 6)     REPLY TO ARGUMENT ABOUT MISREPRESENTATION SCHEME

There *is* no argument: Defendants apparently have no response to Plaintiff's motion that the several years worth of misrepresentations connected to the sales effort are themselves an actionable RICO scheme. Nor do they deny having written or sent these communications through the mails or by wire (electronic) means. Defendants have no response either to the very clear misrepresentations contained in the Income Disclosures (there is no evidence in the record that rebuts or contradicts that at least two of the years contained materially false actual income averages, that Defendants used inflated top earner numbers using insider Witt's status as the number 2 money earner, etc). The court can take this silence as an admission that there is in fact a pattern of racketeering activity and associated scheme.

### 7)     REPLY TO ARGUMENT CONCERNING "CERTAIN" DEFENDANTS' CONDUCT OF THE ENTERPRISE

The Fifth Circuit has the most liberal interpretation of the "employed by or associated with" (what the Defendants call "conduct") language of Section 1962(c). *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1982), *cert. denied*, 439 U.S. 953 (1978) ("the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise"). The motion spells out in detail the meetings in January, 2005 between the corporate defendants, the corporate executives, and the former Excel marketers who became the people allowed places at

the top of the pyramid. There is no genuine issue of fact that each person named as a Defendant was in fact operating in the enterprise.

### 8) REPLY TO ARGUMENT CONCERNING DEFENDANTS PARTICIPATION IN THE ENTERPRISE

All Defendants participated in the enterprise under §1962(c) under the "operation or management" test in the Fifth Circuit.  Each of the Defendants named in the suit participated in the enterprise individually or as agents of their alter-ego organizations by not just receiving funds, but by actively advancing the enterprise through advertising, "education," and recruitment efforts.[25]  Although the Fifth Circuit has an "operation or management" test laid out by *Reve v. Ernst &Young*, 507 U.S. 170, (1993), it has only interpreted it twice it the civil context.  *See also In re Mastercard Int'l Internet Gambling Litig.*, 313 F.3d 257, 259 (5th Cir. La. 2002) (holding defendant internet casinos not liable under RICO against plaintiffs' claims made in an attempt to avoid debts incurred for "chips" purchased with credit cards). *Davis-Lynch, Inc. v. Jose Alvarado Moreno*, 667 F.3d 539 (5th Cir. 2012)  said that simply receiving funds, "without more," from an enterprise is insufficient to prove liability for participation in that enterprise.   That is not what Plaintiffs set out in their motion were the various Presidential Directors' activities. Unlike the passive money recipients in *Davis-Lynch*, here the named defendants were receiving money while continuously furthering the scheme through the deception and recruitment of others.

As set forth in detail in the motion, each of the named Presidential Defendants not only received substantial amounts of money as a result of the scheme (for example the Mercedes car awarded only them), but their participation as an Ignite Millionaire was vital to the scheme's success.   Several of the Presidential Defendants have testified to their level of involvement, both

---

[25] It is difficult to tell who precisely Defendants are claiming was not involved, since no affidavits have been filed. Each of the entities and individuals named in the Second Amended Complaint admitted to being an IA and admitted that the legal entity through which the moneys paid them was in fact operated by them.

individually and through their corporate alter-egos.[26] The "more" here is apparent in the hundreds of presentations, appearances, and frequent flyer miles each defendant accumulated while presenting this "opportunity" to the masses. The Presidential Directors met with SGE management regularly, appeared in videos, agreed to appear in advertising in the glossy magazines, and participated in retreats with SGE management to discuss strategic issues.[27] No reasonable jury could find that the Presidential Defendants were passive recipients of the scheme.

### 9) REPLY TO ARGUMENT RE: §1962(d)

Title 18 §1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." To demonstrate a civil RICO conspiracy a claimant must show that: (1) two or more persons agreed to commit a substantive RICO offense, and (2) the defendant knew of and agreed to the overall objective of the RICO offense. *Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 551 (5th Cir. Tex. 2012). "There is no requirement of some overt act or specific act in the statute." *Salinas v. United States*, 522 U.S. 52, 63 (U.S. 1997). A conspiracy need not be proved through direct evidence. *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. Tex. 1998) "Because conspirators normally attempt to conceal their conduct, the elements of a conspiracy offense may be established solely by circumstantial

---

[26] *See, e.g.* Presley Swagerty Dep.at 102, Line 25, 103, lines 1-3. ("We tell them, Hey, you can be a – an associate with us if you're looking to make some money or you can be a customer if you just want to be a customer.")

