UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JUAN RAMON TORRES, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:09-CV-2056 |
| | § | |
| SGE MANAGEMENT LLC, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Pending before the Court is the plaintiffs', Juan Torres and Eugene Robison (collectively, "the plaintiffs"), motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure (Docket No. 121). Also before the Court is the defendants', SGE Management et al. ("the defendants"), response (Docket No. 129) and the plaintiffs' reply (Docket No. 134). On November 6, 2013, the Court heard oral argument and received expert testimony on the relevant issues. Having carefully reviewed the parties' submissions, the record and the applicable law, the Court finds and concludes as follows.

### II. FACTUAL BACKGROUND

Ignite, the marketing arm of Stream Electric, is a retailer of electricity and natural gas services that conducts its sales through a system in which independent employees (known as independent agents, "IAs") make sales to customers and recruit individuals to become new IAs. The plaintiffs are former IAs. Premised upon their experiences in that capacity, they bring this suit, alleging violations of 42 U.S.C. § 1962(c) and (d), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), by the defendants.

Under Ignite's business structure, which the defendants describe as multi-level marketing, IAs are categorized in one of multiple tiers. An IA begins his tenure with the company as an "associate" and works his way into higher tiers by selling energy accounts and recruiting new IAs. An IA can sell energy accounts to commercial entities (Commercial Compensation Plan) or households (Residential Compensation Plan). An IA's pay varies depending on how many IAs he recruits, the number of sales he makes, the entity making the purchase (commercial or residential) and the sales of his recruits.

The manner in which an IA may make sales or recruit is highly circumscribed by Ignite's Policies and Procedures and Training Workbook, both of which are among the initial materials provided to all IAs. Before IAs begin recruiting, they are trained and provided with approved marketing materials to use when meeting with potential recruits. IAs are encouraged to do live presentations of the Ignite business opportunity to recruits, and ideally, take the recruit to a live public presentation, put on by Ignite or an experienced IA.

After their tenure with Ignite, the plaintiffs brought this suit, naming as defendants various business entities associated with Ignite, and certain employees of Ignite. In this suit, the plaintiffs assert that Ignite is an illicit pyramid scheme run by the defendants, the operation of which violates RICO. They claim mail fraud and wire fraud as the predicate RICO offenses.

The plaintiffs allege that they were injured by the defendants' operation of the pyramid scheme because they lost money as a result of becoming IAs—the $329 sign-up fee and any monthly payments for the Ignite "homesite" (i.e. personal website) was greater than the pay they received from Ignite for working as IAs. The plaintiffs seek to certify a class composed of the 236,544 IAs who have lost money as a result of the defendants' operation of the pyramid scheme.

### III. LEGAL STANDARD

"To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)." *Maldonado v. Ochsner Clinic Foundation*, 493, F.3d 521, 523 (5th Cir. 2007) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997). This is not a pleading exercise; the party seeking certification must affirmatively establish that the proposed class meets the requirements of Rule 23. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011) ("Rule 23 does not set forth a mere pleading standard.").

Before certifying a class, the court "must conduct a rigorous analysis of the Rule 23 prerequisites." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012) (internal citation omitted). In conducting that analysis "sometimes it may be necessary to probe beyond the pleadings," and the court may need to evaluate "the merits of the plaintiff's underlying claims." *Wal-Mart*, 131 S.Ct. at 2551.

### IV. ANALYSIS AND DISCUSSION

The Court begins its analysis with an evaluation of Rule 23(a)'s requirements.

#### A. FRCP 23(a)

The four requirements of Rule 23(a) are generally referred to as numerosity, commonality, typicality and adequacy.

##### i. Numerosity

Rule 23(a)(1) requires the class to be so numerous that joinder of all members is impracticable. The plaintiffs seek to certify a class of 236,544 people. The defendants do not challenge certification on this basis. The Court finds the proposed class to be sufficiently numerous to satisfy Rule 23(a)(1).