[27] *See, e.g.* exhibits to Motion for Class Certification: Ex. 17 (Empower Magazine – The Ignite Life); Ex. 32 (E-mail, Chris Domhoff to Executive Directors, 5/23/07, Stream 0374974-5); Ex. 68 (Stream Working Summit Meeting, 12/6/11, Dep. Ex. 31, Tab 187, Stream 0216025); Ex. 79 (Power Play Article, March 2006, Dep. Ex. 33, Tab 188, Stream 0571814-19); Ex. 81 (Top 10 Tips from top money earners, Stream 0409473); Ex. 84 (The Ignite Life by Sarah Blaskovich, Stream 0409958-63); Ex. 85 (Empower Magazine, 1/29/2008, Stream 0281194-261); Ex. 87 (Riding the Current by Jennifer Workman Pitcock, Stream 0281166); Ex. 99 (E-mail, Chris Domhoff to Tim Rose, 7/14/2006, Dep. Ex. 33, Tab 210, Stream 0387088); Ex. 103 (E-mail, Rob Snyder to Presley Swagerty, 1/15/12, Dep. Ex. 105, Stream 0261411); Ex. 159 (E-mail, Rob Snyder to Steve Fisher, 9/10/12, Stream 0568545-51); Ex. 183 (Presidential Director Retreat Workshop Notes, Stream 0270336-52); Ex. 192 (E-mail, Roby Snyder to Presley Swagerty, et al, 10/15/11, Stream 00193365-7); Ex. 204 (Audio files produced by Stream); Ex. 205 (Video files produced by Stream); Ex. 207 (Ignite video and audio materials downloaded from the Ignite website/YouTube).

evidence. 'The agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the 'development and collocation of circumstances.'"" *Id.* (quoting *United States v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992)).   A minor role in a conspiracy is enough.   *Id.*   The defendant need not know "all of the details of the unlawful enterprise or the number or identities of all of the co-conspirators, as long as there is evidence from which the jury could reasonably infer that the defendant knowingly participated in some manner in the overall objective of the conspiracy." *Id.* at 858. In addition, a conspirator under 1962(d) does not necessarily need to know that what he is doing is illegal.   As the Supreme Court has explained:

> A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense.

*Salinas* at 65.

In this case, Plaintiffs need not show that defendants objectively knew they were participating in an illegal pyramid scheme.  If the operation was, in fact, a pyramid scheme as plaintiffs have shown, it is enough that the defendants intended for the scheme to continue and took some action to make that happen. There is more than sufficient proof in the motion to support the finding that each of the Presidential Directors understood their role in the scheme and carried out over many years massive recruiting (what Defendants collectively call "hard work") such that they developed "downlines" of tens or hundreds of thousands of people. There is proof, as noted above, that each of them participated in advertising etc., with the goal of inducing other people to enter into the "business opportunity." That is more than sufficient to satisfy the weak test under *Salinas*.

Respectfully submitted this 11th of October 2013,

SOMMERS SCHWARTZ, P.C.

/s/ Andrew Kochanowski
Andrew Kochanowski
Lance Young
Tiffany R. Ellis
One Towne Square, Suite 1700
Southfield, MI 48076
(248) 355-0300
akochanowski@sommerspc.com
lyoung@sommerspc.com
tellis@sommerspc.com

- and -

CLEARMAN | PREBEG LLP
Scott M. Clearman
Texas State Bar No. 04350090
Matthew J.M. Prebeg
Texas State Bar No. 00791465
Brent T. Caldwell
Texas State Bar No. 24056971
815 Walker, Suite 1040
Houston, Texas 77002
(713) 223-7070
sclearman@clearmanprebeg.com
mprebeg@clearmanprebeg.com
bcaldwell@clearmanprebeg.com

- and -

JEFFREY W. BURNETT, PLLC
Jeffrey W. Burnett
Texas State Bar No. 24025274
12226 Walraven
Huffman, Texas  77336
(281)324-1400
jburnett@burnetthoustonlaw.com

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 11, 2013 the foregoing document was served upon all counsel of record through the Court's CM/ECF system, including to the following:

Michael K. Hurst
John Guild
Gruber Hurst Johansen & Hail LLP
2500 Fountain Place
1445 Ross Avenue
Dallas, TX 75205
mhurst@ghjhlaw.com
jguild@ghjhlaw.com

Vanessa Jean Rush
Stream Gas and Electric, Ltd.
1950 N. Stemmons Fwy, Ste. 3000
Dallas, TX 75207
vanessa.rush@streamenergy.net

/s/ Andrew Kochanowski
Sommers Schwartz, P.C.
One Towne Square, Suite 1700
Southfield, MI 48076
(248) 355-0300
akochanowski@sommerspc.com