### ii. Commonality

Rule 23(a)(2) requires that there be questions of law or fact common to the class. The plaintiff must "demonstrate that the class members 'have suffered the same injury,'" *Wal-Mart*, 131 S.Ct. at 2551 (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982)), and that "the claims of every class member depend upon a common contention that is capable of classwide resolution." *Stukenberg*, 675 F.3d at 838 (quoting *Wal-Mart*, 131 S.Ct. at 2551). In other words, the contention must be "of such a nature that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

The plaintiffs assert that the injury suffered by each class member was the net loss after the $329 initial sign-up fee to acquire the Ignite business opportunity and any monthly fees paid to maintain their Ignite homesite. They argue that there are a multitude of common questions, including: whether the defendants have formed a RICO enterprise; whether the defendants have engaged in a scheme to defraud as defined in 18 U.S.C. § 1341(a); whether the defendants used mail or wire services to effectuate their allegedly illegal conspiracy; whether the defendants multi-level marketing scheme was devised and implemented as a facially illegal pyramid scheme; whether the class members have collectively been harmed by the defendants' activities; and so on. The plaintiffs contend that these common questions will generate common answers that will help resolve this litigation.

The defendants argue that Robison's pursuit of the Commercial Compensation Plan is fatal to class certification because his claim does not present a question in common with most of the class. This is so, they assert, because the undisputed fact is that the vast majority of IAs pursued the Residential Compensation Plan. The defendants contend that whether the

Commercial Plan is a pyramid scheme is a separate question from whether the Residential Plan is a pyramid scheme. Because the lead plaintiff does not have this fundamental question in common with the great majority of the class, the defendants argue that commonality is not met.

In reply, the plaintiffs argue that "the existence of the pyramid revolves around the legality of the system in toto, not whether a percentage of the 274,000 people who signed up intended to sell to their friends, their neighbors, the local business owner, or elsewhere."

In the Court's view, the gravamen of the plaintiffs' complaint is that the defendants, with use of the mails and wires, operated an illegal pyramid scheme through which they defrauded the class members. The questions outlined by the plaintiffs are central to the validity of all the class members' claims and the resolution of those questions would determine the validity of the claims in one stroke. The defendants either did or did not form a RICO enterprise; they either did or did not engage in a section 1341(a) scheme to defraud; they either did or did not use mail or wire services in the course of the scheme; they either did or did not operate an illegal pyramid scheme; the operation of that scheme either did or did not harm the class members. Those questions will generate answers common to the class; they do not turn based on the individual class member considered. The Court is satisfied that those answers will drive the resolution of this litigation. Accordingly, the Court finds that commonality is met.[1]

### iii. Typicality

Rule 23(a)(3) requires that the claims of the representative party be typical of the claims of the proposed class. Typicality is satisfied when the representative plaintiff's claims arise from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory. *See* 7A Charles Alan

---

[1] Tellingly, the Court has been pointed to no evidence (and finds none) that an IA who intended to sell to commercial entites actually locked himself into that decision and could not later begin selling to households.

Wright & Mary Kay Kane, Federal Practice & Procedure § 1764 (3d ed. 2005); *see also Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 2012 WL 565997, at *2 (N.D. Tex. Jan. 27, 2012) aff'd sub nom. *Erica P. John Fund, Inc. v. Halliburton Co.*, 718 F.3d 423 (5th Cir. 2013) cert. granted, 134 S. Ct. 636 (U.S. 2013).

The defendants argue that because Robison pursued the Commercial Compensation Plan, while the vast majority of IAs pursued the Residential Compensation Plan, his claim is not typical of those of the rest of the class. For the reasons previously discussed, the Court rejects this contention. The Court finds that the claims of the representative plaintiffs are typical of those of the proposed class. The representatives, like all class members, allegedly suffered an economic loss as a result of their unwitting participation in an allegedly illegal pyramid scheme.

  **iv.**  **Adequacy**

Rule 23(a)(4) requires a determination that the representative party will fairly and adequately protect the interests of the class. "A plaintiff must show that plaintiff's counsel has the zeal and competence to represent the class, and that the proposed class representative is willing and able to take an active role in controlling the litigation and protecting the absent class members." *Id.* at *2 (citing *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001)). The 23(a)(4) inquiry also serves to uncover conflicts of interest between the representative plaintiff and the proposed class. *Berger*, 257 F.3d at 480.

Counsel for the plaintiffs have extensive experience in class action litigation that makes them well-qualified to represent this class. Further, counsel have invested significant time and resources in this litigation, and shown themselves to be zealous advocates. The plaintiffs are prototypical IAs, willing to take an active role in controlling the litigation and protecting absent class members, as evidenced by obtaining reversal of an adverse determination on a dispositive

motion. Finally, the Court knows of no conflict of interest between the plaintiffs and other members of the putative class. Therefore, the Court finds that adequacy is met.

Having concluded that the Rule 23(a) requirements are met, the Court now turns to the 23(b) inquiry. The plaintiffs seek certification under 23(b)(2) and (3).

**B.     FRCP 23(b)(2)**

Certification under Rule 23(b)(2) is only available when the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. The focus is "on the defendants' alleged unlawful conduct, not on individual injury." *Rodrigues v. Countrywide*, 695 F.3d 360, 362-63 (5th Cir. 2012). Certification under 23(b)(2) is not permissible "when each class member would be entitled to an individualized award of monetary damages." *Wal-Mart*, 131 S. Ct. at 2557. However, where the requested monetary relief is incidental to the requested injunctive or declaratory relief, certification may be proper. *Id.* at 2560 (discussing the exception recognized by the Fifth Circuit in *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998) and declining to reach the issue); *see Allison*, 151 F.3d at 413-15 (explaining the exception and its underlying rationale).

Although in limited instances a party may seek both injunctive and monetary relief under rule 23(b)(2), "certification under [the provision] is appropriate only if members of the proposed class would benefit from the injunctive relief they request." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 416 (5th Cir. 2004). As such, "the question whether the proposed class members are properly seeking such relief is antecedent to the question whether that relief would predominate over money damages." *Id.*

The plaintiffs seek an order enjoining the defendants from continued operation of the alleged pyramid scheme and any further engagement in unlawful, fraudulent or deceptive acts. The defendants argue that the plaintiffs do not have standing to request injunctive relief, and even if they did, certification under 23(b)(2) is improper because the claim for money damages predominates over the claim for injunctive relief.

The Court agrees with the defendants that the plaintiffs do not have standing to seek an injunction. A party seeking injunctive relief must "demonstrate either continuing harm or a real or immediate threat of repeated injury in the future." *Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383, 388 (5th Cir. 2003); *see also Howard v. Green*, 783 F.2d 1311, 1313 n.2 (5th Cir. 1986) ("Past exposure to illegal conduct would not in itself show a present case or controversy for injunctive relief ... if unaccompanied by any present adverse effects.") (citing *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). By the terms of the complaint, it is clear that any harm the class is alleged to have suffered occurred in the past. There is no allegation of present adverse effects or a threat of future harm to the class members.[2]

Rule 23(b)(2) certification is "inappropriate when the majority of the class does not face future harm." *Maldonago*, 493 F.3d at 525 (citing *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 978 (5th Cir. 2000)). Where, as here, not a single member of the putative class of over 200,000 faces present adverse effects or a threat of future harm, 23(b)(2) cannot be the means by which the class is certified, and the plaintiffs must look elsewhere.[3]

---

[2] That an injunction would prevent potential IAs from being duped by the alleged pyramid scheme is of no moment; those potential IAs are not members of the proposed class.

[3] The Court notes that the plaintiffs have specifically requested injunctive relief and not declaratory relief. (Docket No. 60, Second Am. Compl. at 13 ¶ e). Because the Court will not read into the complaint what is not there, whether the plaintiffs could properly request declaratory relief has not been considered. Further, because the Court finds that the plaintiffs do not have standing for certification under 23(b)(2), the Court does not decide whether the requested monetary relief is incidental to the request for injunctive relief.

### C. FRCP 23(b)(3)

Class certification under Rule 23(b)(3) is only available when common questions predominate over any questions affecting individual class members, and when class resolution is the best means of fair and efficient adjudication of the controversy. *See Amchem* 521 U.S. at 615 (quoting Fed. R. Civ. P. 23(b)(3)). "The predominance inquiry is more demanding than the commonality requirement of Rule 23(a) and requires courts to consider how a trial on the merits would be conducted if a class were certified." *Maldonado*, 493 F.3d at 525. The focus is on whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "[T]he superiority analysis requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case." *Maldonado*, 493 F.3d at 525. Economies of time, effort and expense, and the promotion of uniform decisions as to persons similarly situated, without sacrificing procedural fairness, are important considerations. *See* Fed. R. Civ. P. 23(b)(3), 1996 Amendment, Advisory Committee Notes.

Because the 23(b)(3) inquiry requires the Court to consider how a trial on the merits would be conducted, the Court begins with an examination of the plaintiffs' RICO claim.

#### i. RICO Substantive Law

Any person injured in his business or property by reason of a violation of section 1962 can bring a civil cause of action. *See* 18 U.S.C. § 1964(c). To prove a violation of section 1962(c) or (d), a plaintiff must establish three elements: "(1) a person[4] who engages in (2) a pattern of racketeering activity[5] (3) connected to the acquisition, establishment, conduct, or

---

[4] A "person" is an individual or entity capable of holding a legal or beneficial interest in property. *See Whelan v. Winchester Production Co.*, 319 F.3d 225, 229 n.3 (5th Cir. 2003).
[5] "Racketeering activity" is any of the predicate acts defined in 18 U.S.C. § 1961(1), which includes mail fraud and wire fraud.

control of an enterprise[6]." *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 439 (5th Cir. 2000) (quoting *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988) (emphasis omitted, footnotes added). The person who engages in the racketeering activity must be distinct from the enterprise, and the enterprise must be distinct from the series of predicate acts that constitute the racketeering activity. *Id.* For a plaintiff to prevail in a civil RICO action alleging mail and wire fraud, he must "establish proximate cause in order to show injury 'by reason of' a RICO violation." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008). Proximate cause is a flexible concept—not a black letter rule—that demands "some direct relation between the injury asserted and the injurious conduct alleged." *Id.*

### ii. Contentions of the Parties

The defendants argue that certification under Rule 23(b)(3) is improper because common questions do not predominate over questions affecting individual class members. More specifically, the defendants contend that the plaintiffs cannot establish proximate cause, on a classwide basis with classwide proof, that each of the nearly 250,000 proposed class members over the course of many years were defrauded by the defendants. Instead, the argument goes, to establish proximate cause, the plaintiffs will have to introduce individualized evidence as to which alleged misstatements each IA read or heard, and the extent to which that misstatement induced him to join Ignite.

The defendants also argue that to the extent the class relies on the pyramid scheme claim so as to establish classwide proof based on evidence of "whether the Compensation Plan emphasized recruiting over customer gathering,"[7] the deficiency is still not cured. (Docket No.

---

[6] An "enterprise" is "a group of persons or entities associating together for the common purpose of engaging in a course of conduct." *Whalen*, 319 F.3d at 229 (citing *United States v. Turkette*, 425 U.S. 576, 583 (1981)).

[7] The defendants maintain that this is not the standard by which the legality of a multi-level marketing plan is determined.

121, Pls.' Mot. for Class Certification, App. III, Ex. 2 at ¶ 15). Because of the regular promotion activities conducted by Ignite, the economic incentives of the Compensation Plan vary wildly among the class members, depending on when they became IAs. The defendants argue that even under the plaintiffs' proposed legal standard, the answer to whether the defendants operated an illegal pyramid scheme could be different for each IA depending on the promotions available when he enrolled.

In sum, the defendants argue that without individualized proof, the plaintiffs will not be able to establish proximate cause between the asserted injury and alleged RICO scheme, and because questions affecting individual class members will predominate over common questions, the proposed class is not eligible for (b)(3) certification.

The plaintiffs, citing *Bridge*, assert that first-party reliance is not necessary to bring a civil RICO claim predicated on mail or wire fraud, and therefore, they will not have to submit individualized evidence as to each IA. They argue that proximate cause in this instance is akin to a fraud-on-the-market scheme in which it can be rationally inferred that the enticement to invest (i.e. the representations made by the defendants that Ignite is a lucrative financial opportunity) was acted upon by the purchasers of the worthless product (i.e. the 274,000 IAs). The plaintiffs allege that every IA signed the Policies and Procedures, which requires each signatory to acknowledge that he was given and read the materials offered by the defendants. They further allege that the defendants require IAs to use only approved marketing material when recruiting new IAs. Thus, they argue, the existence of 274,000 IAs is circumstantial evidence of classwide reliance (and thus proximate cause) on the defendants' misrepresentations. Accordingly, the plaintiffs maintain, no individual class member need testify about which particular misrepresentation induced him to sign up as an IA.

### iii.   Analysis

In *Bridge*, the Cook County Treasurer's Office auctioned off various tax liens, and the plaintiffs alleged that the defendants circumvented the rules by filing false attestations with the Treasurer's Office, and thereby obtained more than their fair share of liens. The Supreme Court rejected the defendants' first-party reliance argument—that to recover under RICO for mail fraud, the plaintiffs must show that they relied on the alleged false statements, and because the false statements were sent to the Treasurer's Office and never seen by the plaintiffs, the plaintiffs had no claim under the statute. The Court observed, "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations." *Id.* at 649. The Court held that RICO's "by reason of" language only requires the plaintiff to show that the defendant's violation was the proximate cause of his injury. *Id.* at 654. First-party reliance is not an element of a RICO claim predicated on mail or wire fraud, and the plaintiff need not establish first-party reliance to prevail. *Id.* at 661. The Court then found that third-party reliance—the Treasurer's Office relied on the defendants' misrepresentations and the plaintiffs were thereby injured—was sufficient to establish proximate cause. *Id.* at 658. The Court concluded its opinion cautioning, "none of this is to say that a RICO plaintiff who alleged injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations" and "the complete absence of reliance may prevent the plaintiff from establishing proximate cause." *Id.* at 658-59 (emphasis in original).

Though the plaintiffs are correct that they are not required to show first-party reliance, the defendants are equally correct that the plaintiffs must establish proximate cause. The crux of the disagreement is whether there is a manner of proof whereby the plaintiffs can establish classwide proximate cause. Unsurprisingly, the plaintiffs believe there is such a manner of proof.

The defendants, on the other hand, believe the plaintiffs can only make out proximate cause on an individualized basis—by showing first-party reliance on various misrepresentations or parsing out the economic incentives present when each individual class member signed up to be an IA.[8]

The plaintiffs seek 23(b)(3) certification on the theory that because IAs were only allowed to use the defendants' marketing materials (allegedly replete with fraudulent misstatements)[9] when they recruited new IAs, and every class member signed the Policies and Procedures (which contained at least one misstatement)[10] when they became IAs, classwide reliance can be shown without resort to individual testimony. Simply put, the plaintiffs' position is that because every class member saw at least one of the many documents that contained fraudulent misstatements, classwide reliance can be shown. The Court disagrees.

Even assuming that all the defendants' marketing materials contained misstatements and omissions, and that IAs were required to adhere to those materials when recruiting new IAs, it is not apparent, and could not be determined without individual testimony, which specific materials each IA used when recruiting other IAs. Establishing proximate cause in this instance would require each class member to testify or otherwise provide evidence as to which materials he saw, the misstatements he read or heard, and the extent those misstatements induced him to become an IA. Similarly, even assuming the sole identified misstatement in the Policies and Procedures is actually a misstatement, each IA would still be required to provide the counterintuitive testimony that it was that specific misstatement that induced him to become an IA.[11]

---

[8] The plaintiffs have not, indeed could not under these facts, claim third-party reliance.
[9] *See generally* Docket No. 121, Pls.' Mot. for Class Certification, FRE 1006 Misrepresentations and Omissions Chart, App. III, Ex. 8.
[10] *Id.* at ¶ 29.
[11] The notion is counterintuitive because it appears that the Policies and Procedures is similar to an employee manual in that it spells out the dos and don'ts of the position and articulates the legal relationship between Ignite and the IA. As such, it would presumably be given only to those who have made the decision to become IAs; not used as a recruiting device. If these assumptions are correct, then the Policies and Procedures could not have been the catalyst for an IA becoming an IA.

Equally true, the defendants would be entitled to cross-examine each class member on the substance of his testimony. It is at least possible that some number of the class members saw none of the materials or presentations by the defendants and only signed up to become an IA at the prodding of a friend or neighbor IA who did not use those recruitment aids. Furthermore, it could be the case that some especially entrepreneurial class members read the allegedly fraudulent claims about how easy it was to make money, maintained a healthy degree of skepticism regarding those claims, but became IAs nonetheless because they believed they (though not necessarily everyone else) would make a significant amount of money, even if not as much as advertised. Again, the defenants would be entitled to explore all these areas.

In that vein, this case is similar to *David v. Signal International, LLC*, 2012 U.S. Dist. LEXIS 114247, at *106-12 (E.D. La. Jan. 3, 2012). There the plaintiffs, citizens of India, pursued a market approach theory of reliance whereby first-party reliance could be proven by circumstantial, classwide evidence. They claimed that the class members traveled to the United States and worked for the defendant under deplorable conditions because they were enticed by the false promise of a green card. The court rejected the theory because undisputed facts evidenced many possible reasons any given class member came to the United States to work for the defendant.[12]

Here, as in *David*, individualized reliance issues as to the plaintiffs' knowledge, motivations and expectations bear heavily on the proximate cause analysis, rendering 23(b)(3) certification unavailable under that theory.

---

[12] For example, the court observed that some of the class members had previously worked in the United States and therefore must have understood the temporary nature of the H-2B visas they had been issued, yet they still went to work for the defendant. *David*, 2012 U.S. Dist. LEXIS 114247, at *108-09. Another possible reason the court noted was testimony that some of the class members were so adamant about coming to the United States that they were willing to do so even though it might mean not getting a green card. *Id.* at 109.

To the extent the plaintiffs seek 23(b)(3) certification based on a fraud-on-the-market theory and the common sense inference that IAs were duped into joining a pyramid scheme, the Court finds that the class can be certified. Although the litany of reasons any individual class member signed up to become an IA may vary, common sense compels the conclusion that every IA believed they were joining a lawful venture. That the defendants' business opportunity is allegedly an unlawful pyramid scheme in which the vast majority of participants are sure to lose money, gives rise to an inference that the only reason the class members paid the $329 sign-up fee (and possibly other fees) is because the true nature of the "opportunity" was disguised as something it was not. As such, establishing proximate cause would not be an individualized inquiry; rather, it could be determined as to all the class members at once. Because it can rationally be assumed (at least without any contravening evidence) that the legality of the Ignite program was a bedrock assumption of every class member, a showing that the program was actually a facially illegal pyramid scheme would provide the necessary proximate cause.[13] The defendants' knowing misrepresentations about the scheme directly resulted in the losses incurred by the defrauded class members.[14]

The plaintiffs' theory is not novel. In *Negrete v. Allianz Life Insurance Co. of North America*, the plaintiffs in a RICO class action sought to prove causation on a classwide basis on the theory that reliance on the defendant's alleged misrepresentations is the common sense

---

[13] The concept of proximate cause ensures "a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury." *Bridge*, 553 U.S. at 657. If the plaintiffs' allegations are true, their alleged injury—the loss of money—is the direct result of the defendants' fraud. *See id.* at 658. "It [is] a foreseeable and natural consequence of [the defendants'] [pyramid] scheme" that the vast majority of the unwitting IAs would lose money. *Id.*

[14] To the extent this seems to conflict with the Court's reasoning in denying 23(b)(3) certification under the plaintiffs' misrepresentation theory, the Court notes that the misrepresentation theory rested on the fact that every IA read or saw at least one of the many misstatements in the defendants' marketing materials and Policies and Procedures. Whereas here, all the class members are presumed to be relying on the same misrepresentation—that the Ignite business opportunity was a legal, non-fraudulent venture. In the former scenario, individual issues would predominate for the reasons previously stated. In this latter scenario, the issue is classwide.

explanation for class members' purchasing decisions. 287 F.R.D. 590, 611-12 (C.D. Cal. 2012). The court allowed the plaintiffs to prove classwide reliance under that theory, explaining:

> "That [the defendant's] annuities are allegedly inferior in value and performance to comparable investment products…gives rise to an inference that consumers decided to purchase the 'inferior' annuities because of the standardized marketing materials at issue…for they otherwise had no reason to do so. Consumers are nearly certain to rely on prominent (and prominently marketed) features of a product which they purchase, particularly where there are not otherwise compelling reasons for purchasing a product that is allegedly worth less than the purchase price."

287 F.R.D. at 612.

Similarly, in *Peterson v. H & R Block Tax Services, Inc.*, the court certified the class under the presumption that the class members relied on the defendant's alleged misrepresentations. 174 F.R.D. 78, 84-85 (N.D. Ill. 1997). The court so concluded because it found the presumption logical and the allegations in the complaint made reliance apparent. The plaintiffs alleged that each class member paid a significant fee for a service for which no class member was eligible. The court held that reliance was apparent because "it is inconceivable that the class members would rationally choose to pay a fee for a service they knew was unavailable." *Id.*

The central claim in the case before this Court is that the defendants purported to be offering a potentially lucrative business opportunity for an initial fee of $329 when in actuality all that was being offered was a position as a pawn in an illegal pyramid scheme. It defies rational thought that the class members would knowingly pay for that "opportunity." Because both logical inference and circumstantial evidence allow the class members to establish

proximate cause on a classwide basis, the Court finds that common, rather than individual issues, predominate.[15]

The Court also finds that a class action is the superior method of adjudication of this controversy. Having carefully reviewed the facts, claims and substantive law, the Court is convinced that a class action would promote economies of time and uniform decisions among similarly situated individuals. The Court also takes note of the fact that in light of the relatively small individual claims at issue, relief is unlikely if each proposed class member proceeded individually. *See Amchem*, 521 U.S. at 616.

For these reasons, the Court finds certification under Rule 23(b)(3) to be proper.

D.   **Class Members Subject to Arbitration**

The parties disagree about which IAs are eligible for inclusion in the putative class. Because the Court has certified the class, it is now necessary to resolve this dispute.

i.   **Arbitration Clause as to Fifth Circuit *Torres* Decision**

When this action was first filed, the defendants filed a motion to dismiss arguing, *inter alia*, that all IAs were subject to the arbitration agreement they entered into with the defendants.[16] The Court granted the motion, but the Fifth Circuit reversed, finding the agreement to arbitrate illusory and thus void. *See Torres v. SGE Management*, 397 F. App'x 63, 66 (5th Cir. 2010). After remand and as the litigation proceeded, Ignite modified its arbitration clause in an attempt to cure the deficiencies identified by the Fifth Circuit. On March 3, 2011, it amended its

---

[15] The Court is unpersuaded by the defendants' contention that calculating damages would require individualized mini-trials, precluding certification. Here, damages are capable of computation by objective standards. *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006) ("[C]alculating damages on an individual basis will not…preclude class certification…where individual damages [can] be determined by reference to a mathematical or formulaic calculation") (citation omitted). Furthermore, the pertinent records are in the defendants' possession. Although the damage calculations only provide a snapshot in time, that photograph can be taken on the eve of trial so as to provide the most up-to-date picture of who has lost money and the exact amount of the loss.
[16] The arbitration agreement is contained in the Policies and Procedures that all IAs signed upon becoming IAs.

Policies and Procedures to include the modified arbitration agreement, which became effective April 3, 2011.

The defendants then submitted a motion to amend their answer to add an affirmative defense and the motion was granted. The new defense is that all IAs who joined Ignite on or after the effective date of the new arbitration agreement are subject to arbitration and cannot be a member of this class. Having reviewed the Fifth Circuit's opinion in *Torres* and the amended arbitration agreement, the Court finds that the deficiencies have been cured. Accordingly, the class is limited to IAs who joined Ignite beginning January 1, 2005, through April 2, 2011.

### ii. Arbitration Clause as to Eleventh Circuit *Betts* Decision

In *Betts v. SGE Management*, the Eleventh Circuit found Ignite's original arbitration agreement (the one the Fifth Circuit found illusory and void) to be valid and enforceable. 402 F. App'x 475 (11th Cir. 2010). Accordingly, it dismissed the case and its putative class of 10,000 IAs, all residents of Georgia, and required them to submit to arbitration if they wished to pursue their claims. The defendants allege that instead of the Georgia IAs initiating arbitration proceedings, the plaintiffs in this action expanded the scope of the proposed class to include the Georgia IAs.

The four elements of res judicata are: "(1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions." *Test Masters Educational Services, Inc. v. Singh*, 438 F.3d 559, 571 (5th Cir. 2005) (citing *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 395 (5th Cir. 2004). Because the Court is satisfied that all the element of res judicata are met here, the Georgia IAs are bound by the decision in *Betts*, and cannot be included in the certified class.

## V. CONCLUSION

For the foregoing reasons, the plaintiffs' motion for class certification under Rule 23(b)(2) is DENIED and the motion for class certification under Rule 23(b)(3) is GRANTED. The class will consist of all IAs who joined Ignite on or after January 1, 2005, through April 2, 2011, excluding the IAs subject to the Eleventh Circuit opinion in *Betts*. The Court appoints, from the law firms Clearman Prebeg LLP and Sommers Schwartz P.C., Scott Clearman, Andrew Kochanowski and Matthew Prebeg as class counsel.

**IT IS SO ORDERED.**

SIGNED on this 13th day of January, 2014.

_____
Kenneth M. Hoyt
United States District Judge